**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

EVANSTON INSURANCE COMPANY :
: NO.:
    Plaintiff :
 vs. : CIVIL ACTION - LAW
:
WEXFORD HEALTH SOURCES, INC. :
:
    Defendant : **DECLARATORY JUDGMENT ACTION**
:
:

**COMPLAINT FOR DECLARATORY JUDGMENT**

   Plaintiff Evanston Insurance Company ("Evanston"), by and through its undersigned counsel and hereby files this action for declaratory relief, and in support thereof avers as follows:

**The Parties**

   1.  Plaintiff, Evanston, is an Illinois corporation with its principal place of business located at Ten Parkway North, Deerfield, IL 60015.

   2.  Defendant, Wexford Health Sources, Inc. ("Wexford") is a Florida Corporation with a principal place of business located at 501 Holiday Drive, Foster Plaza 4, Pittsburgh, PA 15220.

**Jurisdiction**

   3.  This is an action for Declaratory Judgment filed pursuant to 28 U.S.C.A. §2201 *et seq.* and Fed. R. Civ. P. No. 57, to determine a question of actual controversy among the parties as is more particularly described herein, and to ascertain rights, duties and obligations, if any, under a certain insurance policy.

   4.  Evanston and Defendants are citizens of different states, creating diversity of citizenship sufficient to support this Court's jurisdiction, pursuant to 28 U.S.C.A. §1332.

1

5.     The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     This case arises from claims brought against Wexford, for which it has sought and may continue to seek defense and/or indemnification from Evanston, as set forth in more detail below.

7.     An actual controversy has arisen among and between Evanston and Wexford, with respect to rights and obligations under the terms of an insurance policy issued by Evanston to Wexford, as set forth in more detail below.

8.     As a result of the coverage controversy, Evanston seeks a declaration of its rights and/or responsibilities under the aforementioned policies.

## The Evanston Policy

9.     The Evanston Insurance Company issued Medical Professions Professional Liability Insurance Policy, No. SM903254, to The Bantry Group Corporation D/B/A Wexford Health Sources, Inc., for the Policy Period October 1, 2014 to October 1, 2015 (the "Policy") (a true and correct copy of the Policy, including the Policy declarations and all applicable endorsements, is attached hereto, made part hereof, and identified as Exhibit "A").

10.     The Policy contains the following provision:

**Limit of Liability-Reduction for Refusal to Settle:** The Company shall not settle any Claim with the consent of the Insured. If, however, the Insured is a partnership, professional association, professional corporation or limited liability company, the written consent of an Insured who was formerly but is no longer a member of the partnership, professional association or limited liability company or director, officer, stockholder or Employee of a professional corporation will not be required, provided the written consent of the corporate directors, officers, stockholders or Employees of a professional corporation, or their duly appointed representatives, has been obtained. If, however, the Insured shall refuse to consent to any settlement recommended by the Company and shall elect to contest the Claim or continue any legal proceedings in connection with such Claim, then the Company's liability for the Claim shall not exceed the amount for which the Claim could have been settled including Claim Expenses incurred up to the date

of such refusal. Such amounts are subject to the provisions of the above. Limits of Liability A. and B.

(Ex. A, Limits of Liability C.)

11. The Policy defines the term "Claim" as "a demand received by the Insured for monetary damages or services and shall include the service of suit or institution of arbitration proceedings against the Insured." (Ex. A, Definitions B.)

12. The Policy defines the term "Claims Expenses" as follows:

Claim Expenses means reasonable and necessary amounts incurred by the Company or by the Insured with the prior written consent of the Company in the defense of that portion of any Claim for which coverage is afforded under this Coverage Part, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals, provided, however, that Claim Expenses shall not include: (1) salary, wages, overhead, or benefit expenses of or associated with Employees or officials of the Named insured or employees or officials of the Company, or (2) salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for the Named Insured or the Company.

Claim Expenses also includes those attorneys fees as provided under the Prisoner Litigation Reform Act.

(Ex. A, Endorsement 26 – Amendment of Definitions: Damages and Claim Expenses)

13. The Policy defines the term "Damages" as follows:

Damages means the monetary portion of any judgment, award or settlement; provided, however that Damages shall not include: (1) multiplied portions of damages in excess of actual damages, including trebling of damages; (2) taxes, criminal or civil fines, or penalties imposed by law; (3) sanctions; (4) matters which are uninsurable under the law pursuant to which this policy shall be construed; or (5) the return of or restitution of fees, profits or charges for services rendered.

(Ex. A, Endorsement 26 – Amendment of Definitions: Damages and Claim Expenses)

### Factual and Procedural History

14.     On August 14, 2014, Claimant, Lamont Hall, filed a Complaint in the United States District Court for the Northern District of Illinois, Eastern Division, entitled <u>Lamont Hall v Arthur Funk, M.D. and Wexford Health Sources, Inc.</u>, and filed at Case No. 14-cv-6308. Claimant filed an Amended Complaint on April 17, 2015 (a copy of the <u>Hall</u> First Amended Complaint is attached hereto as Exhibit "B").

15.     The <u>Hall</u> Complaint alleges that from on or about February 8, 2013, to on or about October 4, 2013, Lamont Hall was incarcerated at Statesville Correctional Center, a prison facility operated by the Illinois Department of Corrections ("IODC").

16.     Hall alleged that he was denied proper medical treatment by Dr. Funk and Wexford while at the IODC for a gunshot wound sustained prior to his incarceration. The Complaint asserted claims for Eighth Amendment Violations, Malpractice, and Intentional Infliction of Emotional Distress.

17.     Wexford tendered the <u>Hall</u> Complaint to Evanston for coverage.

18.     Evanston determined that the <u>Hall</u> action constituted a covered Claim under the Policy (the "<u>Hall</u> Claim") and accordingly accepted the tender and assigned defense counsel to defend its Insureds against the <u>Hall</u> Claim.

19.     On June 1, 2016, Evanston notified Wexford that Mr. Hall had indicated a willingness to settle the <u>Hall</u> Claim for $120,000 and requested Wexford's consent to settle per the provision of the policy (a true and correct copy of Evanston's letter is attached hereto as Exhibit "C").

20.     The June 1, 2016 letter quoted the Policy's Limit of Liability – Reduction for Refusal to Settle provision in its entirety and specifically advised Wexford:

> Should you maintain the position that you will not consent to settlement of this matter at any amount up to and including $120,000.00, or any other such amount as may be recommended by the Company, the Company will not be liable for more than the amount for which the Claim could have been so settled, including Claim Expenses incurred up to the date of your refusal to consent.

(Ex. C at 2.)

21.     Evanston has provided insurance coverage for Wexford and its healthcare employees for a number of years. Over this period of time, Evanston has issued over 100 letters advising Wexford of Evanston's willingness to settle various Claims, and seeking Wexford's consent to settle. Wexford has alternatively withheld consent to settle or has provided consent to settle these matters throughout the course of its relationship with Evanston.

22.     On at least one of these prior instances, Wexford did not provide consent to settle and the matter proceeded to resolution in excess of the amount set forth in Evanston's letter. On this occasion, Wexford paid the difference between the amount set forth in Evanston's letter and the resolution of the Claim.

23.     Wexford did not provide its consent to settle the <u>Hall</u> matter as requested by Evanston on June 1, 2016, requiring Evanston to continue to incur Claims Expenses defending the matter through trial.

24.     A jury trial was held beginning on April 9, 2018. On April 16, 2018, the jury reached a verdict in favor of Mr. Hall. The jury awarded $125,000 in compensatory damages and $300,000 in punitive damages against Wexford only. The jury did not award any damages against the co-defendant, Arthur Funk, M.D.

25.     Evanston promptly advised Wexford that it's duty to indemnify Wexford for the <u>Hall</u> verdict was limited to $120,000, citing the June 1, 2016 letter which invoked the Evanston policy condition for refusal to provide consent to settle.

26.     On April 16, 2018, a judgment was entered against Wexford in the amount of $425,000.  The judgment included $125,000 in compensatory damages and $300,000 in punitive damages (a copy of the judgment is attached hereto as Exhibit "D").

27.     On March 18, 2019, an award of attorneys' fees in the amount of $551,758.05 was entered against Wexford (a copy of the award is attached hereto as Exhibit "E").

28.     On June 4, 2019, Evanston issued a Reservation of Rights letter to Wexford.  Among other things, the letter reminded Wexford that Evanston's liability for Damages and Claim Expenses had been capped by Wexford's refusal to consent to the $120,000 settlement recommended by Evanston in June 2016.  The letter also stated that Evanston had no duty to indemnify Wexford for punitive damages (a true and correct copy of Evanston's Reservation of Rights letter is attached hereto as Exhibit "F").

**Count I**

29.     Plaintiff hereby incorporates the foregoing averments as if the same were set forth at length herein.

30.     Under the terms of the Policy, Evanston must obtain its Insured's consent prior to settling an action on behalf of its insured.

31.     In the event an Insured refuses a settlement recommended by Evanston, the Policy, pursuant to the Limit of Liability – Reduction for Refusal to Settle provision, caps Evanston's liability at the amount for which the matter could have been settled and Claims Expenses incurred up to the date of the Insured's refusal to consent to the recommended settlement.

32.     Evanston advised Wexford of Plaintiff's willingness to settle the Hall action for $120,000 and sought Wexford's consent to settle.

33.     Wexford did not consent to settle the Hall action for $120,000.

WHEREFORE, Evanston is entitled to judgment declaring that (a) Evanston's duty to indemnify Wexford for the <u>Hall</u> judgment is limited to $120,000; and (b) Wexford is responsible for all Claim Expenses incurred in defense of the <u>Hall</u> Claim after the date of its refusal to consent to settlement.

### Count II

34.     Plaintiff hereby incorporates the foregoing averments as if the same were set forth at length herein.

35.     The Policy provides coverage for "damages" as that term is defined in the policy.  The definition of "damages" expressly does not include "matters which are uninsurable under the law pursuant to which this policy shall be construed".

36.     The punitive damages award against Wexford is uninsurable under all laws governing the Policy.

37.     Evanston has no duty to indemnify Wexford for the punitive damage award in the <u>Hall</u> action.


WHEREFORE, Plaintiff Evanston Insurance Company respectfully requests that this Honorable Court enter judgment in its favor and further enter the following decree, declaring:


a. That the Limit of Liability – Reduction for Refusal to Settle provision contained in the Evanston Policy is applicable and Evanston's maximum duty to indemnify Wexford in the Hall action is limited to $120,000;

b. That the Limit of Liability – Reduction for Refusal to Settle provision contained in the Evanston Policy requires Wexford to reimburse Evanston for all Claim Expenses incurred in defense of the <u>Hall</u> action after the date of its refusal to consent to Evanston's recommended settlement;

7

c. That there is no duty to indemnify Wexford under Evanston Policy for punitive damages assessed against Wexford;

d. That the Court enter such additional and further relief as the Court may deem to be appropriate under the circumstances.

Evanston Insurance Company


/s/ Kevin P. McJessy          

McJessy Ching & Thompson, LLC
Counsel for Plaintiff
3759 N. Ravenswood Ave., Ste. 231
Chicago, IL 60613
(773) 880-1260
(773) 880-1265 Fax
borders@mcandt.com
mcjessy@mcandt.com

# EXHIBIT "A"

<u>Insurer:</u>



# EVANSTON INSURANCE COMPANY

[A stock insurance company, herein called the Company, which except in Illinois is a non-admitted insurer, writing pursuant to the surplus lines laws and not under the jurisdiction of the Insurance Commissioner.]

# ▌▌ EVANSTON INSURANCE COMPANY

MARKEL®

Policy No. SM903254
Prev. No. SM896570
Prod. No. 31980

## DECLARATIONS – SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE – CLAIMS MADE COVERAGE

### SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED OPERATIONS LIABILITY) INSURANCE - CLAIMS MADE COVERAGE

**Claims Made Coverage:** The coverage afforded by this policy is limited to liability for only those Claims that are first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised.

**Notice:** This is a duty to defend policy. Additionally, this policy contains provisions that reduce the limits of liability stated in the policy by the costs of legal defense and permit legal defense costs to be applied against the deductible, unless the policy is amended by endorsement. Please read the policy carefully.

1. **NAMED INSURED:** THE BANTRY GROUP CORPORATION DBA: WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL MANAGEMENT

2. **BUSINESS ADDRESS:**
   501 HOLIDAY DRIVE, FOSTER PLAZA 4
   PITTSBURGH, PA 15220

3. **POLICY PERIOD:** From October 1, 2014 to October 1, 2015
   12:01 A.M. Standard Time at address of Insured stated above

4. **PROFESSIONAL SERVICES:**

   Correctional Medical, Dental Mental Health Services as required by Contract for Locations Afforded Coverage under this Policy

5. **SPECIFIED PRODUCTS, GOODS, OPERATIONS AND PREMISES COVERED:**
   Correctional Healthcare Operation as required by Contract for Locations Afforded Coverage under this Policy; all related premises and operations of the Insured

6. **LIMITS OF LIABILITY:**

   I.  For Professional Liability:

   | | | |
   |---|---|---|
   | A. | Each Claim: | $ 3,000,000 |
   | B. | Aggregate: | $10,000,000 |

   II. For General Liability:

   A. For Coverage A. (Bodily Injury and Property Damage Liability):

   | | | |
   |---|---|---|
   | (i) | Each Occurrence: | $ 3,000,000 |
   | (ii) | Damage to Premises – Any One Premises: | $    100,000 |

   B. For Coverage B. (Personal Injury and Advertising Injury Liability):

   | | | |
   |---|---|---|
   | (i) | Each Person or Organization: | $ 3,000,000 |

   C. For Coverage C. (Medical Payments):

   | | | |
   |---|---|---|
   | (i) | Each Injured Person: | $      5,000 |
   | D. | Aggregate – All Coverages: | $10,000,000 |

Policy No. SM903254

7. **DEDUCTIBLE:**

    I.  For Professional Liability:

        A.  Each Claim:            $    50,000

    II.  For General Liability:

        A.  For Coverage A. (Bodily Injury and Property Damage Liability):

            Each Occurrence:          $    50,000

        B.  For Coverage B. (Personal Injury and Advertising Injury Liability):

            Each Person or Organization:      $    50,000

8. **RETROACTIVE DATE:**

    I.  For Professional Liability:    October 1, 2008
    II.  For General Liability:       October 1, 2008

9. **RATE:**    Refer to Endorsement No. 31

    **PREMIUM BASE:**    ADC in excess of 95,000

10. **PREMIUM FOR POLICY PERIOD:**              REDACTED

    Minimum
    Deposit

11. **PREMIUM FOR EXTENDED REPORTING PERIOD:**

    75% for 12 months; 100% for 24 months; 125% for 36 months; 150% for 48 months; 150% for 60 months respectively

12. The Insured is not a proprietor, superintendent, executive officer, director, partner, trustee or employee of any hospital, sanitarium, clinic with bed-and-board facilities, laboratory, or any business enterprise not named in Item 1. hereinabove, except as follows:

    None

**Policy No.** SM903254

13.   **ENDORSEMENTS ATTACHED AT POLICY INCEPTION:**

| | |
|---|---|
| 1. EIC 4115-01 | 25% Minimum Earned Premium Endorsement |
| 2. EIC 832-01 | Asbestos Exclusion |
| 3. ZZ-44002-01 | Mold Exclusion |
| 4. MEIL 5229 09 10 | Longer Duration Extended Reporting Period Availability |
| 5. EIC 4638-02 | Certified Acts of Terrorism Endorsement |
| 6. MEIL 5410 02 12 | Amendment of Definitions and Exclusions - Electronic Data and Distribution of Material in Violation of Statutes |
| 7. MEIL 1313 02 12 | Amendment of Definitions and Exclusions - Electronic Data and Distribution of Material in Violation of Statutes |
| 8. MEIL 1228 02 14 | Non-Stacking Limitation When Two Or More Policies Apply |
| 9. MEIL 1323 09 13 | Conditional Exclusion of Terrorism |
| 10. MPIL 1069 09 13 | Notice to Policyholders Potential Restriction of Terrorism Coverage |
| 11. IL 09 10 12 03 | Pennsylvania Notice |
| 12. MESM 2031 10 12 | Amendatory Endorsement - Civil Rights Violation |
| 13. Manuscript | Amendatory Endorsement |
| 14. MESM 2001 03 14 | Amendment of the Insured B - Addition of Physician/Surgeon/Dentist/Podiatrist |
| 15. EIC 4653 | Employee Benefits Liability Coverage - Coverage D. |
| 16. EIC 4655 | Amendment of Cancellation |
| 17. MESM 1008 12 13 | Additional Insured Endorsement - Professional Liability (Required By Contract) |
| 18. EIC 4772 10/08 | Amendment of The Insured - Addition of Independent Contractor |
| 19. EIC 4842 | Amendment of General Liability Coverage A. - Hired and Non-Owned Automobile Liability |
| 20. MESM 2093 01 14 | Crisis Management Emergency Response Expense Reimbursement Coverage |
| 21. MESM 2055 02 13 | Risk Management Services Expense Reimbursement |
| 22. EIC 4698 | Sexual Acts Liability Endorsement |
| 23. EIC 4656 10 12 | Claim Expenses In Addition to the Each Claim Limits of Liability |
| 24. Manuscript | Schedule of Contracts Covered Under This Policy |
| 25. Manuscript | Schedule of Premium Payments |
| 26. Manuscript | Amendment of Definitions: Damages and Claim Expenses |
| 27. Manuscript | Amendment of Insuring Agreement and Definitions |
| 28. EIC 4696 | Aggregate Policy Limit |
| 29. EIC 4691 | Government Access to Records Endorsement |
| 30. EIC 4671 | Additional Insured Endorsement - Bodily Injury/Property Damage (Blanket) |
| 31. Manuscript | Amendment of Declarations Item 9. Rate and Premium Base |

14.   **NOTICES:**

Notices required to be provided to the Company under this policy shall be addressed to:

**CLAIM NOTICES:**

Claims Service Center
MARKEL SERVICE, INCORPORATED
Ten Parkway North
Deerfield, Illinois 60015

Fax: (855) 662-7535
E-mail: newclaims@markelcorp.com

**ALL OTHER NOTICES:**

MARKEL NORTHEAST
a division of Markel Service, Incorporated
310 Highway 35 South
Red Bank, NJ 07701

Fax: (866) 730-1027

Authorized Representative

Policy Form: SM-20003-01 04/08
Dec: SM-10003-01 04/08
Date Printed: October 21, 2014

## POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

RE: Policy Number: SM903254
Insured: THE BANTRY GROUP CORPORATION DBA: WEXFORD HEALTH SOURCES INC. AND
BALLYMORE MEDICAL MANAGEMENT
Insurer: EVANSTON INSURANCE COMPANY
Risk ID. No.: 2166124

You are hereby notified that under the Terrorism Risk Insurance Act as amended in 2007 the definition of terrorism has changed. *As defined in Section 102(1) of the Act*: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Under the Act, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. The Act requires EVANSTON INSURANCE COMPANY to also notify you that Terrorism Coverage required to be offered by the Act for losses caused by certified acts of terrorism is partially reimbursed by the United States Government under a formula established by federal law. Under this formula, the United States Government generally pays 85% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this terrorism coverage is provided below and does not include any charges for the portion of loss covered by the federal government under the Act.

The Terrorism Risk Insurance Act as amended, contains a $100 billion cap that limits United States Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

Nothing in this notice affects or modifies your coverage except and only to the extent specifically required by the Act. You should also know that under federal law you are NOT required to purchase terrorism coverage.

Certified Acts of Terrorism coverage is provided for no additional premium.

# Markel's Designed Protection®
## Risk Management Resource
## Allied Health Care (Specified Medical) Professions

Welcome to Markel's Designed Protection® leading edge Risk Management Resources.

The following risk management resources are available exclusively to our policyholders at our website www.markelcorp.com/riskmanagement at *no additional cost*.

## HOW TO QUICKLY ACCESS RISK MANAGEMENT RESOURCES:

Step 1.    Go onto our website, www.markelcorp.com/riskmanagement.

Step 2.    Select the Designed Protection services that apply to your policy, to get to the Login screen.

Step 3.    Review the disclaimer, enter your current policy number and click on the button below to access. Your policy number is SM000000.

If you need technical assistance during the log in process, call (866) 932-2433, x113719.

### Available Risk Management Resource:

- **Designed Protection® Risk Management Telephone Hotline for Allied Health Care (Specified Medical) Professions**

    This confidential telephone hotline is staffed by healthcare professional defense attorneys that are available to answer general risk management questions.



# EVANSTON INSURANCE COMPANY

**MARKEL®**

## Endorsement

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.: SM903254 |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.: 1 |
| MANAGEMENT | Effective Date of Endorsement: October 1, 2014 |

### 25% MINIMUM EARNED PREMIUM ENDORSEMENT

In consideration of the premium paid, it is hereby understood and agreed that in the event that this policy is cancelled by the Named Insured, the policy premium is subject to a minimum earned premium of twenty-five percent (25%) of the total premium.

All other provisions of the policy shall remain unchanged.

**EIC 4115-01 2/03**                                                                                             **Page 1 of 1**

 **EVANSTON INSURANCE COMPANY**

MARKEL®

## Endorsement

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.: SM903254 |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.: 2 |
| MANAGEMENT | Effective Date of Endorsement: October 1, 2014 |

### ASBESTOS EXCLUSION

In consideration of the premium paid, it is hereby understood and agreed that the insurance provided by this policy shall not apply to any Claim, loss or expense caused by, resulting from or arising out of asbestos, asbestos fibers or any product or material containing asbestos in any form, under any theory of liability whatsoever.

It is further agreed that the Company shall have no duty to defend or to pay or reimburse for any fees, costs or expenses in the investigation or defense of any Claim excluded herein.

All other provisions of the policy shall remain unchanged.

**EIC 832-01 10/02** **Page 1 of 1**

# **EVANSTON INSURANCE COMPANY**
**MARKEL®**

## **Endorsement**

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.: SM903254 |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.: 3 |
| MANAGEMENT | Effective Date of Endorsement: October 1, 2014 |

### **MOLD EXCLUSION**

In consideration of the premium paid, it is hereby understood and agreed that this policy does not apply to any Claim based upon, arising out of, or in any way involving **Mold** or **Mold Event**.

Solely for the purposes of this endorsement:

**Mold** means any permanent or transient fungus, mold, mildew or mycotoxin, or any of the spores, scents or by-products resulting therefrom that exist, emanate from or move anywhere indoors or outdoors, regardless of whether they are proved to cause disease, injury or damage.

**Mold Event** means any actual, alleged or threat of contact with, exposure to, or inhalation, ingestion, absorption, discharge, dispersal, seepage, migration, release, escape, presence, growth or reproduction of **Mold**.

All other provisions of the policy shall remain unchanged.



**INTERLINE**
POLICY NUMBER: SM903254

**MARKEL®**

## EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LONGER DURATION EXTENDED REPORTING PERIOD AVAILABILITY

This endorsement modifies insurance provided under the following:

PHYSICIANS, SURGEONS, DENTISTS AND PODIATRISTS PROFESSIONAL LIABILITY INSURANCE POLICY
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE POLICY
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART - CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE
    COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED
    OPERATIONS LIABILITY) INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE
LOCUM TENENS AND CONTRACT STAFFING PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
LOCUM TENENS AND CONTRACT STAFFING GENERAL LIABILITY INSURANCE (INCLUDING PRODUCTS AND
    COMPLETED OPERATIONS LIABILITY) COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that in addition to the availability of the Extended Reporting Period for the period of months stated in Item 11. of the Declarations, an Extended Reporting Period of the following duration shall also be available:

48 months;
60 months;
72 months; or
84 months.

The Named Insured must make a written request for the longer duration Extended Reporting Period received by the Company within 10 days after the end of the Policy Period. The written request must specify from the options stated above which period of Extended Reporting Period is requested. The Company will determine the additional premium to be charged for such Extended Reporting Period.

The Company will provide to the Named Insured in writing the amount of the additional premium for an Extended Reporting Period of the duration specified within 10 days of receipt of the Named Insured's written request.

All other terms and conditions of the Section Extended Reporting Period shall apply with regard to the Named Insured's exercise of any such longer duration Extended Reporting Period.

All other terms and conditions remain unchanged.

**MEIL 5229 09 10**                                                                                              **Page 1 of 1**

**INTERLINE**

**MARKEL®**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CERTIFIED ACTS OF TERRORISM ENDORSEMENT

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED
OPERATIONS LIABILITY) INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED
OPERATIONS LIABILITY) INSURANCE COVERAGE PART – OCCURRENCE COVERAGE
LOCUM TENENS AND CONTRACT STAFFING GENERAL LIABILITY INSURANCE (INCLUDING PRODUCTS AND
COMPLETED OPERATIONS LIABILITY) COVERAGE PART - CLAIMS MADE COVERAGE
LOCUM TENENS AND CONTRACT STAFFING GENERAL LIABILITY INSURANCE (INCLUDING PRODUCTS AND
COMPLETED OPERATIONS LIABILITY) COVERAGE PART - OCCURRENCE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that, with respect to any Claim otherwise covered hereunder, this Coverage Part shall not exclude any Claim based upon, arising out of, or in any way involving any Certified Act of Terrorism.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance of Act. The federal Terrorism Risk Insurance of Act sets forth the following criteria for a Certified Act of Terrorism:

1.     The act resulted in insured losses in excess of $5 million in the aggregate attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.     The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and the Company has met the Company's deductible under the Terrorism Risk Insurance Act, the Company shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such cases insured losses up to that amount are subject to pro rata allocation in accordance with the procedures established by the Secretary of Treasury.

All other provisions of the policy shall remain unchanged.

**EIC 4638-02 01/08**                                                                                    **Page 1 of 1**

**INTERLINE**

**MARKEL®**  **EVANSTON INSURANCE COMPANY**

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF DEFINITIONS AND EXCLUSIONS – ELECTRONIC DATA AND DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES

This endorsement modifies insurance provided under the following:

LOCUM TENENS AND CONTRACT STAFFING PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE POLICY
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART – CLAIMS MADE
   COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE
   COVERAGE
PHYSICIANS, SURGEONS, DENTISTS AND PODIATRISTS AND PROFESSIONAL LIABILITY INSURANCE POLICY

Section The Exclusions is amended by the addition of the following:

any Claim based upon or arising out of any violation of:

**(a)** the Telephone Consumer Protection Act of 1991 (TCPA) and amendments thereto or any similar or related federal or state statute, law, rule, ordinance or regulation;

**(b)** the CAN-SPAM Act of 2003 and amendments thereto or any similar or related federal or state statute, law, rule, ordinance or regulation; or

**(c)** any other statute, law, rule, ordinance or regulation that prohibits or limits the sending, transmitting, communication or distribution of information or other material.

All other terms and conditions remain unchanged.

**MEIL 5410 02 12**  **Page 1 of 1**

**INTERLINE**

**MARKEL®**     **EVANSTON INSURANCE COMPANY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF DEFINITIONS AND EXCLUSIONS – ELECTRONIC DATA AND DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES

This endorsement modifies insurance provided under the following:

GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED OPERATIONS LIABILITY) INSURANCE POLICY
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED
   OPERATIONS LIABILITY) COVERAGE PART – OCCURRENCE COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED
   OPERATIONS LIABILITY) INSURANCE COVERAGE PART – CLAIMS MADE COVERAGE

1.    Section Definitions is amended by the addition of the following:

     **Electronic Data** means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or other media which are used with electronically controlled equipment.

2.    Section Definitions, Property Damage, is deleted and replaced as follows:

     **Property Damage** means:

     1.    physical injury to or destruction of tangible property, including consequential loss of use thereof; or

     2.    loss of use of tangible property which has not been physically injured or destroyed; provided, however, such loss of use is caused by an Occurrence;

     provided, however, tangible property shall not include Electronic Data.

3.    Section The Exclusions A. is amended by the addition of the following:

     any Claim based upon or arising out of any violation of:

     **(a)**    the Telephone Consumer Protection Act of 1991 (TCPA) and amendments thereto or any similar or related federal or state statute, law, rule, ordinance or regulation;

     **(b)**    the CAN-SPAM Act of 2003 and amendments thereto or any similar or related federal or state statute, law, rule, ordinance or regulation; or

     **(c)**    any other statute, law, rule, ordinance or regulation that prohibits or limits the sending, transmitting, communication or distribution of information or other material.

All other terms and conditions remain unchanged.

**MEIL 1313 02 12**                                      **Page 1 of 1**

**INTERLINE**

**MARKEL®**     **EVANSTON INSURANCE COMPANY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NON-STACKING LIMITATION WHEN TWO OR MORE POLICIES APPLY

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED
   OPERATIONS LIABILITY) COVERAGE PART – OCCURRENCE COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED
   OPERATIONS LIABILITY) INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE
   COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART – CLAIMS MADE COVERAGE

In consideration of the premium paid, it is understood and agreed that the following is added to both Other Conditions B., Other Insurance of the General Liability Coverage Parts and to Other Insurance of the Professional Liability Coverage Parts:

If any Claim under this policy is also covered by one or more policies issued by the Company or any of its affiliated companies affording coverage to the Named Insured or to any organization or person who controls, is controlled by, or is affiliated by common control with the Named Insured unless such other insurance is written only as specific excess insurance or umbrella insurance over the Limits of Liability provided in this policy, then with respect to such Claim:

1. The Limit of Liability available under this policy will be equal to the percentage that this policy's available Limit of Liability bears to the total combined Limits of Liability available under all applicable policies; and

2. The total Limit of Liability available for such Claim shall not exceed the greater/est available Limit of Liability remaining on all such policies and its payment shall extinguish the Company's and its affiliated companies' liability on all such policies for such Claim.

Nothing contained in this endorsement shall be construed to increase the Limits of Liability of this Policy.

All other terms and conditions remain unchanged.

**MEIL 1228 02 14**                                                                                      **Page 1 of 1**

**INTERLINE**

**MARKEL®**  **EVANSTON INSURANCE COMPANY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONDITIONAL EXCLUSION OF TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT)

This endorsement modifies insurance provided under the following:

GENERAL LIABILITY INSURANCE POLICY
LOCUM TENENS AND CONTRACT STAFFING GENERAL LIABILITY INSURANCE COVERAGE PART - CLAIMS
MADE COVERAGE
LOCUM TENENS AND CONTRACT STAFFING GENERAL LIABILITY INSURANCE COVERAGE PART -
OCCURRENCE COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITYINSURANCE COVERAGE PART - CLAIMS MADE
COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – OCCURRENCE
COVERAGE
SPECIFIED PRODUCTS AND COMPLETED OPERATIONS LIABILITY INSURANCE POLICY
SPECIFIED PROFESSIONAL AND SPECIFIED GENERAL LIABILITY POLICY – COVERAGE B. ONLY

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

A. Applicability of the Provisions of This Endorsement

1. The provisions of this endorsement shall become applicable commencing on the date when one or more of the following first happens or the inception date of this policy if the Policy Period in which this endorsement applies begins after such date:

   a. The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act, has terminated with respect to the type of insurance provided under this Coverage Part or policy; or

   b. A renewal, extension or replacement of the Program has become effective without a requirement to make terrorism coverage available and with revisions that:

      (1) Increase the Company's statutory percentage deductible under the Program for terrorism losses;

      (2) Decrease the United States Government's statutory percentage share in potential terrorism losses above such deductible; or

      (3) Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.

2. If the provisions of this endorsement become applicable, such provisions:

   a. For Claims Made Coverage Parts, or policies supersede any terrorism endorsement already endorsed to this policy that addresses Certified Acts of Terrorism, but only with respect to an incident of terrorism (however defined) that results in a Claim first made on or after the date when the provisions of this endorsement become applicable; or

b. For Occurrence Coverage Parts, supersede any terrorism endorsement already endorsed to this policy that addresses Certified Acts of Terrorism, but only with respect to an incident of terrorism (however defined) that results in a Bodily Injury or Property Damage and an Occurrence, the entirety of which happens on or after the date when the provisions of this endorsement become applicable; and

c. Remain applicable unless the Company notifies the first Named Insured of changes in these provisions, in response to federal law.

3. If the provisions of this endorsement do not become applicable, any terrorism endorsement already endorsed onto this policy, that addresses Certified Acts of Terrorism, will continue in effect unless the Company notifies the first Named Insured of changes to that endorsement in response to federal law.

B. Section Definitions is amended by the addition of the following:

1. **Terrorism** means any activity against any natural person, organization or property of any nature:

   a. That involve the following or preparation for the following:

      (1) Use or threat of force or violence;

      (2) Commission or threat of a dangerous act; or

      (3) Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

   b. When one or both of the following applies:

      (1) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

      (2) It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express or express opposition to a philosophy or ideology.

C. Section The Exclusions is amended by the addition of the following:

This Coverage Part or policy does not apply to any Claim based upon, arising out of, directly or indirectly caused by Terrorism, including action in hindering or defending against an actual or expected incident of Terrorism. Any such Claim is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such incident of Terrorism.

This exclusion shall apply only when one or more of the following are attributed to an incident of Terrorism:

1. The Terrorism is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination;

2. Radioactive material is released, and it appears that one purpose of the Terrorism was to release such material;

3. The Terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials;

4. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the Terrorism was to release such materials;

5. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, the Company will include all insured damage sustained by property of all natural persons and organizations affected by the Terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusion; or

6. Fifty (50) or more persons sustain death or Serious Physical Injury.

   For the purposes of this exclusion, Serious Physical Injury means:

   a. Physical injury that involves a substantial risk of death;

   b. Protracted and obvious physical disfigurement; or

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

c. Protracted loss of or impairment of the function of a bodily member or organ.

Multiple incidents of Terrorism which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the thresholds in Items C.5. or C.6. are exceeded.

With respect to this exclusion Items C.5. and C.6. describe the threshold used to measure the magnitude of an incident of Terrorism and the circumstances in which the threshold will apply, for the purpose of determining whether this exclusion will apply to that incident. When the exclusion applies to an incident of Terrorism, there is no coverage under this Coverage Part or policy.

All other provisions of the policy shall remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc.
with its permission.

INTERLINE

**MARKEL®**    **EVANSTON INSURANCE COMPANY**

## NOTICE TO POLICYHOLDERS
## POTENTIAL RESTRICTION OF TERRORISM COVERAGE

The federal Terrorism Risk Insurance Act established the federal Terrorism Risk Insurance Program ("Program") within the Department of the Treasury, under which the United States Government shares, with the insurance industry, the risk of loss from future terrorist attacks. The Program is subject to a termination date of December 31, 2014 unless extended by the United States Government. If the Program terminates, or is extended with certain changes prior to or during the term of this policy, then the treatment of terrorism under this policy will change. If the Program is terminated, the definition of "Certified Act of Terrorism" will no longer apply and the limit on the Company's liability pursuant to the federal Terrorism Risk Insurance Act will no longer apply. If the Program is extended with changes, the definition of "Certified Act of Terrorism" may change and the limit on the Company's liability pursuant to the federal Terrorism Risk Insurance Act may change.

**THIS POLICY DURING TENURE OF THE TERRORISM RISK INSURANCE PROGRAM AS THE PROGRAM EXISTS PURSUANT TO THE TERRORISM RISK INSURANCE PROGRAM REAUTHORIZATION ACT OF 2007:**

Contains either:

    **a.** A Certified Acts of Terrorism Exclusion which excludes any claim or portion thereof based upon, arising out of, or in any way involving a "Certified Act of Terrorism"; or

    **b.** A Certified Acts of Terrorism Endorsement which indicates that this policy does not contain an exclusion of any claim based upon, arising out of, or in any way involving a "Certified Act of Terrorism". The endorsement states that such claims are subject to a limit on the Company's liability pursuant to the federal Terrorism Risk Insurance Act.

    The absence of a terrorism exclusion does not create coverage for any injury or damage that would otherwise be excluded under the policy.

**POTENTIAL CHANGES TO THIS POLICY:**

Endorsement MEIL 1323 09 13 Conditional Exclusion of Terrorism is attached to this policy. The provisions of the endorsement only become applicable to the policy if one or more of the following happens:

    **a.** The Program established by the federal Terrorism Risk Insurance Act, has terminated with respect to the type of insurance provided under the policy; or

    **b.** A renewal, extension or replacement of the Program has become effective without a requirement to make terrorism coverage available and with revisions that:

        **(1)** Increase the Company's statutory percentage deductible under the Program for terrorism losses;

        **(2)** Decrease the United States Government's statutory percentage share in potential terrorism losses above such deductible; or

        **(3)** Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under the policy.

IL 09 10 12 03

# PENNSYLVANIA NOTICE

An Insurance Company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss. These services may include any of the following or related services incident to the application for, issuance, renewal or continuation of, a policy of insurance:

1. Surveys;

2. Consultation or advice; or

3. Inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf, is not liable for damages from injury, death or loss occurring as a result of any act or omission by any person in the furnishing of or the failure to furnish these services.

The Act does not apply:

1. If the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or service contractors;

2. To consultation services required to be performed under a written service contract not related to a policy of insurance; or

3. If any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

 © ISO Properties, Inc., 2003

**MARKEL®**    **EVANSTON INSURANCE COMPANY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDATORY ENDORSEMENT – CIVIL RIGHTS VIOLATION

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. Section Definitions H. is amended by the addition of the following:

   4. An allegation of a civil rights violation pursuant to the Civil Rights Act of 1871 (42 U.S.C. § 1983 *et seq.*) and amendments thereto, provided that such allegation is the result of any natural person receiving Professional Services.

2. Section Limits of Liability E. is deleted and replaced with the following:

   E. **Multiple Insureds, Claims and Claimants:** The inclusion herein of more than one Insured in any Claims or suits or the making of Claims or the bringing of suits by more than one person or organization shall not operate to increase the Limits of Liability stated in the Declarations. More than one Claim arising out of a single act, error or omission, including Professional Services to a woman and/or her unborn child or children during the course of pregnancy, including pre-natal, delivery and post-natal care, or a series of related or a series of related acts, errors or omissions shall be considered a single Claim. All such Claims, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of such act, error or omission is made, or with regard to written notice given to and accepted by the Company pursuant to Section Claims B., Discovery Clause, on the date within the Policy Period on which such written notice of potential Claim is first received by the Company.

All other terms and conditions remain unchanged.

**MESM 2031 10 12**                                                                                                    **Page 1 of 1**

 **EVANSTON INSURANCE COMPANY**

MARKEL®

## Endorsement

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.: SM903254 |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.: 13 |
| MANAGEMENT | Effective Date of Endorsement: October 1, 2014 |

### AMENDATORY ENDORSEMENT

In consideration of the premium paid, it is hereby understood and agreed that coverage afforded under the Employee Benefits Liability Coverage and Hired and Non-Owned Liability Coverage applied to all schedule contracts covered under any in force Evanston Insurance Company policy.

All other provisions of the policy shall remain unchanged.



**INTERLINE**
POLICY NUMBER: SM903254

# MARKEL®    EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDMENT OF THE INSURED B.
## ADDITION OF PHYSICIAN/SURGEON/DENTIST/PODIATRIST

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. Section THE INSURED B. is deleted and replaced with the following:

   B. Any past or current principal, partner, officer, director, Employee or Volunteer Worker of the Named Insured solely while acting on behalf of the Named Insured and within the scope of their duties as such; provided, however, this insurance shall not apply to any Claim made against any Insured who is a physician, surgeon, dentist or podiatrist arising out of the rendering of or failure to render Professional Services in his/her capacity as a physician, surgeon, dentist or podiatrist; other than the following Named Physician(s), Surgeon(s), Dentist(s) or Podiatrist(s) solely:

      1. While acting on behalf of the Named Insured and within the scope of his/her duties as a principal, partner, officer, director, Employee or Volunteer Worker of the Named Insured;

      2. For an act, error or omission in Professional Services happening:

         a. On or after the Retroactive Date stated below; and

         b. Before the Departure Date, if any, stated below;

         as applicable to such Named Physician, Surgeon, Dentist or Podiatrist; and

      3. For Claims first made against such Named Physician, Surgeon, Dentist or Podiatrist during the Policy Period, provided that prior to the effective date of this policy the Named Physician, Surgeon, Dentist or Podiatrist had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may lead a reasonable person in the Insured's position to conclude that a Claim was likely.

2. Section DEFINITIONS is amended by the addition of the following:

   **Departure Date** means the date on which the Named Physician, Surgeon, Podiatrist or Dentist ceases to provide Professional Services on behalf of the Named Insured.

## Schedule of Active Providers

|  | Named Physician, Surgeon, Dentist, Podiatrist Retroactive Date: |
| --- | --- |
| Named Physician, Surgeon, Dentist or Podiatrist | |
| On File with the company for the Following Contracts listed below | October 1, 2014 |
| Illinois Department of Corrections Springfield IL 62794 | October 1, 2014 |
| Mississippi Department of Corrections Jackson MS 39202 | October 1, 2014 |
| Treatment & Detention Facility Rushville, IL 62681 | October 1, 2014 |
| Kane County Sheriffs Office Geneva, IL 60134 | October 1, 2014 |
| West Virginia Division of Corrections Charleston WV 25311 | October 1, 2014 |
| Yavapai County Sheriff's Office Prescott AZ | October 1, 2014 |
| St Clair County Sheriff's Office Belleville, IL 62220 | October 1, 2014 |
| Florida Department of Corrections Region IV | October 1, 2014 |

## Schedule of Departed Providers

| Named Physician, Surgeon, Dentist or Podiatrist | Named Physician, Surgeon, Dentist, Podiatrist Retroactive Date: | Named Physician, Surgeon, Dentist, Podiatrist Departure Date: |
| --- | --- | --- |
| | | |

All other terms and conditions remain unchanged.

**MESM 2001 03 14**

**Page 2 of 2**

# ▉▉ **EVANSTON INSURANCE COMPANY**
MARKEL®

## Endorsement

| Named Insured:<br>THE BANTRY GROUP CORPORATION DBA:<br>WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL<br>MANAGEMENT | Attached to and forming<br>a part of Policy No.:     SM903254<br>Endorsement No.:     15<br>Effective Date of Endorsement:   October 1, 2014 |
| --- | --- |

### EMPLOYEE BENEFITS LIABILITY COVERAGE - COVERAGE D.

### THIS ENDORSEMENT PROVIDES CLAIMS MADE COVERAGE

This endorsement modifies insurance provided under the following:

#### Specified Medical Professions General Liability Coverage Part

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. Item 8. of the Declarations, Retroactive Date, is amended by the addition of the following:

   III.    For Employee Benefits Liability Coverage: October 1, 1997

2. Item 6.II. of the Declarations, Limits of Liability, is amended by the addition of the following:

   E.    For Coverage D. (Employee Benefits Liability):

       (i)    Each Claim:                         $1,000,000

       (ii)    Aggregate:                        $1,000,000

3. Item 7.II. of the Declarations, Deductible, is amended by the addition of the following:

   C.    For Coverage D. (Employee Benefits Liability):

       Each Claim:                              $1,000

4. Section The Insured is amended by the addition of the following:

   As respects Employee Benefits Liability Coverage only:

   the Named Insured and any principal, partner, officer, director or Employee of the Named Insured; provided that such Employee is authorized to act in the Administration of the Named Insured's Employee Benefits Program.

5. Section Insuring Agreements is amended by the addition of the following:

   D.    **Coverage D. - Employee Benefits Liability:** The Company shall pay on behalf of the Insured all sums in excess of the Deductible amounts stated in Item 7.II.C. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of Claims first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the

# ▌▌ EVANSTON INSURANCE COMPANY
MARKEL®

## Endorsement

Company pursuant to Section Claim Reporting Provision, by Employees or their legal representatives, which arise out of any act, error or omission in the Administration of the Named Insured's Employee Benefits Program provided:

1. the act, error or omission happens during the Policy Period or on or after the Retroactive Date stated in Item 8.III. of the Declarations and before the end of the Policy Period; and

2. prior to the effective date of this endorsement the Insured had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may lead a reasonable person in the Insured's position to conclude that a Claim was likely.

6. Solely for purposes of this endorsement, the following definitions shall apply:

**Administration** means conduct of the Insured, or of any person for whose acts, errors or omissions the Insured is legally responsible, with respect to:

(a) providing information to Employees, or their dependents and beneficiaries, regarding the Named Insured's Employee Benefit Program;

(b) handling of records in connection with the Named Insured's Employee Benefits Program; or

(c) effecting enrollment, termination or cancellation of Employees, or their dependents and beneficiaries, in the Named Insured's Employee Benefits Program;

Provided, however, Administration does not include handling payroll deductions.

**Employees** means Employees or former Employees.

**Employee Benefits Program** means any program providing some or all of the following benefits to Employees of the Named Insured:

1. group life, accident or health insurance, dental, vision and hearing plans; and flexible spending accounts provided that only Employees may subscribe to such benefits and that such benefits are generally made available solely to those Employees who fulfill the plan's eligibility requirements;

2. profit sharing plans, employee stock subscription plans, employee stock ownership plans, employee savings plans and pension plans; provided that only Employees may subscribe to such benefits and that such benefits are generally made available solely to those Employees who fulfill the plan's eligibility requirements;

3. unemployment insurance, social security benefits, workers' compensation or disability benefits; and

4. vacation plans and leave of absence programs.

# ▮▮ EVANSTON INSURANCE COMPANY
**MARKEL®**

## Endorsement

7.　Section Definitions, Claim, is deleted for purposes of this endorsement only and replaced solely with respect to Coverage D. Employee Benefits Liability:

**Claim** means a demand received by the Insured for compensation for Damages, including service of suit or institution of arbitration proceedings against the Insured.

8.　Section The Exclusions is amended by the addition of the following:

E.　With respect to Coverage D. Employee Benefits Liability only, this Coverage Part does not apply to:

1.　any Claim based upon or arising out of any dishonest, fraudulent, criminal, or malicious or knowingly wrongful acts, errors or omissions;

2.　any Claim based upon or arising out of Bodily Injury, Property Damage, Personal Injury or Advertising Injury;

3.　any Claim based upon or arising out of unlawful discrimination;

4.　any Claim based upon or arising out of wrongful termination or other employment related practices;

5.　any Claim based upon or arising out of the Insured's failure to comply with workers' compensation, unemployment compensation, social security or disability benefits laws or any similar law;

6.　any Claim based upon or arising out of the Insured's activities as a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto or any similar federal, state or local law;

7.　any Claim based upon or arising out of the investment or non-investment of any Employee Benefits Program funds;

8.　any Claim based upon or arising out of failure of any investment or security to perform;

9.　any Claim for failure of performance of contract by any insurer;

10.　any Claim based upon or arising out of insufficient funds to meet any obligations under any Employee Benefits Program;

11.　any Claim based upon or arising out of the failure or inability of any entity to make any payments or provide any benefits due under any Employee Benefits Program;

12.　any Claim for benefits under any Employee Benefits Program to the extent that such benefits, with reasonable effort and cooperation of the Insured, are available from the applicable benefit funds or other available and collectible insurance;

# EVANSTON INSURANCE COMPANY
MARKEL®

## Endorsement

    13.    any Claim based upon or arising out of advice given or which should have been given to any Employees to participate or not to participate in any Employee Benefits Program;

    14.    criminal or civil fines, taxes, or penalties, including those imposed under the Internal Revenue Code or any similar state or local law;

    15.    any Claim based upon or arising out of the selection, design, planning, development, creation, formation, or structure of any Employee Benefits Program; or

    16.    any Claim based upon or arising out of any change in availability, eligibility or cost of any Employee Benefits Program.

9.    Solely for purposes of this endorsement, Section Limits of Liability is amended by the addition of the following:

   H.    **Coverage D. - Employee Benefits Liability**

    1.    **Limit of Liability-Each Claim**: The total liability of the Company for the combined total of Damages and Claim Expenses for all Claims first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, for each Claim insured herein shall not exceed the Limits of Liability stated in Item 6.II.E.(i) of the Declarations applicable to Each Claim.

    2.    **Limit of Liability-Coverage Aggregate:** Subject to the above Limits of Liability H.1., the total liability of the Company shall not exceed the Coverage Aggregate Limit of Liability as stated in Item 6.II.E.(ii) of the Declarations for all Damages and Claim Expenses under Coverage D.

10.    Solely for purposes of this endorsement, the first paragraph of Section Limits of Liability F. is deleted and replaced with the following:

   F.    **Deductible:** The Deductible amount stated in **Item 7.II.C.**of the Declarations shall be paid by the Named Insured and shall be applicable to each Claim and shall include Damages and Claim Expenses, whether or **not** Damages are paid.

11.    Solely with respect to this endorsement, Section Limits of Liability G., Multiple Insureds, Claims, Occurrences, Offenses and Claimants, is amended by the addition of the following:

More than one Claim arising out of a single act, error or omission or a series of related acts, errors or omissions shall be considered a single Claim. All such Claims, whenever made, shall be treated as a single Claim. Such single Claim, whenever made, shall be considered first made on the date on which the earliest Claim arising out of such act, error or omission is made or with regard to notice given to and accepted by the Company pursuant to Discovery Clause, on the date within the Policy Period on which such notice of potential Claim is first received by the Company.

 **EVANSTON INSURANCE COMPANY**

MARKEL®

## Endorsement

12. Solely with respect to this endorsement, Section Defense, Settlements and Claim Expenses is amended by the addition of the following:

The Company shall have the right to defend and investigate any Claim to which this endorsement applies. The Company may make such investigation and settlement of any Claim as it deems expedient. Claim Expenses incurred in defending and investigating a Claim shall be a part of and shall not be in addition to the applicable Limits of Liability stated in Item 6. II. of the Declarations. Such Claim Expenses shall reduce the Limits of Liability and shall be applied against the Deductible. The Company shall have no obligation to pay any Damages or to defend or to continue to defend any Claim or to pay Claim Expenses for Claims after the applicable Limits of Liability stated in Item 6.II. of the Declarations have been exhausted.

13. Solely for purposes of the coverage provided by this endorsement, the following is added:

**Discovery Clause:** If during the Policy Period, the Insured first becomes aware of a specific act, error or omission which may result in a Claim within the scope of the coverage provided for in this endorsement, then the Insured may provide written notice to the Company containing the information listed below. If such written notice is received by the Company during the Policy Period, then any Claim subsequently made against the Insured arising out of such act, error or omission shall be deemed for the purpose of this insurance to have been first made on the date on which such written notice is first received by the Company.

It is a condition **precedent** to the coverage afforded by this Discovery Clause that written notice be given to the Company containing the following information:

1. the description of the specific act, error or omission;

2. the date on which such act, error or omission took place;

3. the injury or damage which has or may result from such act, error or omission;

4. the identity of any injured persons; and

5. the circumstances by which the Insured first became aware of such act, error or omission.

14. Solely for purposes of the coverage provided by this endorsement, Section Extended Reporting Period is deleted and replaced with the following:

### EXTENDED REPORTING PERIOD

A. The Named Insured's right to exercise the Extended Reporting Period under this endorsement shall exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Insuring Agreements in the policy for which an Extended Reporting Period is available.

B. If the Named Insured nonrenews this policy in its entirety or cancels this policy in its entirety pursuant to Common Policy Conditions B., Cancellation, or if the Company nonrenews this policy in its entirety or cancels this policy in its entirety


# EVANSTON INSURANCE COMPANY
MARKEL®

## Endorsement

pursuant to Common Policy Conditions B., Cancellation, for reasons other than nonpayment of premium or Deductible or non-compliance with the terms and conditions of this policy, then the Named Insured shall have the right to exercise the Extended Reporting Period as regards all Coverage Parts included under this policy according to the terms and conditions applicable to the Extended Reporting Period as detailed in the Specified Medical Professions Professional Liability Insurance Coverage Part.

C.   In the event that the Named Insured exercises the Extended Reporting Period as detailed in the Specified Medical Professions Professional Liability Insurance Coverage Part, then such exercise of the Extended Reporting Period shall extend the coverage granted under this endorsement to Claims first made against the Insured, during the period of months; as elected by the Named Insured, and reported to the Company pursuant to Section Claims A., Claim Reporting Provision, following immediately upon the effective date of such cancellation or nonrenewal, for any act, error or omission negligently committed in the Administration of the Insured's Employee Benefit Program rendered on or after the Retroactive Date and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this endorsement.

All other provisions of the policy shall remain unchanged.

# ▌▌▌ EVANSTON INSURANCE COMPANY
**MARKEL®**

## Endorsement

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.: 'SM903254' |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.: 16 |
| MANAGEMENT | Effective Date of Endorsement: October 1, 2014 |

### AMENDMENT OF CANCELLATION

#### This endorsement modifies the COMMON POLICY CONDITIONS

In consideration of the premium paid, it is hereby understood and agreed that the second paragraph of Common Policy Conditions B., Cancellation, is deleted and replaced with the following:

> This policy may be cancelled by the Company or by its underwriting manager, on behalf of the Company, by mailing to the Named Insured, at the address stated in Item 2. of the Declarations, written notice stating when, not less than 90 days thereafter, such cancellation shall be effective. However, if the policy is cancelled because the Named Insured has failed to pay a premium or Deductible when due, including premium and/or Deductible(s) due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies of which this policy is a renewal or replacement, this policy may be cancelled by the Company or by its underwriting manager, on behalf of the Company, by mailing a written notice of cancellation to the Named Insured stating when, not less than ten (10) days thereafter, such cancellation shall be effective. The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Such notice shall be conclusive on all Insureds. Delivery of such written notice by the Named Insured, the Company or its underwriting manager shall be equivalent to mailing. If cancelled by the Company or its underwriting manager, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

All other provisions of the policy shall remain unchanged.

**EIC 4655 04/07** **Page 1 of 1**



**INTERLINE**
POLICY NUMBER: SM903254

**MARKEL®**     **EVANSTON INSURANCE COMPANY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED ENDORSEMENT – PROFESSIONAL LIABILITY (REQUIRED BY CONTRACT)

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. Section The Insured is amended by the addition of the following:

   Whenever used in this Coverage Part, the unqualified word Insured shall also mean Additional Insured.

2. **Additional Insured** means, whenever used in this endorsement, the following:

   to whom the Named Insured is obligated by valid written contract or written agreement:

   a. Executed prior to the date of an act, error or omission in Professional Services; and

   b. To provide coverage as an additional insured, but only as respects Claims that arise out of the conduct of Professional Services rendered or that should have been rendered by an Insured that is not an Additional Insured and that are otherwise covered herein.

3. In the event that the Limits of Liability stated in the Declarations for this Coverage Part exceed the limits of liability required by such contract or agreement, coverage provided by this endorsement shall not exceed the limits of liability required by such contract or agreement.

4. Where no coverage shall apply herein for the Insured which is not an Additional Insured, no coverage or defense shall be afforded to the Additional Insured.

5. Section Defense, Settlements and Claim Expenses is amended by the addition of the following:

   The Company's obligation to provide defense shall not be severable with respect to the Additional Insured and all other Insureds hereunder.

   With respect to the Additional Insured and any other Insured hereunder, all Insureds shall be represented by the same attorney unless mutual representation is prohibited by law or by any applicable professional code of conduct.

6. This insurance shall be excess and non-contributory insurance over any other insurance afforded to the Additional Insured.

7. As respects the coverage afforded to the Additional Insured, Section Limits of Liability C. is deleted and replaced with the following:

**C. Limit of Liability-Reduction for Refusal to Settle:** The Company shall not settle any Claim against the Additional Insured without the consent of the first Named Insured. If, however, such Named Insured shall refuse to consent to any settlement recommended by the Company and shall elect to contest the Claim or continue any legal proceedings in connection with such Claim, then the Company's liability for the Claim shall not exceed the amount for which the Claim could have been so settled including Claim Expenses incurred up to the date of such refusal. Such amounts are subject to the provisions of the above Limits of Liability A. and B.

All other terms and conditions remain unchanged.

# ▊▊ **EVANSTON INSURANCE COMPANY**
**MARKEL®**

## Endorsement

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.: SM903254 |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.: 18 |
| MANAGEMENT | Effective Date of Endorsement: October 1, 2014 |

### AMENDMENT OF THE INSURED –
### ADDITION OF INDEPENDENT CONTRACTOR
(use with policy form SM-20001; SM-20003)

This endorsement modifies insurance provided under the following:

**Specified Medical Professions Professional Liability Insurance Coverage Part**

In consideration of the premium paid, it is hereby understood and agreed that Section The Insured is amended by the addition of the following:

G. the following independent contracted healthcare professional, solely while acting on behalf of the Named Insured and within the scope of his/her duties on behalf of the Named Insured:

1. for an act, error or omission in Professional Services happening on or after the Retroactive Date specified below as applicable to such independent contracted healthcare professional; and

2. for Claims first made against such independent contracted healthcare professional on or after the Effective Coverage Date and prior to the Expiration Coverage Date, specified below as applicable to such independent contracted healthcare professional, provided that prior to the Effective Coverage Date specified below as applicable to such independent contracted healthcare professional, the independent contracted healthcare professional had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may result in a Claim under this policy.

| Independent Contracted Healthcare Professional | Independent Contracted Healthcare Professional Retroactive Date: | Coverage Date Effective: | Expiration: |
|---|---|---|---|
| On File with the company for the Following Contracts listed below | Contract Start Date | 10/1/2014 | End of Policy Period |
| Illinois Department of Corrections Springfield IL 62794 | Contract Start Date | 10/1/2014 | End of Policy Period |
| Mississippi Department of Corrections Jackson MS 39202 | Contract Start Date | 10/1/2014 | End of Policy Period |

All other provisions of the policy shall remain unchanged.

EIC 4772 10/08          Page 1 of 2

| | | | |
|---|---|---|---|
| Treatment & Detention Facility Rushville, IL 62681 | Contract Start Date | 10/1/2014 | End of Policy Period |
| Kane County Sheriffs Office Geneva, IL 60134 | Contract Start Date | 10/1/2014 | End of Policy Period |
| West Virginia Division of Corrections Charleston WV 25311 | Contract Start Date | 10/1/2014 | End of Policy Period |
| Yavapai County Sheriff's Office Prescott AZ | Contract Start Date | 10/1/2014 | End of Policy Period |
| St Clair County Sheriff's Office Belleville, IL 62220 | Contract Start Date | 10/1/2014 | End of Policy Period |
| Florida Department of Corrections Region IV | Contract Start Date | 10/1/2014 | End of Policy Period |

All other provisions of the policy shall remain unchanged.

**EIC 4772 10/08**

# **EVANSTON INSURANCE COMPANY**

**MARKEL®**

---

## Endorsement

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.: SM903254 |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.: 19 |
| MANAGEMENT | Effective Date of Endorsement: October 1, 2014 |

---

### AMENDMENT OF GENERAL LIABILITY COVERAGE A. -
### HIRED AND NON-OWNED AUTOMOBILE LIABILITY
(use with policy form SM-20003)

This endorsement modifies insurance provided under the following:

**Specified Medical Professions General Liability Insurance Coverage Part**

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. The title of the Declarations and the Claims Made Coverage statement immediately following the title of the Declarations and preceding the **Notice** are deleted and replaced as follows:

> **DECLARATIONS – SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE – CLAIMS MADE COVERAGE**
>
> **SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED OPERATIONS LIABILITY) INSURANCE - CLAIMS MADE COVERAGE WITH THE ADDITION OF HIRED AUTOMOBILE AND NON-OWNED AUTOMOBILE LIABILITY INSURANCE – OCCURRENCE COVERAGE**

**Claims Made Coverage:** Other than the coverage referenced in "Occurrence Coverage" below, the coverage afforded by this policy is limited to liability for only those Claims that are first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised.

**Occurrence Coverage:** Solely the Hired Automobile and Non-Owned Automobile Liability Insurance coverage added by this endorsement is Occurrence Coverage. The General Liability (Including Products and Completed Operations Liability) Insurance Coverage to which it is added is not occurrence coverage.

2. Item 6.II.A. of the Declarations, Limits of Liability, is amended by the addition of the following:

(iii) For Hired Automobile and Non-Owned Automobile Liability to which Coverage A. applies:

| | |
|---|---|
| (a) Each Occurrence: | $2,000,000 |
| (b) Aggregate: | $2,000,000 |

 **EVANSTON INSURANCE COMPANY**

MARKEL®

## Endorsement

3. The title of Specified Medical Professions General Liability Insurance Coverage Part and the statement immediately following the title and preceding the Section The Insured are deleted and replaced as follows:

Specified Medical Professions General Liability (Including Products and Completed Operations Liability) Insurance Coverage Part - Claims Made Coverage - With the Addition of Hired Automobile and Non-Owned Automobile Liability Insurance – Occurrence Coverage

THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGES, AND SOLELY AS RESPECTS HIRED AUTOMOBILE AND NON-OWNED AUTOMOBILE LIABILITY, OCCURRENCE COVERAGE. PLEASE READ IT CAREFULLY.

4. Solely with respect to Hired Automobile and Non-Owned Automobile Liability, to which Coverage A. applies, Section The Insured is deleted and replaced with the following:

### THE INSURED

The unqualified word "Insured", either in the singular or plural, means:

A. the Named Insured stated in Item 1. of the Declarations;

B. any person using a Hired Automobile with the Named Insured's permission;

C. with respect to a Non-Owned Automobile, any partner or executive officer of the Named Insured, but only while such Non-Owned Automobile is being used in the Named Insured's business; or

D. any other person or organization, but only with respect to their liability because of acts or omissions of an Insured under A., B. or C. hereinabove;

And none of the following is an "Insured":

(1) any partner or executive officer with respect to any Automobile owned by such partner or officer or a member of his or her household;

(2) the owner or lessee (of whom the Named Insured is a sublessee) of a Hired Automobile or the owner of a Non-Owned Automobile or any agent or Employee of any such owner or lessee; and

(3) any person or organization with respect to the conduct of any current or past partnership or joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

5. Section Insuring Agreements A., Coverage A. - Bodily Injury and Property Damage Liability, is amended by the addition of the following:

**Hired Automobile and Non-Owned Automobile Liability:** The insurance provided under Coverage A., Bodily Injury and Property Damage Liability, shall also pay on behalf of the Insured all sums in excess of the Deductible amount stated in Item 7.II.A. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of Bodily Injury and Property Damage arising out of the:

1. maintenance or use of a Hired Automobile by the Insured in the course of the Named Insured's business; or

# EVANSTON INSURANCE COMPANY
**MARKEL®**

## Endorsement

2. use of a Non-Owned Automobile by any person other than the Named Insured in the course of the Named Insured's business; and

caused by an Occurrence, provided:

(i) the entirety of such Bodily Injury or Property Damage and Occurrence happens during the Policy Period;

(ii) such Bodily Injury or Property Damage arises out of only those products, goods, operations or premises stated in Item 5. of the Declarations;

(iii) prior to the effective date of this policy the Insured has no knowledge such Bodily Injury, Property Damage or Occurrence had occurred in whole or in part, and if any Insured knew prior to the Policy Period that the Bodily Injury, Property Damage or Occurrence had occurred, then any continuation, change or resumption of such Bodily Injury, Property Damage or Occurrence during or after the Policy Period will be deemed to have been known prior to the Policy Period;

(iv) such Bodily Injury or Property Damage, which occurs during the Policy Period and was not, prior to the Policy Period known to have occurred by any Insured, includes any continuation, change or resumption of that Bodily Injury or Property Damage after the end of the Policy Period; and

(v) such Bodily Injury, Property Damage or Occurrence will be deemed to have been known to have occurred at the earliest of any Insured:

(1) reporting all, or any part, of the Bodily Injury, Property Damage or Occurrence to the Company or any other insurer;

(2) receiving a Claim because of the Bodily Injury, Property Damage or Occurrence; or

(3) becoming aware by any other means that Bodily Injury, Property Damage or Occurrence has occurred or has begun to occur.

6. Solely with respect to Hired Automobile and Non-Owned Automobile Liability, to which Coverage A. applies, Section Definitions L., Insured Contract, is deleted and replaced with the following:

**Insured Contract** means that part of any contract or agreement pertaining to the Named Insured's business, as regards to the rental or lease, by the Named Insured or any Employee, of any Automobile; provided, however, Insured Contract shall not include that part of any contract or agreement that obligates the Named Insured or any Employee to pay for Property Damage for any Automobile rented or leased by the Named Insured or any Employee.

7. Solely with respect to Hired Automobile and Non-Owned Automobile Liability, to which Coverage A. applies, Section Definitions is amended by the addition of the following:

**Hired Automobile** means any Automobile the Named Insured leases, hires, rents or borrows; provided, however, Hired Automobile shall not include: (1) any Automobile the Named Insured leases, hires or rents under a lease or rental agreement of one hundred and eighty



# EVANSTON INSURANCE COMPANY

## Endorsement

(180) days or more; or (2) any Automobile the Named Insured leases, hires, rents or borrows from any partner, manager, member or executive officer of the Named Insured or an Employee or Volunteer Worker, or members of their households.

**Non-Owned Automobile** means any Automobile the Named Insured does not own, lease, hire, rent or borrow which is used in connection with the Named Insured's business and shall include Automobiles owned by a partner, manager, member or executive officer of the Named Insured or an Employee or Volunteer Worker, or members of their households, but only while used in the Named Insured's business.

8. Solely with respect to Hired Automobile and Non-Owned Automobile Liability, to which Coverage A. applies, Section The Exclusions B. 6. is deleted and replaced as follows:

   6. any Claim based upon or arising out of Bodily Injury or Property Damage arising out of ownership, maintenance, operation, use or entrustment to others or loading or unloading of:

      (i) any aircraft or watercraft owned or operated by or rented or loaned to any Insured; or

      (ii) any other aircraft or watercraft operated by any person in the course of his/her employment or activities on behalf of the Named Insured;

9. Solely with respect to Hired Automobile and Non-Owned Automobile Liability, to which Coverage A. applies, Section The Exclusions B. 9. is deleted and replaced as follows:

   9. any Claim based upon or arising out of Property Damage to:

      (i) property owned or being transported by or rented or loaned to the Insured;

      (ii) property in the care, custody or control of the Insured;

10. Solely with respect to Hired Automobile and Non-Owned Automobile Liability, to which Coverage A. applies, Section The Exclusions B. 12. is deleted.

11. Solely with respect to Hired Automobile and Non-Owned Automobile Liability, to which Coverage A. applies, Section Limits of Liability A. is amended by the addition of the following:

    Solely with respect to Hired Automobile and Non-Owned Automobile Liability, the total liability of the Company for the combined total of Damages and Claim Expenses because of all Bodily Injury and Property Damage as the result of any one Occurrence shall not exceed the Limit of Liability stated in 6.II.A.(iii)(a) of the Declarations.

12. Section Limits of Liability E. is deleted and replaced as follows:

    E. **Limit of Liability – Aggregates:**

       1. **Limit of Liability – Hired Automobile and Non-Owned Automobile Liability Aggregate:** Solely with respect to Hired Automobile and Non-Owned Automobile Liability, to which Coverage A. applies, subject to the above described Limit of Liability A. as stated in Item 6.II.A.(iii)(a) of the Declarations for Hired Automobile and Non-Owned Automobile Liability to which Coverage A. applies, the total liability of the Company for all Hired Automobile and Non-Owned Automobile Liability to which Coverage A. applies, shall not exceed the Aggregate Limit of Liability as stated in Item 6.II.A.(iii)(b) of the Declarations for all Damages and Claim Expenses.

# **EVANSTON INSURANCE COMPANY**

MARKEL®

## Endorsement

2. **Limit of Liability – Aggregate:** Subject to the above Limits of Liability A., B., C., D. and E.1., the total liability of the Company shall not exceed the Aggregate Limit of Liability as stated in Item 6.II.D. of the Declarations for all Damages and Claim Expenses for Coverage A. and B., including all Damages and Claim Expenses for Hired Automobile and Non-Owned Automobile Liability to which Coverage A. applies and all medical expenses for Coverage C.

13. The first paragraph of Section Limits of Liability G. is deleted and replaced as follows:

G. **Multiple Insureds, Claims, Occurrences, Offenses and Claimants:** The inclusion herein of more than one Insured in any Claim or suit or the making of Claims or the bringing of suits by more than one person or organization shall not operate to increase the Limits of Liability stated in Item 6.II. of the Declarations.

Solely with respect to Hired Automobile and Non-Owned Automobile Liability, to which Coverage A. applies: regardless of the number of Hired Automobiles, Non-Owned Automobiles or vehicles involved in a single Occurrence, the total liability of the Company for the combined total of Damages and Claim Expenses because of all Bodily Injury and Property Damage as the result of any one Occurrence shall not exceed the Limit of Liability stated in 6.II.A.(iii)(a) of the Declarations.

Solely with respect to the coverage afforded hereunder other than the Hired Automobile and Non-Owned Automobile Liability: more than one Claim arising out of a single Occurrence or offense shall be considered a single Claim;. all such Claims, whenever made, shall be treated as a single Claim; and such single Claim, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of such Occurrence or offense is made or with regard to notice given to and accepted by the Company pursuant to Section Claims B., Discovery Clause, on the date within the Policy Period on which such notice of potential Claim is first received by the Company.

14. Section Claims A., Claim Reporting Provision, is deleted and replaced as follows:

A. Occurrence and Claim Reporting Provision:

1. Solely with respect to Hired Automobile and Non-Owned Automobile Liability, to which Coverage A. applies, the Insured shall give to the Company written notice as stated in Item 14. of the Declarations as soon as practicable of any Occurrence that happens during the Policy Period which may give rise to a Claim against the Insured.

2. Solely with respect to the coverage afforded hereunder other than the Hired Automobile and Non-Owned Automobile Liability, the Insured shall give to the Company written notice as stated in Item 14. of the Declarations as soon as practicable of any Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised.

3. In the event suit is brought against the Insured, the Insured shall immediately forward to Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois, 60015, on behalf of the Company, every demand, notice, summons or other process received by him/her or by his/her representatives.



# EVANSTON INSURANCE COMPANY

**MARKEL®**

## Endorsement

15. Section Claims B., Discovery Clause, does not apply with respect to the coverage afforded by Coverage A. for Hired Automobile and Non-Owned Automobile Liability.

16. Section Extended Reporting Period does not apply with respect to the coverage afforded by Coverage A. for Hired Automobile and Non-Owned Automobile Liability.

17. Solely with respect to Hired Automobile and Non-Owned Automobile Liability, to which Coverage A. applies, Section Other Conditions B., Other Insurance, is deleted and replaced as follows:

    B.    Other Insurance: This insurance is excess over any primary insurance covering any Hired Automobile or any Non-Owned Automobile.

All other provisions of the policy shall remain unchanged.



# **MARKEL®**     **EVANSTON INSURANCE COMPANY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CRISIS MANAGEMENT EMERGENCY RESPONSE EXPENSE REIMBURSEMENT COVERAGE

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is understood and agreed that the policy is amended as follows:

1.  The policy is amended by the addition of the following:

    **Crisis Management Emergency Response Expense Reimbursement Limit:** $25,000

2.  Section SUPPLEMENTARY PAYMENTS, Crisis Management Emergency Response Expense Reimbursement, is added as follows:

    **SUPPLEMENTARY PAYMENTS**

    **Crisis Management Emergency Response Expense Reimbursement:** In the event that:

    a.  during the Policy Period, the Named Insured incurs Crisis Management Emergency Response Expenses with the prior written approval of the Company; and

    b.  during the Policy Period or within six (6) months following the date the Crisis was initiated, the Named Insured submits a request for reimbursement of such Crisis Management Emergency Response Expenses by providing an itemized accounting of such Crisis Management Emergency Response Expenses, which is submitted in writing to the Company by completion of the Company's Crisis Management Emergency Response Expense Reimbursement Form which must be submitted to the Company addressed to Medical Professional Team, Markel Service Incorporated, 10 Parkway North, Deerfield, IL 60015 (Fax: (847) 572-6377);

    the Company will reimburse the Named Insured for such Crisis Management Emergency Response Expenses up to the Crisis Management Emergency Response Expense Reimbursement Limit set forth in Item 1. of this endorsement.

    Reimbursement to the Named Insured pursuant to this provision shall be in addition to the Limits of Liability stated in the Declarations and shall not be subject to the Deductible.

3.  Section DEFINITIONS is amended by the addition of the following:

    **Crisis** means the public announcement that an Incident occurred on the Named Insured's premises or at an event sponsored by the Named Insured.

**Crisis Management Emergency Response Expenses** mean those expense incurred by the Named Insured for services provided by a Crisis Management Firm. However, Crisis Management Emergency Response Expenses shall not include:

1.  Compensation, fees, benefits, overhead, charges or expense of any person or organization included in the definition of Insured;

2.  Any expenses that are payable on the Named Insured's behalf or reimbursable to the Named Insured under any other insurance, whether collectible or not;

3.  Claim adjustment costs incurred by the Named Insured, such as fees incurred by retaining a public adjuster or appraiser.

**Crisis Management Firm** means any service provider requested by the Named Insured and approved by the Company to provide Crisis management emergency response services. The Company's approval shall not be unreasonably withheld.

**Incident** means an accident or other event, including the accidental discharge of pollutants, resulting in death or Serious Bodily Injury to three (3) or more persons.

**Serious Bodily Injury** means any injury to a person that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

All other provisions of the policy shall remain unchanged.



**INTERLINE**
POLICY NUMBER: SM903254

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## RISK MANAGEMENT SERVICES
## EXPENSE REIMBURSEMENT COVERAGE

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1.    The policy is amended by the addition of the following:

**Risk Management Services Expense Reimbursement Limit:** $50,000

2.    Section SUPPLEMENTARY PAYMENTS, Risk Management Services Expense Reimbursement, is added as follows:

**SUPPLEMENTARY PAYMENTS**

**Risk Management Services Expense Reimbursement: In the event that:**

a.    during the Policy Period, the Named Insured incurs Risk Management Services Expense with the prior written approval of the Company; and

b.    during the Policy Period or within six (6) months following the expiration or earlier cancellation or termination of this policy, the Named Insured submits a request for reimbursement of such Risk Management Services Expense by providing an itemized accounting of such Risk Management Services Expense, which is submitted in writing to the Company by completion of the Company's Risk Management Service Expense Reimbursement Form which must be submitted to the Company addressed to Medical Professional Team, Markel Service Incorporated, 10 Parkway North, Deerfield, IL 60015 (Fax: (847) 572-6377);

the Company will reimburse the Named Insured for such Risk Management Services Expense up to the Risk Management Services Expense Reimbursement Limit set forth in Item 1. of this endorsement.

Reimbursement to the Named Insured pursuant to this provision shall be in addition to the Limits of Liability stated in the Declarations and shall not be subject to the Deductible.

3.    Section DEFINITIONS is amended by the addition of the following:

**Risk Management Services Expense** means expense incurred with the prior written approval of the Company for risk management seminars, publications, risk management training, onsite risk consulting and training, risk management audit services or other risk management related services provided by a Risk Management Services Firm and related to the risks of professional and/or general liability, data privacy and security. However, Risk Management Services Expense shall not include:

1.    Compensation, fees, benefits, overhead, charges or expense of any person or organization included in the

definition of Insured;

2.    Any expenses that are payable on the Named Insured's behalf or reimbursable to the Named Insured under any other insurance, whether collectible or not;

3.    Any amounts related to any existing or anticipated claim or suit, including but not limited to legal fees, fees of a public adjuster or appraiser, court costs, and expert witness fees;

4.    Meal and beverages expenses, and travel expenses including but not limited to airfare, transportation, and lodging.

**Risk Management Services Firm** means any service provider requested by the Named Insured and approved by the Company to provide risk management services. The Company's approval shall not be unreasonably withheld.

All other provisions of the policy shall remain unchanged.

# ▊▊▊ EVANSTON INSURANCE COMPANY
**MARKEL®**

## Endorsement

| | |
|---|---|
| Named Insured:<br>THE BANTRY GROUP CORPORATION DBA:<br>WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL<br>MANAGEMENT | Attached to and forming<br>a part of Policy No.: SM903254<br>Endorsement No.: 22<br>Effective Date of Endorsement: October 1, 2014 |

### SEXUAL ACTS LIABILITY ENDORSEMENT
(use with policy form SM-20003)

This endorsement modifies insurance provided under the following:

**Specified Medical Professions Professional Liability Insurance Coverage Part**
**Specified Medical Professions General Liability Insurance Coverage Part**

In consideration of the premium paid, it is hereby understood and agreed that the Specified Medical Professions Professional Liability Insurance Coverage Part is amended as follows:

1. Section Insuring Agreement is amended by the addition of the following:

   **Sexual Acts Liability:** The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in Item 7.I.A. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of Claims first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, for Sexual Injury arising out of any Sexual Act perpetrated or alleged to have been perpetrated by the Insured or by any person for whose actions the Insured is legally responsible, or for allegations that the Insured was negligent in hiring, training or supervising any Insured person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury provided:

   A. such Sexual Act arises out of the conduct of the Insured's Professional Services;

   B. such Sexual Act is perpetrated or alleged to have been perpetrated during the Policy Period or on or after the Retroactive Date as stated in Item 8.I. of the Declarations and before the end of the Policy Period; and

   C. prior to the effective date of this policy the Insured had no knowledge of such Sexual Act or any fact, circumstance, situation or incident involving such Sexual Act which may result in a Claim under this policy.

2. Section Definitions is amended by the addition of the following:

   **Sexual Act** means sexual abuse, sexual molestation or sexual exploitation arising out of the conduct of the Insured's Professional Services.

   **Sexual Injury** means bodily injury, sickness, disease, unlawful detention, false imprisonment, humiliation, emotional distress, mental anguish, sexual dysfunction, invasion of right of privacy, assault or battery, solely when arising out of a Sexual Act.

# ▐▌ EVANSTON INSURANCE COMPANY
**MARKEL®**

## Endorsement

3.    Section The Exclusions I. is deleted.

4.    Section The Exclusions is amended by the addition of the following exclusions:

    T.    to any Insured who perpetrates or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury; provided, however, the Company shall defend such Insured and pay Claim Expenses on their behalf unless it is established in fact that such Insured perpetrated such Sexual Act;

    U.    to any manager, supervisor, officer, director, trustee or partner who gains knowledge of any actual or alleged Sexual Act and fails to take reasonable care to prevent a future Sexual Act;

    V.    to any Claim based upon or arising out of any Sexual Act which is perpetrated or alleged to have been perpetrated by an Insured who previously perpetrated or is alleged to have previously perpetrated a Sexual Act, and after a manager, supervisor, officer, director, trustee or partner has gained knowledge of the previously perpetrated or previously alleged to have been perpetrated Sexual Act; or

    W.    to any Claim based upon or arising out of Sexual Injury to any employee of the Insured.

5.    Section Limits of Liability is amended by the addition of the following:

    F.    **Limit of Liability - Sexual Acts Liability Coverage**: The total liability of the Company for the combined total of Damages and Claim Expenses for all Claims insured herein because of Sexual Injury or allegations that the Insured was negligent in hiring, training or supervising any Insured person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury is limited to:

        1.    $1,000,000    All Claims Made by Each Claimant

        2.    $3,000,000    All Claims under Sexual Acts Liability Coverage

    Multiple Sexual Acts: Two or more Sexual Acts against one person shall be deemed to be one Sexual Act and shall be subject to the coverage and limits in effect at the time of the first Sexual Act.

# ⬛ **EVANSTON INSURANCE COMPANY**
**MARKEL®**

## Endorsement

6. Section Limits of Liability B. is amended by the addition of the following:

Subject to Section Limits of Liability F., Limits of Liability - Sexual Acts Liability Coverage, the total liability of the Company for all Damages and Claim Expenses for all Claims insured herein because of Sexual Injury or allegations that the Insured was negligent in hiring, training or supervising any Insured person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury shall be part of and not in addition to the amount stated in Item 6.I. of the Declarations, Policy Aggregate Limit of Liability, arising out of all Claims first made against the Insured during the Policy Period and the Extend Reporting Period, if exercised.

It is further understood and agreed that the Specified Medical Professions General Liability Insurance Coverage Part is amended as follows:

1. Section Definitions is amended by the addition of the following:

**Sexual Act** means sexual abuse, sexual molestation or sexual exploitation arising out of the conduct of the Insured's Professional Services.

**Sexual Injury** means bodily injury, sickness, disease, unlawful detention, false imprisonment, humiliation, emotional distress, mental anguish, sexual dysfunction, invasion of right of privacy, assault or battery, solely when arising out of a Sexual Act.

2. Section The Exclusions A. under the under the Specified Medical Professions General Liability Insurance Coverage Part is amended by the addition of the following exclusions:

(i) any Claim based upon or arising out of any Sexual Injury; or

(ii) to any Claim based upon or arising out of any allegations that the Insured was negligent in hiring, training or supervising any person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury.

All other provisions of the policy shall remain unchanged.

**EIC 4698 12/07**                                                                                   **Page 3 of 3**

# ▌▌▌ EVANSTON INSURANCE COMPANY
MARKEL®

## Endorsement

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.:     SM903254 |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.:     23 |
| MANAGEMENT | Effective Date of Endorsement:   October 1, 2014 |

### CLAIM EXPENSES IN ADDITION TO THE EACH CLAIM LIMIT OF LIABILITY

This endorsement modifies insurance provided under the following:

### Specified Medical Professions Professional Liability Insurance Coverage Part

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. Section Limits of Liability A. is deleted and replaced with the following:

   A.  **Limit of Liability-Each Claim:** The total liability of the Company for Damages for each Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, shall not exceed the Limit of Liability stated in Item 6.I.A. of the Declarations as applicable to Each Claim.

2. Section Defense, Settlements and Claim Expenses is deleted and replaced with the following:

   ### DEFENSE, SETTLEMENTS AND CLAIM EXPENSES

   The Company shall have the right and duty to defend and investigate any Claim to which coverage under this Coverage Part applies. Subject to Section Limits of Liability C., the Company may make such investigation and settlement of any Claim as it deems expedient.

   Claim Expenses incurred in defending and investigating a Claim shall be in addition to the applicable Limits of Liability stated in Item 6.I. of the Declarations. Such Claim Expenses shall not reduce the Limits of Liability and shall be applied against the Deductible. The Company shall have no obligation to pay any Damages or to defend or to continue to defend any Claim or to pay Claim Expenses for Claims after the applicable Limit or Limits of Liability stated in Item 6.I. of the Declarations have been exhausted.

All other provisions of the policy shall remain unchanged.

EIC 4656 10 12           Page 1 of 1



**INTERLINE**
POLICY NUMBER: SM903254

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SCHEDULE OF CONTRACTS COVERED UNDER THIS POLICY

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of premium paid, it is hereby understood and agreed that coverage afforded under this policy of insurance extends to the following contracts

On File with the company for the Following Contracts listed below

Illinois Department of Corrections Springfield IL 62794

Mississippi Department of Corrections Jackson MS 39202

Treatment & Detention Facility Rushville, IL 62681

Kane County Sheriffs Office Geneva, IL 60134

West Virginia Division of Corrections Charleston WV 25311

Yavapai County Sheriff's Office Prescott AZ

St Claire County Sheriff's Office Belleville, IL 62220

Florida Department of Corrections Region IV

All other provisions of the policy shall remain unchanged.



**INTERLINE**
POLICY NUMBER: SM903254

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SCHEDULE OF PREMIUM PAYMENTS

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that That policy premium shown on DECLARATIONS Item 10. is to be paid in 12 monthly installments due to the company no later than:

| Payment Number | Amount | Due Date |
|---|---|---|
| 1 | $162,041.16 | 11/1/2014 |
| 2 | $162,041.16 | 12/1/2014 |
| 3 | $162,041.16 | 1/1/2015 |
| 4 | $162,041.16 | 2/1/2015 |
| 5 | $162,041.16 | 3/1/2015 |
| 6 | $162,041.16 | 4/1/2015 |
| 7 | $162,041.16 | 5/1/2015 |
| 8 | $162,041.16 | 6/1/2015 |
| 9 | $162,041.16 | 7/1/2015 |
| 10 | $162,041.16 | 8/1/2015 |
| 11 | $162,041.16 | 9/1/2015 |
| 12 | $162,041.16 | 9/30/2015 |

All other provisions of the policy shall remain unchanged.



INTERLINE
POLICY NUMBER: SM903254

**MARKEL®**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDMENT OF DEFINITIONS: DAMAGES AND CLAIM EXPENSES

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1.    Section DEFINITIONS C. is deleted and replaced with the following:

C.  **Claim Expenses** means reasonable and necessary amounts incurred by the Company or by the Insured with the prior written consent of the Company in the defense of that portion of any Claim for which coverage is afforded under this Coverage Part, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals; provided, however, that Claim Expenses shall not include: (1) salary, wages, overhead, or benefit expenses of or associated with Employees or officials of the Named Insured or employees or officials of the Company; or (2) salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for the Named Insured or the Company.

Claim Expenses also includes those attorneys fees as provided under the Prisoner Litigation Reform Act.

2.    **DEFINITIONS D. Damages** is deleted and replaced with the following:

I.    Damages means the monetary portion of any judgment, award or settlement; provided, however that Damages shall not include: (1) multiplied portions of damages in excess of actual damages, including trebling of damages; (2) taxes, criminal or civil fines, or penalties imposed by law; (3) sanctions; (4) matters which are uninsurable under the law pursuant to which this policy shall be construed; or (5) the return of or restitution of fees, profits or charges for services rendered.

All other provisions of the policy shall remain unchanged.

**Page 1 of 1**



**INTERLINE**
POLICY NUMBER: SM903254

**MARKEL®**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURING AGREEMENT AND DEFINITIONS

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART

In consideration of the premium paid, it is hereby understood and agreed that INSURING AGREEMENT is deleted and replaced as follows:

## INSURING AGREEMENT

The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in Item 7.I.A. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of Claims first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to the Section Claims A., Claim Reporting Provision, for Professional Personal Injury to which this Coverage Part applies by reason of any act, error or omission in Professional Services or Wrongful Act in the performance of Care Management Activities rendered or that should have been rendered by the Insured or by any person for whose acts, errors or omissions the Insured is legally responsible, and arising out of the conduct of the Insured's Professional Services provided:

A. the act, error or omission happens during the Policy Period or on or after the Retroactive Date stated in Item 8.I. of the Declarations; and

B. prior to the effective date of this policy the Insured had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may lead a reasonable person in the Insured's position to conclude that a Claim was likely.

## DEFINITIONS

L. **Care Management Activities means** ongoing case management; development and implement of outcomes research and measurements; protocol development and implementation; disease management protocols; health education programs; utilization review including quality improvement activities.

All other provisions of the policy shall remain unchanged.

**Page 1 of 1**

# **▌▌ EVANSTON INSURANCE COMPANY**
**MARKEL®**

## **Endorsement**

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.: SM903254 |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.: 28 |
| MANAGEMENT | Effective Date of Endorsement: October 1, 2014 |

### **AGGREGATE POLICY LIMIT**
(use with policy form SM-20003)

This endorsement modifies insurance provided under the following:

**Specified Medical Professions Professional Liability Insurance Coverage Part**
**Specified Medical Professions General Liability Insurance Coverage Part**

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. Item 6. of the Declarations, Limits of Liability, is amended by the addition of the following:

    III. Policy Aggregate: $20,000,000

2. The Specified Medical Professions Professional Liability Insurance Coverage Part is amended as follows:

    Section Limits of Liability is amended by the addition of the following:

    **Limit of Liability - Policy Aggregate:** Notwithstanding the Limits of Liability applicable to this Coverage Part and any other purchased Coverage Part(s), the total liability of the Company under this policy shall not exceed the Policy Aggregate Limit of Liability as stated in Item 6.III. of the Declarations.

3. The Specified Medical Professions General Liability Insurance Coverage Part is amended as follows:

    Section Limits of Liability is amended by the addition of the following:

    **Limit of Liability - Policy Aggregate:** Notwithstanding the Limits of Liability applicable to this Coverage Part and any other purchased Coverage Part(s), the total liability of the Company under this policy shall not exceed the Policy Aggregate Limit of Liability as stated in Item 6.III. of the Declarations.

All other provisions of the policy shall remain unchanged.

**EIC 4696 01/08** **Page 1 of 1**

# **▮▮▮ EVANSTON INSURANCE COMPANY**
**MARKEL®**

## **Endorsement**

| | |
|---|---|
| Named Insured:<br>THE BANTRY GROUP CORPORATION DBA:<br>WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL<br>MANAGEMENT | Attached to and forming<br>a part of Policy No.:   SM903254<br>Endorsement No.:   29<br>Effective Date of Endorsement:   October 1, 2014 |

### **GOVERNMENT ACCESS TO RECORDS ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**Locum Tenens and Contract Staffing Professional Liability Insurance Coverage Part**
**Specified Medical Professions Professional Liability Coverage Part**
**Specified Medical Professions Professional Liability Insurance Policy**
**Physicians, Surgeons, Dentists and Podiatrists and Professional Liability Insurance Policy**

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

The following is added in compliance with the requirement of 42 U.S.C. 1395 x(v)(1)(l) of the Omnibus Reconciliation Act of 1980:

### **ADDITIONAL CONDITIONS**

Upon written request, the Company will allow the Secretary of Health and Human Services and the Comptroller General access to the policy and necessary books, documents and records to verify the cost of the policy, to the extent required by law. Access will also be allowed to subcontracts between the Company and any related organization of the Company and to its books, documents and records. Such access will be provided up to four (4) years after the end of the Policy Period.

All other provisions of the policy shall remain unchanged.

# ▐█ EVANSTON INSURANCE COMPANY
**MARKEL®**

## Endorsement

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.:  SM903254 |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.:  30 |
| MANAGEMENT | Effective Date of Endorsement:  October 1, 2014 |

### ADDITIONAL INSURED ENDORSEMENT – BODILY INJURY/PROPERTY DAMAGE LIABILITY (BLANKET)

This endorsement modifies insurance provided under the following:

**Specified Medical Professions General Liability Insurance Coverage Part**

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. Section The Insured is amended by the addition of the following:

   Whenever used in this Coverage Part, the unqualified word Insured shall also mean Additional Insured.

2. **Additional Insured** means, whenever used in this endorsement, the following:

   any person or organization to whom the Named Insured is obligated by valid written contract to provide coverage as an additional insured to such person or organization but only as respects liability for Bodily Injury or Property Damage caused by the negligence of the Named Insured and only for Occurrences, Claims or coverage not otherwise excluded in the policy.

3. Coverage provided to any Additional Insured as defined herein shall apply solely to an Occurrence involving the products, goods, operations or premises covered by this Coverage Part.

4. No coverage shall be afforded to the above Additional Insured for Bodily Injury or Property Damage to any Employee or to any obligation of the Additional Insured to indemnify another because Damages arising out of such injury.

5. Where no coverage shall apply herein for the Named Insured, no coverage or defense shall be afforded to the above Additional Insured.

All other provisions of the policy shall remain unchanged.

**EIC 4671 08/07** **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDMENT of DECLARATIONS ITEM 9. RATE and PREMIUM BASE

This endorsement modifies insurance provided under the following:

Specified Medical Professions Professional Liability Coverage Insurance Coverage Part
Specified Medical Professions General Liability Insurance Coverage Part

9.

**RATE: $16.00**
**PREMIUM BASE**

Contract (s) added during the Policy Period shown on Item 3
Average Daily Census (ADC) of each New Contract (s)

**RATE:$20.00**

Contract(s) that were added during Policy Period of Policy SM903254

**PREMIUM BASE:**

ADC of Contract(s) that were added during Policy Period of Policy SM903254

**RATE: $22.25**
**PREMIUM BASE:**

Contracts cover under Policy SM903254
ADC of Contracts covered under Policy SM903254

All other provisions of the policy shall remain unchanged.

**Page 1 of 1**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change
Number 32

| POLICY NUMBER<br>SM903254 | POLICY CHANGES<br>EFFECTIVE<br>July 1, 2015 | COMPANY<br>EVANSTON INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br>THE BANTRY GROUP CORPORATION DBA: WEXFORD<br>HEALTH SOURCES INC. AND BALLYMORE MEDICAL<br>MANAGEMENT | | AUTHORIZED REPRESENTATIVE<br>USG INSURANCE SERVICES, INC.<br>1000 Town Center Way<br>Suite 300<br>Canonsburg, PA 15317 |

COVERAGE PARTS AFFECTED
Specified Medical Professions Professional Liability Insurance Coverage Part – Claims Made Coverage
Specified Medical Professions General Liability (Including Products and Completed Operations Liability)
Insurance Coverage Part – Claims Made Coverage

CHANGES

Cancellation of Coverage: Mississippi Department of Corrections Jackson MS

In consideration of the return premium specified below, it is hereby understood and agreed that coverage for Mississippi Department of Corrections Jackson MS Contract is cancelled Pro-Rata effective: July 1, 2015

Return Premium Due: $82,469

Coverage for claims arising for services rendered or that should have been rendered on or after the contract retroactive date and prior to the contract expiration date of the Mississippi Department of Corrections Contract will be reported in accordance with the provisions of section 8 claims reporting provision of the specified medical professions professional liability coverage part or the specified medical professions general liability coverage part as applicable.

Authorized Representative

All other terms and conditions remain unchanged.

IL 12 01 11 85      Copyright, Insurance Services Office, Inc., 1983      **Page 1 of 1**
Copyright, ISO Commercial Risk Services, Inc., 1983

# EVANSTON INSURANCE COMPANY
MARKEL®

## Endorsement

Named Insured:
THE BANTRY GROUP CORPORATION DBA:
WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL
MANAGEMENT

Attached to and forming
a part of Policy No.:            SM903254
Endorsement No.:                33
Effective Date of Endorsement:  July 1, 2015

### PURCHASED EXTENDED REPORTING PERIOD Mississippi Department of Corrections

This endorsement modifies insurance provided under the following:

**Specified Medical Professions Professional Liability Insurance Coverage Part**
**Specified Medical Professions General Liability Insurance Coverage Part**

In consideration of an additional premium of $356,633 and subject to all the terms, limits of liability, exclusions and conditions of this policy, it is hereby understood and agreed that:

1.  The coverage for the **Mississippi Department of Corrections Jackson MS** Contract is extended to apply to Claims first made against the Insured during the 36 months immediately following cancellation of the **Mississippi Department of Corrections Contract Jackson MS July 1, 2015**, and reported in accordance with the provisions of Section Claims A., Claim Reporting Provision, of the Specified Medical Professions Professional Liability Insurance Coverage Part or the Specified Medical Professions General Liability Insurance Coverage Part, as applicable, but only with respect to:

    (i)   any act, error or omission in Professional Services rendered on or after the Retroactive Date July 1, 2006 and prior to the effective date of such cancellation or nonrenewal, and prior to July 1, 2015 and which is otherwise covered by the Specified Medical Professions Professional Liability Insurance Coverage Part;

    (ii)  Bodily Injury or Property Damage which happened on or after the Retroactive Date July 1, 2006 and prior to the effective date July 1, 2015 of such cancellation or nonrenewal, caused by an Occurrence which happened on or after the Retroactive Date July 1, 2006 and prior to the effective date of such cancellation or nonrenewal and arising from those products, goods, operations or premises stated of the Declarations and which is otherwise covered by the Specified Medical Professions General Liability Insurance Coverage Part; or

    (iii) Personal Injury or Advertising Injury which happened on or after the Retroactive Date July 1, 2006 and prior to the effective date of such cancellation or

All other provisions of the policy shall remain unchanged.

nonrenewal July 1, 2015, caused by an offense which happened on or after the

Retroactive Date July 1, 2006 stated in and prior to the effective date of such cancellation or nonrenewal July 1, 2015 and arising from those products, goods, operations or premises stated in and which is otherwise covered by the Specified Medical Professions General Liability Insurance Coverage Part.

This 36 month interval is herein referred to as the Extended Reporting Period.

2. Immediately upon the commencement of the Extended Reporting Period the entire premium therefor shall be deemed fully earned. If the Extended Reporting Period is terminated before its term for any reason, the Company shall not be liable to return any portion of the premium paid for the Extended Reporting Period.

3. Nothing contained in this endorsement shall in any way increase the applicable limits of liability set forth in the Declarations.

All other provisions of the policy shall remain unchanged.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change
Number 34

| POLICY NUMBER<br>SM903254 | POLICY CHANGES<br>EFFECTIVE<br>July 1, 2015 | COMPANY<br>EVANSTON INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br>THE BANTRY GROUP CORPORATION DBA: WEXFORD<br>HEALTH SOURCES INC. AND BALLYMORE MEDICAL<br>MANAGEMENT | | AUTHORIZED REPRESENTATIVE<br>USG INSURANCE SERVICES, INC.<br>1000 Town Center Way<br>Suite 300<br>Canonsburg, PA 15317 |

COVERAGE PARTS AFFECTED
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART -
 CLAIMS MADE COVERAGE

## CHANGES

### ADDITION OF ENDORSEMENT

In consideration of the premium paid, it is hereby understood and agreed that Amendment of The Insured B. Addition Of Physician/Surgeon/Dentist/Podiatrist, MESM 2001 03 14, Endorsement No. 14 is deleted in its entirety and Amendment of The Insured B. Addition Of Physician/Surgeon/Dentist/Podiatrist, MESM 2001 03 14, Endorsement No. 35 is being added as attached effective as of the date stated above.

Jerard albarese
Authorized Representative

All other terms and conditions remain unchanged.

 Copyright, Insurance Services Office, Inc., 1983
Copyright, ISO Commercial Risk Services, Inc., 1983 **Page 1 of 1**

INTERLINE
POLICY NUMBER: SM903254

**MARKEL®**   **EVANSTON INSURANCE COMPANY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF THE INSURED B.
# ADDITION OF PHYSICIAN/SURGEON/DENTIST/PODIATRIST

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. Section THE INSURED B. is deleted and replaced with the following:

   B. Any past or current principal, partner, officer, director, Employee or Volunteer Worker of the Named Insured solely while acting on behalf of the Named Insured and within the scope of their duties as such; provided, however, this insurance shall not apply to any Claim made against any Insured who is a physician, surgeon, dentist or podiatrist arising out of the rendering of or failure to render Professional Services in his/her capacity as a physician, surgeon, dentist or podiatrist; other than the following Named Physician(s), Surgeon(s), Dentist(s) or Podiatrist(s) solely:

      1. While acting on behalf of the Named Insured and within the scope of his/her duties as a principal, partner, officer, director, Employee or Volunteer Worker of the Named Insured;

      2. For an act, error or omission in Professional Services happening:

         a. On or after the Retroactive Date stated below; and

         b. Before the Departure Date, if any, stated below;

         as applicable to such Named Physician, Surgeon, Dentist or Podiatrist; and

      3. For Claims first made against such Named Physician, Surgeon, Dentist or Podiatrist during the Policy Period, provided that prior to the effective date of this policy the Named Physician, Surgeon, Dentist or Podiatrist had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may lead a reasonable person in the Insured's position to conclude that a Claim was likely.

2. Section DEFINITIONS is amended by the addition of the following:

   **Departure Date** means the date on which the Named Physician, Surgeon, Podiatrist or Dentist ceases to provide Professional Services on behalf of the Named Insured.

## Schedule of Active Providers

| Named Physician, Surgeon, Dentist or Podiatrist | Named Physician, Surgeon, Dentist, Podiatrist Retroactive Date: |
|---|---|
| On File with the Company for the Following Contracts listed below; | |
| Illinois Department of Corrections Springfield, IL 62794 | October 1, 2014 |
| Treatment & Detention Facility Rushville, IL 62681 | October 1, 2014 |
| Kane County Sheriffs Office Geneva, IL 60134 | October 1, 2014 |
| West Virginia Division of Corrections Charleston, WV 25311 | October 1, 2014 |
| Yavapai County Sheriff's Office Prescott, AZ | October 1, 2014 |
| St Clair County Sheriff's Office Belleville, IL 62220 | October 1, 2014 |
| Florida Department of Corrections Region IV | October 1, 2014 |

## Schedule of Departed Providers

| Named Physician, Surgeon, Dentist or Podiatrist On File with the Company for the Following Contracts listed below | Named Physician, Surgeon, Dentist, Podiatrist Retroactive Date: | Named Physician, Surgeon, Dentist, Podiatrist Departure Date: |
|---|---|---|
| Mississippi Department of Corrections Jackson, MS 39202 | | July 1, 2015 |

All other terms and conditions remain unchanged.

# **EVANSTON INSURANCE COMPANY**
MARKEL®

## **Endorsement**

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.: SM903254 |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.: 36 |
| MANAGEMENT | Effective Date of Endorsement: July 1, 2015 |

**It is understood and agreed to that Endorsement No. 18 is deleted in its entirety and replaced with the following:**

### **AMENDMENT OF THE INSURED -**
### **ADDITION OF INDEPENDENT CONTRACTOR**

This endorsement modifies insurance provided under the following:

**Specified Medical Professions Professional Liability Insurance Coverage Part**

In consideration of the premium paid, it is hereby understood and agreed that Section The Insured is amended by the addition of the following:

G. the following independent contracted healthcare professional, solely while acting on behalf of the Named Insured and within the scope of his/her duties on behalf of the Named Insured:

1. for an act, error or omission in Professional Services happening on or after the Retroactive Date specified below as applicable to such independent contracted healthcare professional; and

2. for Claims first made against such independent contracted healthcare professional on or after the Effective Coverage Date and prior to the Expiration Coverage Date, specified below as applicable to such independent contracted healthcare professional, provided that prior to the Effective Coverage Date specified below as applicable to such independent contracted healthcare professional, the independent contracted healthcare professional had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may result in a Claim under this policy.

| | Independent | | |
|---|---|---|---|
| Independent Contracted | Contracted Healthcare | Coverage Date | |
| Healthcare Professional | Professional | Effective: | Expiration: |
| | Retroactive Date: | | |
| On File with the Company for the Following Contracts listed below | Contract Start Date | 10/1/2014 | End of Policy Period |
| Illinois Department of Corrections Springfield IL 62794 | Contract Start Date | 10/1/2014 | End of Policy Period |

All other provisions of the policy shall remain unchanged.

**EIC 4772 10/08**

| | | | |
|---|---|---|---|
| Mississippi Department of Corrections Jackson,MS 39202 | 7/1/2006 | 10/1/2014 | July 1, 2015 |
| Treatment & Detention Facility Rushville, IL 62681 | 7/1/2011 | 10/1/2014 | End of Policy Period |
| Kane County Sheriffs Office Geneva, IL 60134 | 12/1/2010 | 10/1/2014 | End of Policy Period |
| West Virginia Division of Corrections Charleston, WV 25311 | 5/1/ 2008 | 10/1/2014 | End of Policy Period |
| Yavapai County Sheriff's Office Prescott, AZ | 7/1/2003 | 10/1/2014 | End of Policy Period |
| St Clair County Sheriff's Office Belleville, IL 62220 | 1/1/2003 | 10/1/2014 | End of Policy Period |
| Florida Department of Corrections Region IV | 03/01/2013 | 10/1/2014 | End of Policy Period |

All other provisions of the policy shall remain unchanged.

**EIC 4772 10/08**

# **EVANSTON INSURANCE COMPANY**

**MARKEL®**

## Endorsement

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.: SM903254 |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.: 37 |
| MANAGEMENT | Effective Date of Endorsement: July 1, 2015 |

**It is understood and agreed to that Endorsement No. 24 is deleted in its entirety and replaced with the following:**

### SCHEDULE OF CONTRACTS COVERED UNDER THIS POLICY

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of premium paid, it is hereby understood and agreed that coverage afforded under this policy of insurance extends to the following contracts

On File with the company for the Following Contracts listed below

Illinois Department of Corrections Springfield, IL 62794

Mississippi Department of Corrections Jackson, MS 39202 – Ceased contract July 1, 2015
36 month Extended Reporting Period to expire July 1, 2018

Treatment & Detention Facility Rushville, IL 62681

Kane County Sheriffs Office Geneva, IL 60134

West Virginia Division of Corrections Charleston, WV 25311

Yavapai County Sheriff's Office Prescott, AZ

St Claire County Sheriff's Office Belleville, IL 62220

Florida Department of Corrections Region IV

All other provisions of the policy shall remain unchanged.



# EVANSTON INSURANCE COMPANY

**MARKEL®**

## Endorsement

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.: SM903254 |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.: 38 |
| MANAGEMENT | Effective Date of Endorsement: July 1, 2015 |

## SCHEDULE OF PREMIUM PAYMENTS

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART -
CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART - CLAIMS
MADE COVERAGE

In consideration of the premium paid, for the State of Mississippi Contract. Extended Reporting Period
endorsement effective July 1, 2015, it is hereby understood and agree that Premium is to be paid to
the Company in two installments.

| Payment Number | Amount | Due Date |
|---|---|---|
| 1 | $213,980 | September 1, 2015 |
| 2 | $142,653 | October 1, 2015 |

All other provisions of the policy shall remain unchanged.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change
Number 39

| POLICY NUMBER<br>SM903254 | POLICY CHANGES<br>EFFECTIVE<br>October 1, 2015 | COMPANY<br>EVANSTON INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br>THE BANTRY GROUP CORPORATION DBA: WEXFORD<br>HEALTH SOURCES INC. AND BALLYMORE MEDICAL<br>MANAGEMENT | | AUTHORIZED REPRESENTATIVE<br>USG INSURANCE SERVICES, INC.<br>1000 Town Center Way<br>Suite 300<br>Canonsburg, PA 15317 |

COVERAGE PARTS AFFECTED
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE – CLAIMS MADE
COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED
OPERATIONS LIABILITY) INSURANCE - CLAIMS MADE COVERAGE

CHANGES

**AMENDMENT OF POLICY PERIOD**

In consideration of the additional premium of $324,970, it is hereby understood and agreed that Item 3. of the
Declarations, **POLICY PERIOD**, is deleted and replaced with the following:

3. **POLICY PERIOD**:　　　　From October 1, 2014 to December 1, 2015
12:01 A.M. Standard Time at the address stated above

_Gerard Albanese_
Authorized Representative

All other terms and conditions remain unchanged.



**EVANSTON INSURANCE COMPANY**

MARKEL®

## Endorsement

| | |
|---|---|
| Named Insured: | Attached to and forming |
| THE BANTRY GROUP CORPORATION DBA: | a part of Policy No.: SM903254 |
| WEXFORD HEALTH SOURCES INC. AND BALLYMORE MEDICAL | Endorsement No.: 40 |
| MANAGEMENT | Effective Date of Endorsement: October 1, 2015 |

## SCHEDULE OF PREMIUM PAYMENTS

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that That policy premium shown on DECLARATIONS Item 10. is to be paid in 12 monthly installments due to the company no later than:

| Payment Number | Amount | Due Date |
|---|---|---|
| 1 | $162,485 | 10/6/2015 |
| 2 | $162,485 | 10/28/2015 |

All other provisions of the policy shall remain unchanged.

## COMMON POLICY CONDITIONS

In consideration of the premium paid, the undertaking of the Named Insured to pay the applicable Deductible as described herein and in the amount stated in the Declarations, in reliance upon the statements in the application attached hereto and made a part hereof and the underwriting information submitted on behalf of the Insured, and subject to the terms, conditions and limitations of this policy, the Company and the Insured agree as follows:

All Coverage Parts included in this policy are subject to the following conditions.

A.  **Territory:** The insurance afforded by this policy applies worldwide, provided the Claim is made in the United States of America, its territories or possessions or Puerto Rico.

B.  **Cancellation:** This policy may be cancelled by the Named Insured on behalf of all Insureds by mailing to the Company written notice as stated in Item 14. of the Declarations stating when thereafter such cancellation shall be effective. If cancelled by the Named Insured, the earned premium shall be computed at the customary short rate. Payment or tender of unearned premium shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

This policy may be cancelled by the Company or by its underwriting manager, on behalf of the Company, by mailing to the Named Insured, at the address stated in Item 2. of the Declarations, written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. However, if the policy is cancelled because the Named Insured has failed to pay a premium or Deductible when due, including premium and/or Deductible(s) due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies of which this policy is a renewal or replacement, this policy may be cancelled by the Company or by its underwriting manager, on behalf of the Company, by mailing a written notice of cancellation to the Named Insured stating when, not less than ten (10) days thereafter, such cancellation shall be effective. The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Such notice shall be conclusive on all Insureds. Delivery of such written notice by the Named Insured, the Company or its underwriting manager shall be equivalent to mailing. If cancelled by the Company or its underwriting manager, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

No Coverage Part shall be independently cancellable by the Named Insured or by the Company or its underwriting manager. Cancellation of a Coverage Part if effected by the Named Insured or the Company or its underwriting manager, shall constitute a cancellation of this policy in its entirety.

C.  **Representations:** By acceptance of this policy, the Insureds agree as follows:

1.  that the information and statements contained in the application(s) are the basis of this policy and are to be considered as incorporated into and constituting a part of this policy; and

2.  that the information and statements contained in the application(s) are their representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by the Company under this policy, and that this policy is issued in reliance upon the truth of such representations.

D.  **Entire Agreement:** This policy, the Declarations, the application(s) and any written endorsements attached hereto shall be deemed to be a single unitary contract.

E.  **Changes:** Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Company shall not effect a waiver or a change in any part of this policy and shall not estop the Company from asserting any right under the terms of the policy. The terms of this policy shall not be waived or changed, except by written endorsement issued to form a part of this policy, and this policy embodies all agreements existing between the Insureds and the Company or any of its agents relating to this insurance.

F.  **Assignment of Interest:** Assignment of interest under this policy shall not bind the Company unless its consent is endorsed hereon.

G.  **Subrogation:** In the event of any payment under this policy, the Company shall be subrogated to the right of recovery of all Insureds to the extent of such payment. The Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after the Claim to prejudice such rights.

The Company shall not exercise any such rights against any person, firms or corporations included in the definition of Insured. Notwithstanding the foregoing, however, the Company reserves the right to exercise any rights of subrogation against an Insured in respect of any Claim brought about or contributed to by the intentional, dishonest, fraudulent, criminal or malicious act or omission of such Insured.

Any amount so recovered, whether effected by the Company or by the Insured, shall first be used for the repayment of expenses incurred toward subrogation; second, for any Damages and Claim Expenses payment by the Insured which is in excess of the amount of the Limit of Liability under this policy and which is in excess of any amount paid by any insurer under any other policy; third, for any damages and claim expenses payment by any excess carrier on behalf of the Insured; fourth, for any damages and claim expenses payment by any primary carrier on behalf of the Insured; and, last, for repayment of the Insured's Deductible.

H.  **Premium and Audit:** Upon expiration of this policy, the Named Insured shall furnish to the Company or its underwriting manager, on behalf of the Company, a statement of the Named Insured's actual total premium base as stated in Item 9. of the Declarations for the Policy Period. The actual earned premium shall be computed thereon at the premium rate stated in Item 9. of the Declarations. If the actual earned premium is more than the deposit premium stated in Item 10. of the Declarations, the Named Insured shall pay the difference to the Company; if less, the Company shall refund the difference to the Named Insured except that the Company shall be entitled to the minimum premium as stated in Item 10. of the Declarations. The Company or its underwriting manager, on behalf of the Company, shall have the right to require of the Named Insured, at any time within the said Policy Period or one (1) year thereafter, a sworn statement of the entire amount (or number) of such premium base during the whole or any specified part of the said period, and the Named Insured shall furnish said statement within ten (10) days after request. The statement referred to shall be subject to verification and audit by a duly authorized representative of the Company, who shall have the right and opportunity to examine the books and records of the Named Insured as respects such premium base, and such examination may be made at any time during the said period and within three (3) years thereafter. The rendering of any estimate or statement or the making of any previous settlement shall not bar the examination herein provided for, nor the Company's right to additional premium.

I.  **Action Against the Company:** No action shall lie against the Company unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been fully and finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the Claimant and the Company.

Nothing contained in this policy shall give any person or organization any right to join the Company as a co-defendant in any action against the Insured to determine the Insured's liability. Bankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder.

J.  **Authorization:** By acceptance of this policy, the first person or organization named in Item 1. of the Declarations shall act on behalf of all Insureds with respect to the giving and receiving of all notices to and from the Company as provided herein: the exercising of the Extended Reporting Period, if applicable; the cancellation of this policy in whole or part; the payment of premiums and Deductibles when due; the receiving of any return premiums that may become due under this policy; and the Insureds agree that such person or organization shall act on their behalf.

K.  **Service of Suit:** Except with respect to any policy issued in any state in which the Company is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United

States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Midwest, Ten Parkway North, Deerfield, Illinois 60015 and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner, or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

L.   NUCLEAR ENERGY LIABILITY EXCLUSION (BROAD FORM)

It is agreed that:

1.   **This policy does not apply:**

A.   Under any Liability Coverage, to bodily injury or property damage

(1)  with respect to which an Insured under this policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2)  resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B.   Under any Medical Payments Coverage, or any Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

C.   Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if

(1)  the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an Insured or (b) has been discharged or dispersed therefrom;

(2)  the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Insured; or

(3)  the bodily injury or property damage arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to property damage to such nuclear facility and any property thereat.

**2. As used in this exclusion:**

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means

    (a)    any nuclear reactor,

    (b)    any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

    (c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235.

    (d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste.

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.

**IN WITNESS WHEREOF**, the Company has caused this policy to be signed by its President and Secretary, but this policy shall not be valid unless countersigned on the Declarations by a duly authorized representative of the Company.

Kathleen Anne Sturgeon
Secretary

Bernd Albanese
President

## Specified Medical Professions Professional Liability Insurance Coverage Part – Claims Made Coverage

THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE ONLY. PLEASE READ IT CAREFULLY.

### THE INSURED

The unqualified word "Insured", either in the singular or plural, means:

A. the Named Insured stated in Item 1. of the Declarations;

B. any principal, partner, officer, director, Employee, Volunteer Worker or any former principal, partner, officer, director, Employee, or Volunteer Worker of the Named Insured, solely while acting on behalf of the Named Insured and within the scope of his/her duties as such; provided, however, this insurance shall not apply to any Claim made against any Insured who is a physician, surgeon or dentist arising out of the rendering of or failure to render Professional Services in his/her capacity as a physician, surgeon or dentist;

C. if the Named Insured stated in Item 1. of the Declarations is a limited liability company, any past or current manager thereof, solely while acting on behalf of the Named Insured and within the scope of their duties as manager of the limited liability company and any past or current member, solely while acting on behalf of the Named Insured and within the scope of their duties as a member of the limited liability company;

D. any medical director solely while acting on behalf of the Named Insured and solely within the scope of his/her Administrative Duties as such; provided, however, this insurance shall not apply to any Claim made against any medical director who is a physician, surgeon or dentist arising out of the rendering of or failure to render Professional Services in his/her capacity as a physician, surgeon or dentist;

E. any student enrolled in a training program in connection with the Named Insured's Professional Services solely while acting within the scope of his/her duties as such and at the Named Insured's direction;

F. the heirs, executors, administrators, assigns and legal representatives of each Insured in the event of death, incapacity or bankruptcy of such Insured, but only while acting within the scope of their duties as such on behalf of the Named Insured or of the Insured's estate.

### INSURING AGREEMENT

The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in Item 7.I.A. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of Claims first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to the Section Claims A., Claim Reporting Provision, for Professional Personal Injury to which this Coverage Part applies by reason of any act, error or omission in Professional Services rendered or that should have been rendered by the Insured or by any person for whose acts, errors or omissions the Insured is legally responsible, and arising out of the conduct of the Insured's Professional Services provided:

A. the act, error or omission happens during the Policy Period or on or after the Retroactive Date stated in Item 8.I. of the Declarations; and

B. prior to the effective date of this policy the Insured had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may lead a reasonable person in the Insured's position to conclude that a Claim was likely.

### DEFINITIONS

A. **Administrative Duties** means establishing medical protocol, serving on a standards review, peer review, or credentialing committee or similar professional board or committee of the Named Insured; provided, however, Administrative Duties shall not include:

1. rendering or failure to render to a patient, person or resident of a healthcare facility Professional Services by a medical director which results in Professional Personal Injury; or

2. rendering or failure to render patient specific medical direction via telecommunications to other healthcare professionals.

B.   **Claim** means a demand received by the Insured for monetary damages or services and shall include the service of suit or institution of arbitration proceedings against the Insured.

C.   **Claim Expenses** means reasonable and necessary amounts incurred by the Company or by the Insured with the prior written consent of the Company in the defense of that portion of any Claim for which coverage is afforded under this Coverage Part, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals; provided, however, that Claim Expenses shall not include: (1) salary, wages, overhead, or benefit expenses of or associated with Employees or officials of the Named Insured or employees or officials of the Company; or (2) salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for the Named Insured or the Company.

D.   **Damages** means the monetary portion of any judgment, award or settlement; provided, however, Damages shall not include: (1) punitive or exemplary damages or multiplied portions of damages in excess of actual damages, including trebling of damages; (2) taxes, criminal or civil fines, or attorneys' fees of a party other than an Insured or other penalties imposed by law; (3) sanctions; (4) matters which are uninsurable under the law pursuant to which this policy shall be construed; or (5) the return, restitution or payment of any fees, profits or charges for services rendered.

E.   **Employee** means any person while in the regular service of the Named Insured in the ordinary course of the Named Insured's business and whom the Named Insured compensates by salary, wages or commissions and has the right to govern and direct the performance of such service. Employee includes a Leased Worker but does not include any Temporary Worker or independent contractor.

F.   **Leased Worker** means a person leased to the Named Insured by a labor leasing firm, under an agreement between the Named Insured and the labor leasing firm, to perform duties related to the conduct of the Named Insured's business and which are at the Insured's direction. Leased Worker does not include a Temporary Worker.

G.   **Policy Period** means the period from the inception date of this policy to the policy expiration date as stated in Item 3. of the Declarations, or its earlier cancellation or termination date.

H.   **Professional Personal Injury** means:

1.   any bodily injury, mental injury, sickness, disease, emotional distress or mental anguish, including death resulting therefrom of any patient, person, or resident of a healthcare facility receiving Professional Services;

2.   false arrest, detention or imprisonment, or malicious prosecution except when inflicted by, at the direction of, or with the consent or acquiescence of the Insured who has predetermined to commit such act, or allowed such act to have been committed, without legal justification; or

3.   the publication or utterance of a libel or slander or a publication or an utterance in violation of a patient's right to professional confidence, except when published or uttered by, at the direction of, or with the consent or acquiescence of the Insured who has predetermined to commit such act, or allowed such act to have been committed, without legal justification.

I.   **Professional Services** means those services described in Item 4. of the Declarations.

J.   **Temporary Worker** means any person who is furnished to the Named Insured to substitute for a permanent Employee on leave or to meet seasonal or short-term work load requirements.

K.   **Volunteer Worker** means any person who is not an Employee of the Named Insured and who donates his/her work at the direction of and within the scope of duties determined by the Named

Insured and is not paid a fee, salary or other compensation by the Named Insured or by anyone else for such work performed for the Named Insured.

## THE EXCLUSIONS

This Coverage Part does not apply to:

A. any Claim based upon, arising out of or in any way involving conduct of the Insured, or at the Insured's direction, that is intentional, willful, dishonest, fraudulent, criminal or that constitutes a willful violation of any statute or regulation;

B. liability arising out of the Insured's activities in his/her capacity as proprietor, superintendent, executive officer, director, partner, trustee or Employee of any hospital, sanitarium, clinic with bed-and-board facilities, laboratory, business enterprise, or any governmental body, sub-division or agency not named as an Insured under this policy unless such activities are disclosed in the application and listed in Item 12. of the Declarations;

C. any Claim based upon or arising out of any obligation of the Insured under any workers' compensation, unemployment compensation or disability benefits law or under any similar law;

D. Professional Personal Injury to, or sickness, disease or death of any Employee of the Insured arising out of, and in the course of his/her employment by the Insured;

E. any Claim based upon or arising out of any liability assumed by the Insured in a contract or agreement; provided, however, this exclusion shall not apply to liability an Insured would have in the absence of the contract or agreement;

F. any Claim based upon or arising out of any unlawful discrimination by any Insured;

G. injury arising out of the performance of a criminal act or caused by a person while under the influence of intoxicants or narcotics;

H. liability arising out of the ownership, maintenance, operation, use, loading or unloading of any vehicle, watercraft or aircraft;

I. any Claim based upon or arising out of any sexual act, including without limitation sexual intimacy (even if consensual), sexual contact, sexual advances, requests for sexual favors, sexual molestation, sexual assault, sexual abuse, sexual harassment, sexual exploitation or other verbal or physical conduct of a sexual nature; provided, however, the Company shall defend the Named Insured for such a Claim for the strictly vicarious liability of the Named Insured, unless a manager, supervisor, officer, director, trustee or partner of the Named Insured:

   1. knew or should have known about the sexual act allegedly committed by the Insured but failed to prevent or stop it; or

   2. knew or should have known that the Insured who allegedly committed the sexual act had a prior history of such sexual misconduct act;

   The Company shall not pay Damages on behalf of the Named Insured for such a Claim.

J. any Claim arising out of general liability or products liability;

K. any Claim made against the Insured:

   1. by any person or organization or its subrogee, assignee, contractor, subcontractor, or parent company, subsidiary, division or affiliated company which was or is operated, managed, owned or otherwise controlled, whether directly or indirectly, or in whole or in part, by an Insured or parent company or any subsidiary, division or affiliated organization; or

   2. by or on behalf of any Insured under this policy; provided, however, this exclusion shall not apply to any Claim made against any Insured arising out of the rendering of or failure to render Professional Services by the Insured or by any person for whose acts, errors or omissions the Insured is legally responsible, if such Insured is a patient or client of the Insured;

L. any Claim based upon or arising out of wrongful termination or other employment related practices;

M.    any Claim based upon or arising out of a warranty or guarantee of cure or success of treatment which is alleged to have arisen out of advertisement;

N.    any Claim based upon or arising out of the dispensing of or the use of any drug or device whose approval for use was withdrawn by the Food and Drug Administration (FDA) at the time such drug or device was used or dispensed;

O.    any Claim based upon or arising out of any actual or alleged violations of the Employee Retirement Income Security Act of 1974 (ERISA) and its amendments or any regulation or order issued pursuant thereto or any similar federal, state or local law;

P.    any Claim based upon or arising out of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C., Section 1961, et seq.;

Q.    any Claim based upon or arising out of any allegations of price fixing, unfair competition or trade practices; a dispute over fees, income or revenue; the inducement to enter into, the interference with or the dissolution or termination of any business or economic relationship, or violations of any federal, state or local law (including but not limited to Title 15 of the United States Code or any similar state statute) that prohibits the unlawful restraint of trade, business or profession;

R.    any administrative or judicial hearings pertaining to Medicare/Medicaid fraud or any other hearing initiated against an Insured by the United States Department of Health & Human Services (HHS) or by an utilization or quality review organization under contract with HHS; provided, however, this exclusion shall not apply to HHS proceedings that allege the violation of the Emergency Medical Treatment and Labor Act; or

S.    any Claim brought under any other Coverage Part of this policy.

## LIMITS OF LIABILITY

A.    **Limit of Liability-Each Claim:**  The total liability of the Company for the combined total of Damages and Claim Expenses for each Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, shall not exceed the Limit of Liability stated in Item 6.I.A. of the Declarations as applicable to Each Claim.

B.    **Limit of Liability-Aggregate:**  Subject to the above Limits of Liability A., the total liability of the Company shall not exceed the Aggregate Limit of Liability as stated in Item 6.I.B. of the Declarations for all Damages and Claim Expenses arising out of all Claims first made against the Insured during the Policy Period and the Extended Reporting Period, if exercised.

C.    **Limit of Liability-Reduction for Refusal to Settle:**  The Company shall not settle any Claim without the consent of the Insured. If, however, the Insured is a partnership, professional association, professional corporation or limited liability company, the written consent of an Insured who was formerly but is no longer a member of the partnership, professional association or limited liability company or director, officer, stockholder or Employee of a professional corporation will not be required, provided the written consent of the corporate directors, officers, stockholders or Employees of a professional corporation, or their duly appointed representatives, has been obtained. If, however, the Insured shall refuse to consent to any settlement recommended by the Company and shall elect to contest the Claim or continue any legal proceedings in connection with such Claim, then the Company's liability for the Claim shall not exceed the amount for which the Claim could have been so settled including Claim Expenses incurred up to the date of such refusal. Such amounts are subject to the provisions of the above Limits of Liability A. and B.

D.    **Deductible:**  The Deductible amount stated in Item 7.I.A. of the Declarations shall be paid by the Named Insured and shall be applicable to each Claim and shall include Damages and Claim Expenses, whether or not Damages payments are made.

Such amounts shall, upon written demand by the Company, be paid by the Named Insured within ten (10) days. The total payments requested from the Named Insured in respect of each Claim shall not exceed the Deductible amount stated in Item 7.I.A. of the Declarations. The determination of the Company as to the reasonableness of the Claim Expenses shall be conclusive on the Named Insured.

E. **Multiple Insureds, Claims and Claimants:** The inclusion herein of more than one Insured in any Claim or suit or the making of Claims or the bringing of suits by more than one person or organization shall not operate to increase the Limits of Liability stated in Item 6.I. of the Declarations. More than one Claim arising out of a single act, error or omission or a series of related acts, errors or omissions shall be considered a single Claim. All such Claims, whenever made, shall be treated as a single Claim. Such single Claim, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of such act, error or omission is made or with regard to notice given to and accepted by the Company pursuant to Section Claims B., Discovery Clause, on the date within the Policy Period on which such notice of potential Claim is first received by the Company.

## DEFENSE, SETTLEMENTS AND CLAIM EXPENSES

The Company shall have the right and duty to defend and investigate any Claim to which coverage under this Coverage Part applies. Subject to Section Limits of Liability C., the Company may make such investigation and settlement of any Claim as it deems expedient. Claim Expenses incurred in defending and investigating a Claim shall be a part of and shall not be in addition to the applicable Limits of Liability stated in Item 6.I. of the Declarations. Such Claim Expenses shall reduce the Limits of Liability and shall be applied against the Deductible. The Company shall have no obligation to pay any Damages or to defend or to continue to defend any Claim or to pay Claim Expenses for Claims after the applicable Limit or Limits of Liability stated in Item 6.I. of the Declarations have been exhausted.

## CLAIMS

A. **Claim Reporting Provision:** The Insured shall give to the Company written notice as stated in Item 14. of the Declarations as soon as practicable of any Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised.

In the event a suit is brought against the Insured, the Insured shall immediately forward to Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois, 60015, on behalf of the Company, every demand, notice, summons or other process received by him/her or by his/her representatives.

B. **Discovery Clause:** If during the Policy Period, the Insured first becomes aware of a specific act, error or omission in Professional Services which may result in a Claim within the scope of the coverage for this Coverage Part, then the Insured may provide written notice as stated in Item 14. of the Declarations to the Company containing the information listed below. If such written notice is received by the Company during the Policy Period, then any Claim subsequently made against the Insured arising out of such act, error or omission in Professional Services shall be deemed for the purpose of this insurance to have been first made on the date on which such written notice is first received by the Company.

It is a condition precedent to the coverage afforded by this Discovery Clause that written notice be given to the Company containing the following information:

1. the description of the specific act, error or omission;

2. the date on which such act, error or omission took place;

3. the injury or damage which has or may result from such act, error or omission;

4. the identity of any injured persons; and

5. the circumstances by which the Insured first became aware of such act, error or omission.

C. **Assistance and Cooperation of the Insured:** The Insured shall cooperate with the Company and upon the Company's request, the Insured shall: (1) submit to examination and interview by a representative of the Company, under oath if required; (2) attend hearings, depositions and trials; (3) assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses in the conduct of suits; (4) give a written statement or statements to the Company's representatives and meet with such representatives for the purpose of determining coverage and investigating and/or defending any Claim, all without cost to the Company. The Insured shall further cooperate with the Company and do whatever is necessary to secure and effect any right of indemnity, contribution or apportionment

which the Insured may have. The Insured shall not, except at his/her own cost, make any payment, admit any liability, settle any Claims, assume any obligation or incur any expense without the written consent of the Company.

D.   **False or Fraudulent Claims:** If any Insured shall commit fraud in proffering any Claim, this insurance shall become void as to such Insured from the date such fraudulent Claim is proffered.

## EXTENDED REPORTING PERIOD

A.   If the Named Insured nonrenews this policy or cancels this policy pursuant to Common Policy Conditions B., Cancellation, or if the Company nonrenews this policy or cancels this policy pursuant to Common Policy Conditions B., Cancellation, for reasons other than nonpayment of premium or Deductible or non-compliance with the terms and conditions of this policy, then the Named Insured shall have the right upon payment of an additional premium calculated at the percentage stated in Item 11. of the Declarations of the annual deposit premium for the policy, subject to adjustment as per Common Policy Conditions H., Premium and Audit, but in no event less than the percentage set forth in Item 11. of the Declarations of the annual minimum premium for the policy to extend the coverage granted under this Coverage Part, to Claims first made against the Insured during the period of months stated in Item 11. of the Declarations; as elected by the Named Insured, and reported to the Company pursuant to, Section Claims A., Claim Reporting Provision, following immediately upon the effective date of such cancellation or nonrenewal, for any act, error or omission in Professional Services which was rendered on or after the applicable Retroactive Date stated in Item 8. of the Declarations and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this policy. This period of months as elected by the Named Insured and described in this paragraph shall be referred to in this Coverage Part as the Extended Reporting Period.

If, however, this policy is immediately succeeded by similar claims made insurance coverage on which the Retroactive Date is the same as or earlier than that stated in Item 8. of the Declarations, the succeeding insurance shall be deemed to be a renewal hereof and, in consequence, the Named Insured shall have no right to purchase an Extended Reporting Period.

The quotation of a different premium, Deductible and/or Limit(s) of Liability for renewal does not constitute a cancellation or refusal to renew for the purpose of this provision.

This Extended Reporting Period shall not be available when any Insured's license or right to practice his/her profession is revoked, suspended or surrendered.

B.   As a condition precedent to the right to purchase the Extended Reporting Period, the Named Insured must have paid: (1) all Deductibles when due; (2) all premiums due for the Policy Period; and (3) all premium and deductible(s) due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies of which this policy is a renewal or replacement must have been paid. The right to purchase the Extended Reporting Period shall terminate unless a written request as stated in Item 14. of the Declarations of such election for the Extended Reporting Period is received by the Company within thirty (30) days after the effective date of cancellation or nonrenewal together with payment of the additional deposit premium for the Extended Reporting Period. If such written notice of request and payment of additional premium for the Extended Reporting Period are not so received by the Company, there shall be no right to purchase the Extended Reporting Period at a later date.

C.   The Named Insured shall pay any additional premium that may be due as a result of audit, promptly when due.

D.   In the event of the purchase of the Extended Reporting Period the entire premium therefrom shall be fully earned at its commencement.

E.   The Extended Reporting Period shall not in any way increase the Limits of Liability stated in Item 6. of the Declarations.

## OTHER INSURANCE

This insurance shall be in excess of the applicable Deductible stated in Item 7.I.A. of the Declarations and any other insurance available to the Insured whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided in this Coverage Part.

# Specified Medical Professions General Liability (Including Products and Completed Operations Liability) Insurance Coverage Part - Claims Made Coverage

THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE ONLY. PLEASE READ IT CAREFULLY.

## THE INSURED

The unqualified word "Insured", either in the singular or plural, means:

A.  the Named Insured stated in Item 1. of the Declarations;

B.  if the Named Insured stated in Item 1. the Declarations is an individual, the person so named and his/her lawful spouse, but only with respect to his/her conduct of business as a sole proprietor;

C.  if the Named Insured stated in Item 1. the Declarations is a partnership or joint venture, the partnership or joint venture so named and any partner or member thereof or his/her lawful spouse, but only with respect to the conduct of the partnership or joint venture business;

D.  if the Named Insured stated in Item 1. the Declarations is a limited liability company, the limited liability company so named, any manager thereof, solely while acting on behalf of the Named Insured and within the scope of their duties as manager of the limited liability company and any member thereof, but only with respect to the conduct of the business of the limited liability company;

E.  if the Named Insured stated in Item 1. the Declarations is other than an individual, partnership, joint venture or limited liability company, the organization so designated and any executive officer or director thereof, but only with respect to his/her duties as an executive officer or director of such organization;

F.  any person (other than an Employee of the Named Insured) or organization while acting as real estate manager for the Named Insured;

G.  any Employee of the Named Insured, other than the executive officers of the Named Insured if the Named Insured is an organization other than a partnership, joint venture or limited liability company or managers of the Named Insured if the Named Insured is a limited liability company, solely while acting within the scope of his/her duties as such;

provided, however, that coverage afforded to such Employee does not apply to:

1.  Bodily Injury, Personal Injury or Advertising Injury:

    (i)  to the Named Insured, the Named Insured's partners, the Named Insured's members or to a co-Employee while in the course of his/her employment or performing duties related to the conduct of the Named Insured's business;

    (ii)  to the spouse, child, parent, brother or sister of that co-Employee as a consequence of subparagraph 1.(i) hereinabove;

    (iii)  for which there is any obligation to share Damages with or repay someone else who must pay Damages because of the injury described in subparagraphs 1.(i) and (ii) hereinabove; or

    (iv)  arising out of his/her providing or failure to provide professional health care services, if the Named Insured is engaged in the business or occupation of providing professional health care services;

2.  Property Damage to property:

    (i)  owned, occupied or used by; or

    (ii)  rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

the Named Insured or any Volunteer Worker or Employee of the Named Insured or any partner or member;

H. with respect to the operation, for the purpose of locomotion upon a public highway, of Mobile Equipment registered in the name of the Named Insured under any motor vehicle registration law:

1. an Employee of the Named Insured while operating any such equipment in the course of his/her employment by the Named Insured; or

2. any other person while operating with the permission of the Named Insured any such equipment and any person or organization legally responsible for such person but only with respect to liability arising out of such operation, but only if there is no other valid and collectible insurance available, either on a primary or excess basis, to such person or organization;

provided, however, that no person or organization shall be an Insured under this paragraph H. with respect to:

(i) Bodily Injury to any co-Employee of such person operating any such equipment; or

(ii) Property Damage to property owned by, rented to, in the charge of or occupied by the Named Insured or the employer of any person described in subparagraph 2. hereinabove;

I. any organization which is acquired or formed by the Named Insured, other than a partnership, joint venture or limited liability company, and over which the Named Insured maintains majority ownership, will qualify as a Named Insured if there is no other similar insurance available to that organization;

provided, however that:

1. coverage under this provision is afforded only for ninety (90) days from the date the Named Insured acquires or forms such organization, or the end of the Policy Period, whichever is earlier;

2. Coverage A. does not apply to Bodily Injury or Property Damage that occurred before the Named Insured acquired or formed the organization; and

3. Coverage B. does not apply to Personal Injury or Advertising Injury arising out of an offense committed before the Named Insured acquired or formed the organization;

J. any supervisor, administrator, medical director, department head or head of medical staff solely while acting on behalf of the Named Insured and solely within the scope of his/her duties as such;

K. any student enrolled in a training program in connection with the Named Insured's Professional Services solely while acting within the scope of his/her duties as such and at the Named Insured's direction;

L. any Volunteer Worker other than a healthcare provider of the Named Insured, solely while acting on behalf of the Named Insured and within the scope of his/her duties as such and at the direction of the Named Insured;

M. the heirs, executors, administrators, assigns and legal representatives of each Insured in the event of death, incapacity or bankruptcy of such Insured, but only while acting within the scope of their duties as such on behalf of the Named Insured or of the Insured's estate;

N. any member of the Named Insured's boards or committees, solely for conduct arising out of his/her duties as board or committee members and any person who executes orders from the Named Insured's boards or committees solely while in the course and scope of executing such orders.

This Coverage Part does not apply to Bodily Injury, Property Damage, Personal Injury or Advertising Injury arising out of the conduct of any partnership, joint venture or limited liability company which is not named in the Declarations as a Named Insured.

## INSURING AGREEMENTS

A. **Coverage A. - Bodily Injury and Property Damage Liability:** The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in Item 7.II.A. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of Claims first made against the Insured during the Policy Period or during the Extended Reporting Period, if

exercised, and reported to the Company pursuant to Section Claim Reporting Provision, for Bodily Injury or Property Damage to which this Coverage Part applies caused by an Occurrence, provided:

1.  the entirety of both such Bodily Injury or Property Damage and such Occurrence that caused it took place on or after the Retroactive Date stated in Item 8.II. of the Declarations and before the end of the Policy Period;

2.  such Bodily Injury or Property Damage arises out of only those products, goods, operations or premises stated in Item 5. of the Declarations; and

3.  prior to the effective date of this policy the Insured has no knowledge of such Occurrence or any fact, circumstance, situation or incident which may lead a reasonable person in the Insured's position to conclude that a Claim was likely.

B.  **Coverage B. - Personal Injury and Advertising Injury Liability:** The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in Item 7.II.B. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of Claims first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section Claim Reporting Provision, for Personal Injury or Advertising Injury to which this Coverage Part applies caused by an offense, provided:

1.  the entirety of both such Personal Injury or Advertising Injury and such offense that caused it took place on or after the Retroactive Date stated in Item 8.II. of the Declarations and before the end of the Policy Period;

2.  such Personal Injury or Adverting Injury arises out of only those products, goods, operations or premises stated in Item 5. of the Declarations; and

3.  prior to the effective date of this policy the Insured has no knowledge of such offense or any fact, circumstance, situation or incident which may lead a reasonable person in the Insured's position to conclude that a Claim was likely.

C.  **Coverage C. – Medical Payments**

The Company will pay medical expenses for Bodily Injury caused by an accident:

1.  On premises the Named Insured owns or rents;

2.  On ways next to premises the Named Insured owns or rents; or

3.  Because of the Named Insured's operations;

provided that:

(i)  The accident takes place in the United States of America, its territories or possessions or Puerto Rico and during the Policy Period;

(ii)  The expenses are incurred and reported to the Company within one (1) year of the date of the accident; and

(iii)  The injured person submits to examination, at the Company's expense, by physicians of the Company's choice as often as the Company reasonably requires.

The Company will make these payments regardless of fault. The Company will pay reasonable expenses for:

(1)  First aid administered at the time of an accident;

(2)  Necessary medical, surgical, x-ray and dental services, including prosthetic devices, and

(3)  Necessary ambulance, hospital, professional nursing and funeral services.

## DEFINITIONS

A.  **Advertisement** means a commercial communication, including communications that are published material placed on the Internet or on similar electronic means of communication, that is broadcast or published about the products, goods or operations of the Named Insured for the purpose of promoting the sale or use of such products, goods or operations; provided, however, only that part of a website that is about the products, goods or operations of the Named Insured for the purposes of promoting such products, goods or operations is considered an Advertisement.

B.  **Advertising Injury** means injury, including consequential Bodily Injury, arising out of oral or written publication of material that libels or slanders a person or organization or a person's or organization's products, goods or operations or other defamatory or disparaging material, occurring in the course of the Named Insured's Advertisement.

C.  **Aircraft Products** means any aircraft whether or not heavier than air (including spacecraft and missiles) and any ground support, guidance, control or communications equipment used in connection therewith, and also includes parts, supplies, or equipment installed in or on or used in connection with aircraft, including tools, training aids, instructions, manuals, blueprints and other data, engineering and other advice, services and labor used in the operation, maintenance or manufacture of any aircraft product.

D.  **Automobile** means a land motor vehicle, trailer or semitrailer designed for travel on public roads (including any attached machinery or equipment); provided, however, it does not include Mobile Equipment.

E.  **Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

F.  **Claim** means a notice received by the Insured of an intention to hold the Insured responsible for: (1) a Bodily Injury; (2) a Property Damage; (3) an Advertising Injury; or (4) a Personal Injury; involving this Coverage Part and shall include the service of suit or institution of arbitration proceedings against the Insured.

G.  **Claim Expenses** means reasonable and necessary amounts incurred by the Company or by the Insured with the prior written consent of the Company in the defense of that portion of any Claim for which coverage is afforded under this Coverage Part, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals; provided, however, that Claim Expenses shall not include: (1) salary, wages, overhead, or benefit expenses of or associated with Employees or officials of the Named Insured or employees or officials of the Company; or (2) salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for the Named Insured or the Company.

Solely for the purposes of liability assumed in an Insured Contract, Claim Expenses incurred by or for a party other than an Insured are deemed to be Damages because of Bodily Injury or Property Damage; provided, however, that:

1.  liability to such party for, or the cost of, that party's defense has also been assumed in the same Insured Contract; and

2.  such Claim Expenses are for the defense of that party against a civil or alternative dispute resolution proceeding in which Damages to which this insurance applies are alleged.

H.  **Completed Operations Hazard** means Bodily Injury and Property Damage arising out of only those operations stated in Item 5. of the Declarations, after such operations have been completed or abandoned by the Insured and occurs away from premises owned by or rented to the Named Insured. Operations includes materials, parts or equipment furnished in connection therewith, warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of those products, goods and operations stated in Item 5. of the Declarations and the providing or failure to provide instructions related thereto. Operations shall be deemed completed at the earliest of the following times:

1. when all operations to be performed by or on behalf of the Insured under a contract with the Insured have been completed;

2. when all operations to be performed by or on behalf of the Insured at the site of the operations have been completed; or

3. when the portion of the work out of which the Bodily Injury or Property Damage arises has been put to its intended use by any person or organization other than another contractor or sub-contractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement, but which are otherwise complete, shall be deemed complete.

The Completed Operations Hazard does not include Bodily Injury or Property Damage arising out of:

(i) operations in connection with the transportation of property, unless the Bodily Injury or Property Damage arises out of a condition in or on a vehicle not owned or operated by the Named Insured created by the loading or unloading thereof; or

(ii) the existence of tools, uninstalled equipment or abandoned or unused materials.

I.   **Damages** means the monetary portion of any judgment, award or settlement; provided, however, Damages shall not include: (1) punitive or exemplary damages or multiplied portions of damages in excess of actual damages, including trebling of damages; (2) taxes, criminal or civil fines, or attorneys' fees of a party other than an Insured or other penalties imposed by law; (3) sanctions; (4) matters which are uninsurable under the law pursuant to which this policy shall be construed; or (5) the return, restitution or payment of any fees, profits or charges for services rendered.

J.   **Employee** means any person while in the regular service of the Named Insured in the ordinary course of the Named Insured's business and whom the Named Insured compensates by salary, wages or commissions and has the right to govern and direct the performance of such service. Employee includes a Leased Worker but does not include any Temporary Worker or independent contractor.

K.   **Grounding** means the withdrawal of one or more aircraft from flight operations or the imposition of speed, passenger or load restrictions on such aircraft because of the existence of or alleged existence of a defect, fault or condition in any Aircraft Products.

L.   **Insured Contract** means:

1. a contract for lease of premises; provided, however, that the portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to the Insured or temporarily occupied by the Insured with the permission of the owner shall not be an Insured Contract;

2. any easement or license, except in connection with construction or demolition operations on or within fifty (50) feet of a railroad;

3. an obligation, as required by municipal ordinance, to indemnify a municipality, except in connection with work for the municipality;

4. a sidetrack agreement;

5. an elevator maintenance agreement; or

6. that part of any other contract or agreement pertaining to the Named Insured's business under which the Named Insured assumes the tort liability of another party to pay for Bodily Injury or Property Damage to a third party; provided, however, Insured Contract shall not include that part of any contract or agreement:

(i) that indemnifies a railroad for Bodily Injury or Property Damage arising out of construction or demolition operations, within fifty (50) feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

(ii) that indemnifies an architect, engineer or surveyor for injury or damage arising out of:

   (a) preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or designs or specifications; or

   (b) supervision, inspection, failure to supervise or inspect or architectural, engineering or surveying services; or

(iii) under which the Insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the Insured's rendering or failure to render professional services, including those listed in subparagraph (ii) hereinabove or any supervision, inspection, failure to supervise or inspect or architectural, engineering or survey services.

M. **Leased Worker** means a person leased to the Named Insured by a labor leasing firm, under an agreement between the Named Insured and the labor leasing firm, to perform duties related to the conduct of the Named Insured's business and which are at the Insured's direction. Leased Worker does not include a Temporary Worker.

N. **Mobile Equipment** means any of the following types of land vehicles, including any attached machinery or equipment:

   1. bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   2. vehicles maintained for use solely on or next to premises the Named Insured owns or rents;

   3. vehicles that travel on crawler treads;

   4. vehicles, whether self-propelled or not, on which are permanently mounted:

      (i) power cranes, shovels, loaders, diggers, or drills; or

      (ii) road construction or resurfacing equipment such as graders, scrapers or rollers;

   5. vehicles not described in 1., 2., 3., or 4. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (i) air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (ii) cherry pickers and similar devices used to raise or lower workers;

   6. vehicles not described in 1., 2., 3., or 4. above maintained primarily for purposes other than the transportation of persons or cargo; provided, however, that self-propelled vehicles with the following types of permanently attached equipment are not Mobile Equipment but will be considered Automobiles:

      (i) equipment designed primarily for:

         (a) snow removal;

         (b) road maintenance, but not construction or resurfacing; or

         (c) street cleaning;

      (ii) cherry pickers and similar devices mounted on Automobile or truck chassis and used to raise or lower workers; and

      (iii) air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

O. **Named Insured's Products** means goods or products, other than real property, manufactured, sold, handled or distributed by the Named Insured or by others trading under the Named Insured's name, including any container thereof (other than a vehicle); provided, however, that Named Insured's Products shall not include a vending machine or any other property rented to or located for use of others but not sold.

P.   **Occurrence** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Q.   **Personal Injury** means injury arising out of one or more of the following offenses:

1.   false arrest, detention or imprisonment or malicious prosecution;

2.   wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord, or lessor; or

3.   oral or written publication of material that violates a person's right of privacy.

R.   **Policy Period** means the period from the inception date of this policy to the policy expiration date as stated in Item 3. of the Declarations, or its earlier cancellation or termination date.

S.   **Products Hazard** means Bodily Injury or Property Damage arising out of only those products or goods stated in Item 5. of the Declarations which are the Named Insured's Products, including warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of those products or goods stated in Item 5. of the Declarations and the providing or failure to provide instructions related thereto, occurring away from premises owned by or rented to the Named Insured and after physical possession of such products has been relinquished to others.

T.   **Professional Services** means those services described in Item. 4. of the Declarations.

U.   **Property Damage** means:

1.   physical injury to or destruction of tangible property, including consequential loss of use thereof; or

2.   loss of use of tangible property which has not been physically injured or destroyed; provided, however, such loss of use is caused by an Occurrence.

V.   **Temporary Worker** means any person who is furnished to the Named Insured to substitute for a permanent Employee on leave or to meet seasonal or short-term work load requirements.

W.   **Volunteer Worker** means any person who is not an Employee of the Named Insured and who donates his/her work at the direction of and within the scope of duties determined by the Named Insured and is not paid a fee, salary or other compensation by the Named Insured or by anyone else for such work performed for the Named Insured.

## THE EXCLUSIONS

A.   With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to:

1.   any Claim based upon or arising out of:

(i)   the actual, alleged or threatened discharge, disposal, migration, dispersal, seepage, release or escape of Pollutants; provided, however, this subparagraph shall not apply with respect to:

(a)   the Products Hazard or Completed Operations Hazard;

(b)   damage, arising out of heat, smoke or fumes from hostile fire at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to any Insured;

(ii)   Bodily Injury or Property Damage arising out the actual, alleged or threatened discharge, disposal, migration, dispersal, seepage, release or escape of Pollutants:

(a)   at or from any premises, site or location which is or was at any time used by or for any Insured or others for the handling, storage, disposal, processing or treatment of waste;

(b)   which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any Insured or any person or organization for whom the Insured may be legally responsible; or

(iii) any demand, request, direction, order or statutory or regulatory requirement to test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize Pollutants, or in any way respond to or assess the effects of Pollutants or to pay for or contribute to the costs of undertaking such actions; provided, however, this subparagraph shall not apply to liability for Damages because of Property Damage that the Insured would have in the absence of such demand, request, direction, order or statutory or regulatory requirement;

Pollutants means any solid, liquid, gaseous or thermal irritants or contaminants including, smoke, vapors, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

2. any Claim based upon or arising out of the rendering of or failure to render professional services by the Insured or by any person or organization for whose acts, errors or omissions the Insured is legally responsible;

3. any Claim based upon or arising out of the Insured's activities as a fiduciary under the Employee Retirement Income Security Act of 1974 (ERISA) and its amendments or any regulation or order issued pursuant thereto;

4. any Claim based upon or arising out of any unlawful discrimination by any Insured;

5. any Claim based upon or arising out of wrongful termination or other employment related practices; or

6. any Claim brought under any other Coverage Part of this policy.

B. With respect to Coverage A., this Coverage Part does not apply to:

1. any Claim based upon or arising out of Bodily Injury or Property Damage expected or intended from the standpoint of the Insured; provided, however, this exclusion does not apply to Bodily Injury resulting from the use of reasonable force to protect persons or property;

2. any Claim based upon or arising out of Bodily Injury or Property Damage for which the Insured is obligated to pay Damages because of the assumption of liability in any contract or agreement; provided, however, this exclusion shall not apply to liability for damages:

   (i) that the Insured would have in the absence of the contract or agreement; or

   (ii) assumed in a contract or agreement that is an Insured Contract, provided, the Bodily Injury and Property Damage occurs subsequent to the execution of the Insured Contract;

3. any Claim based upon or arising out of loss of use of tangible property which has not been physically injured or destroyed resulting from:

   (i) a delay in or lack of performance by or on behalf of the Named Insured of any contract or agreement; or

   (ii) a defect, deficiency, inadequacy or dangerous condition in the products, goods or operations of the Named Insured;

   provided, however, this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the Named Insured's Products or work performed by or on behalf of the Named Insured after such products or work have been put to use by any person or organization other than an Insured;

4. any Claim based upon or arising out of Property Damage to the Named Insured's Products arising out of it or any part of it, or for the cost of inspecting, repairing or replacing any defective or allegedly defective product or part thereof or for loss of use of any defective or allegedly defective product;

5. any Claim for damages for any loss, cost or expense incurred by the Named Insured or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of the Named Insured's Products or work completed by or for the Named Insured or of any property of which such products or work form a part, if such products, work or property are

withdrawn from the market or from use because of any known or suspected defect, deficiency, inadequacy or dangerous condition therein;

6. any Claim based upon or arising out of Bodily Injury or Property Damage arising out of ownership, maintenance, operation, use or entrustment to others or loading or unloading of:

    (i) any Automobile, aircraft or watercraft owned or operated by or rented or loaned to any Insured; or

    (ii) any other Automobile, aircraft or watercraft operated by any person in the course of his/her employment or activities on behalf of the Named Insured;

    provided, however, this exclusion shall not apply to:

    (a) the parking of an Automobile on premises owned by, rented to or controlled by the Named Insured or on ways next to such premises, if such Automobile is not owned by or rented or loaned to any Insured;

    (b) a watercraft while ashore on premises owned by, rented to or controlled by the Named Insured; or

    (c) a watercraft that is less than twenty-six (26) feet in length, that is not owned by the Named Insured and that is not being used to carry persons or property for a charge;

7. any Claim based upon or arising out of Bodily Injury or Property Damage arising out of:

    (i) the ownership, maintenance, operation, use, loading or unloading of any Mobile Equipment while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for such contest or activity; or

    (ii) the operation or use of any snowmobile, moped or motorized bicycle, or trailer designed for use therewith;

8. any Claim based upon or arising out of Bodily Injury or Property Damage arising out of the transportation of Mobile Equipment by an Automobile owned or operated by or rented or loaned to any Insured;

9. any Claim based upon or arising out of Property Damage to:

    (i) property owned, occupied or rented to the Insured;

    (ii) property loaned to the Insured;

    (iii) personal property in the care, custody or control of the Insured;

    (iv) that particular part of any property,

        (a) upon which operations are being performed by or on behalf of the Insured if the Property Damage arises out of those operations; or

        (b) the restoration, repair or replacement of which has been made or is necessary because of faulty workmanship thereon by or on behalf of the Insured; provided, however, this subparagraph shall not apply with respect to Property Damage included in the Completed Operations Hazard or the Products Hazard;

    (v) premises that the Named Insured sells, gives away or abandons, if the Property Damage arises out of any part of those premises; provided, however, this subparagraph shall not apply if the premises are included in the Completed Operations Hazard and were never occupied, rented or held for rental by the Named Insured; or

    (vi) to work performed by the Insured arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith with respect to the Completed Operations Hazard;

    provided, however, Items (ii), (iii), and (iv) of this exclusion shall not apply with respect to liability under a written sidetrack agreement;

10. any Claim based upon or arising out of any obligation of the Insured under any workers' compensation, unemployment compensation or disability benefits law or under any similar law;

11. any Claim based upon or arising out of Bodily Injury to any Employee of the Insured arising out of and in the course of employment by the Insured or performing duties related to conduct of the Insured's business or any such Claim brought by or on behalf of the spouse, child, parent, brother, sister or domestic partner of the Employee;

this exclusion shall apply:

(i) whether the Insured may be liable as an employer or in any other capacity; and

(ii) to any obligation to share damages with or repay someone else who must pay damages because of injury;

provided, however, that this exclusion shall not apply with respect to liability assumed by the Insured under an Insured Contract;

12. any Claim based upon or arising out of Bodily Injury or Property Damage for which the Insured may be held liable because of:

(i) causing or contributing to the intoxication of any person;

(ii) the furnishing of alcoholic beverages to a person under legal drinking age or under the influence of alcohol; or

(iii) any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages;

provided, however, this exclusion shall apply only if the Named Insured:

(a) manufactures or distributes alcoholic beverages;

(b) serves or furnishes alcoholic beverages for a charge whether or not such activity requires a license, is for financial gain or livelihood; or

(c) serves or furnishes alcoholic beverages without a charge if a license is required for such activity;

13. any Claim based upon or arising out of Bodily Injury or Property Damage due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing with respect to liability assumed by the Insured under an Insured Contract;

14. any Claim based upon or arising out of Aircraft Products including consequential loss of use thereof resulting from Grounding;

15. any Claim based upon or arising out of any products or goods manufactured, sold, handled, or distributed or work completed by the Insured or by others operating under the direction or control of the Insured in violation of any law, statute, ordinance, or regulation, Federal, State or Municipal government, or agencies thereof;

16. any Claim for Bodily Injury arising out of Personal Injury or Advertising Injury.

17. any Claim based upon or arising out of Bodily Injury sustained by any patient, person or resident of a healthcare facility receiving Professional Services of any Insured or any such Claim brought by or on behalf of the spouse, child, parent, grandparent, brother, sister or domestic partner of such patient, person or resident of a healthcare facility.

Exclusions 3. through 16. shall not apply to damage by fire to premises while rented by the Named Insured or temporarily occupied by the Named Insured with the permission of the owner of the premises. A Limit of Liability applies to this coverage as described in Section Limits of Liability, Coverage A. - Limit of Liability - Damage to Premises.

C. With respect to Coverage B., this Coverage Part does not apply to:

1. any Claim based upon or arising out of Personal Injury or Advertising Injury caused by or at the direction of the Insured with the knowledge that the act would violate the rights of another and would inflict Personal Injury or Advertising Injury;

2. any Claim based upon or arising out of Personal Injury or Advertising Injury arising out of the oral or written publication of material, if done by or at the direction of the Insured with the knowledge of its falsity;

3. any Claim based upon or arising out of Personal Injury or Advertising Injury arising out of oral or written publication of material whose first publication took place before the Retroactive Date stated in Item 8.II. of the Declarations;

4. any Claim based upon or arising out of Personal Injury or Advertising Injury arising out of any criminal act committed by or at the direction of the Insured;

5. any Claim based upon or arising out of Advertising Injury arising out of a mistake in advertised price or incorrect description of any product, good or operation;

6. any Claim based upon or arising out of any liability assumed by the Insured in a contract or agreement; provided, however, this exclusion shall not apply to liability an Insured would have in the absence of the contract or agreement;

7. any Claim based upon or arising out of Personal Injury or Advertising Injury arising out of piracy, unfair competition, the infringement of copyright, title, trade dress, slogan, service mark, service name or trademark, trade name, patent, trade secret or other intellectual property right;

8. any Claim based upon or arising out of Personal Injury or Advertising Injury arising out of an electronic chatroom or bulletin board the Insured hosts, owns, or over which the Insured exercises control;

9. any Advertising Injury committed by any Insured whose business is:

   (i) advertising, broadcasting, publishing, or telecasting;

   (ii) designing or determining content for websites for others; or

   (iii) an Internet access, content search or service provider;

10. any Claim based upon or arising out of a breach of contract; provided, however, this exclusion shall not apply to an implied contract to use another's advertising idea in the Named Insured's Advertisement;

11. any Claim based upon or arising out of the failure of products, goods or services to conform with any statement of quality or performance made in the Named Insured's Advertisement; or

12. any Claim based upon or arising out of the refusal to employ, terminate employment, coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or other practices or policies related to employment or professional privileges.

D. With respect Coverage C., the Company will not pay any expenses for Bodily Injury:

1. to any Insured;

2. to a person hired to do work for or on behalf of the Insured or a tenant of the Named Insured

3. to a person injured on that part of premises owned or rented by the Named Insured that the person normally occupies;

4. to a person, whether or not an Employee of an Insured, if benefits for the Bodily Injury are payable or must be provided under any workers' compensation or disability benefits law or under any similar law;

5. to a person injured while taking part in athletics;

6. included in the Products Hazard or the Completed Operations Hazard;

7. excluded under Coverage A.;

8. to any patient, person or resident of a healthcare facility receiving Professional Services; or

9. due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## LIMITS OF LIABILITY

A. **Coverage A. - Limit of Liability-Each Occurrence:** The total liability of the Company for the combined total of Damages and Claim Expenses for all Claims first made against the Insured during the Policy Period or Extended Reporting Period, if exercised because of all Bodily Injury or Property Damage sustained by one or more persons or entities as the result of any one Occurrence shall not exceed the Limit of Liability stated in Item 6.II.A.(i) of the Declarations as applicable to Each Occurrence.

B. **Coverage A. - Limit of Liability-Damage to Premises:** The total liability of the Company for the combined total of Damages and Claim Expenses for all Claims, including those subject to the above provision regarding the Coverage A. - Limit of Liability – Each Occurrence, because of Property Damage to any one premises while rented by the Named Insured or in the case of damage by fire, while rented by the Named Insured or temporarily occupied by the Named Insured with the permission of the owner of the premises, shall not exceed the Limit of Liability stated in Item 6.II.A.(ii) of the Declarations as applicable to Damage to Premises – Any One Premises.

C. **Coverage B. - Limit of Liability-Each Person or Organization:** The total liability of the Company for the combined total of Damages and Claim Expenses for all Claims under Coverage B. because of all Personal Injury and all Advertising Injury sustained by any one person or organization shall not exceed the Limit of Liability stated in Item 6.II.B.(i) of the Declarations as applicable to Each Person or Organization.

D. **Coverage C.– Medical Payments: Limit of Liability–Each Injured Person:** The total liability of the Company for medical expenses under Coverage C. because of Bodily Injury sustained by any one person shall not exceed the Limit of Liability stated in Item 6.II.C.(i) as applicable to Each Injured Person.

E. **Limit of Liability–Aggregate:** Subject to the above Limits of Liability A., B., C. and D., the total liability of the Company shall not exceed the Aggregate Limit of Liability as stated in Item 6.II.D. of the Declarations for all Damages and Claim Expenses for Coverage A. and B. and all medical expenses for Coverage C.

F. **Deductible:** The applicable Deductible amount stated in Item 7.II. of the Declarations shall be paid by the Named Insured and shall be applicable to each Occurrence under Coverage A. and to each person or organization under Coverage B. and shall include Damages and Claim Expenses, whether or not Damages payments are made.

Such amounts shall, upon written demand by the Company, be paid by the Named Insured within ten (10) days. The total payments requested from the Named Insured in respect of each Occurrence under Coverage A. or each person or organization under Coverage B. shall not exceed the applicable Deductible amount stated in Item 7.II. of the Declarations. The determination of the Company as to the reasonableness of the Claim Expenses shall be conclusive on the Named Insured.

G. **Multiple Insureds, Claims, Occurrences, Offenses and Claimants:** The inclusion herein of more than one Insured in any Claim or suit or the making of Claims or the bringing of suits by more than one person or organization shall not operate to increase the Limits of Liability stated in Item 6.II. of the Declarations. More than one Claim arising out of a single Occurrence or offense shall be considered a single Claim. All such Claims, whenever made, shall be treated as a single Claim. Such single Claim, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of such Occurrence or offense is made or with regard to notice given to and accepted by the Company pursuant to Section Claims B., Discovery Clause, on the date within the Policy Period on which such notice of potential Claim is first received by the Company.

## DEFENSE, SETTLEMENTS AND CLAIM EXPENSES

The Company shall have the right and duty to defend and investigate any Claim to which Coverage A. and/or B. under this Coverage Part applies. The Company may make such investigation and settlement of any Claim as it deems expedient. Claim Expenses incurred in defending and investigating a Claim shall be a part of and shall not be in addition to the applicable Limits of Liability stated in Item 6.II. of the Declarations. Such Claim Expenses shall reduce the Limits of Liability and shall be applied against the applicable Deductible. The Company shall have no obligation to pay any Damages or to defend or to continue to defend any Claim or to pay Claim Expenses for Claims after the applicable Limit or Limits of Liability stated in Item 6.II. of the Declarations have been exhausted.

## CLAIMS

A.  **Claim Reporting Provision:** The Insured shall give to the Company written notice as stated in Item 14. of the Declarations as soon as practicable of any Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised.

In the event suit is brought against the Insured, the Insured shall immediately forward to Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois, 60015, on behalf of the Company, every demand, notice, summons or other process received by him/her or by his/her representatives.

B.  **Discovery Clause:** If during the Policy Period, the Insured first becomes aware of a specific Occurrence or offense which is reasonably expected to result in a Claim within the scope of coverage of this policy, then the Insured may provide written notice to the Company containing the information listed below. If such written notice is received by the Company during the Policy Period, then any Claim subsequently made against the Insured arising out of such Occurrence or offense shall be deemed for the purpose of this insurance to have been made on the date on which such written notice is received by the Company.

It is a condition precedent to the coverage afforded by this Discovery Clause that written notice be given to the Company containing the following information:

1.  the description of the specific Occurrence or offense;

2.  the date on which such Occurrence or offense took place;

3.  the injury or damage which has or may result from such Occurrence or offense;

4.  the identity of any injured persons; and

5.  the circumstances by which the Insured first became aware of such Occurrence or offense.

C.  **Assistance and Cooperation of the Insured:** The Insured shall cooperate with the Company and upon the Company's request, the Insured shall: (1) submit to examination and interview by a representative of the Company, under oath if required; (2) attend hearings, depositions and trials; (3) assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses in the conduct of suits; (4) give a written statement or statements to the Company's representatives and meet with such representatives for the purpose of determining coverage and investigating and/or defending any Claim, all without cost to the Company. The Insured shall further cooperate with the Company and do whatever is necessary to secure and effect any right of indemnity, contribution or apportionment which the Insured may have. The Insured shall not, except at his/her own cost, make any payment, admit any liability, settle any Claims, assume any obligation or incur any expense without the written consent of the Company.

D.  **False or Fraudulent Claims:** If any Insured shall commit fraud in proffering any Claim, this insurance shall become void as to such Insured from the date such fraudulent Claim is proffered.

## EXTENDED REPORTING PERIOD

A.   The Named Insured's right to exercise the Extended Reporting Period under this Coverage Part shall exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Insuring Agreements in the policy for which an Extended Reporting Period is available.

B.   If the Named Insured nonrenews this policy in its entirety or cancels this policy in its entirety pursuant to Common Policy Conditions B., Cancellation, or if the Company nonrenews this policy in its entirety or cancels this policy in its entirety pursuant to Common Policy Conditions B., Cancellation, for reasons other than nonpayment of premium or Deductible or non-compliance with the terms and conditions of this policy, then the Named Insured shall have the right to exercise the Extended Reporting Period as regards all Coverage Parts included under this policy according to the terms and conditions applicable to the Extended Reporting Period as detailed in the Specified Medical Professions Professional Liability Insurance Coverage Part.

C.   In the event that the Named Insured exercises the Extended Reporting Period as detailed in the Specified Medical Professions Professional Liability Insurance Coverage Part, then such exercise of the Extended Reporting Period shall extend the coverage granted under this Coverage Part to Claims first made against the Insured, during the period of months; as elected by the Named Insured, and reported to the Company pursuant to Section Claims A., Claim Reporting Provision, following immediately upon the effective date of such cancellation or nonrenewal, for:

1.   Bodily Injury or Property Damage which happened on or after the Retroactive Date stated in Item 8.II. of the Declarations and prior to the effective date of such cancellation or nonrenewal, caused by an Occurrence which happened on or after the Retroactive Date stated in Item 8.II. of the Declarations and prior to the effective date of such cancellation or nonrenewal and arising from those products, goods, operations or premises stated in Item 5. of the Declarations and which is otherwise covered by this Coverage Part; or

2.   Personal Injury or Advertising Injury which happened on or after the Retroactive Date stated in Item 8.II. of the Declarations and prior to the effective date of such cancellation or nonrenewal, caused by an offense which happened on or after the Retroactive Date stated in Item 8.II. of the Declarations and prior to the effective date of such cancellation or nonrenewal and arising from those products, goods, operations or premises stated in Item 5. of the Declarations and which is otherwise covered by this Coverage Part.

## OTHER CONDITIONS

A.   **Prevention of Loss:** In the event of an Occurrence or an offense involving the products, goods, operations or premises covered by this Coverage Part, the Insured shall promptly, at his/her expense, take all reasonable steps to prevent other Bodily Injury, Property Damage, Personal Injury or Advertising Injury from arising out of the same or similar conditions.

B.   **Other Insurance:** With respect to Coverages A. and B., this insurance shall be in excess of the applicable Deductible stated in Item 7.II. of the Declarations and any other insurance available to the Insured whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided in this Coverage Part.

C.   **Inspection:** Any of the Company's authorized representatives shall have the right and opportunity, whenever the Company so desires, to inspect at any reasonable time the Insured's products, goods, operations and premises, but the Company assumes no responsibility or duty by reason of such inspection or the omission thereof. The Insured agrees to provide appropriate personnel to assist the Company's representatives during such inspection without cost to the Company.

D.   **Reporting of Changes in Products, Goods, Operations and Premises:** The premium charged for this Coverage Part is based on those products, goods, operations and premises identified in the underwriting information submitted to the Company on behalf of the Insured at the time of policy inception. The Insured shall report promptly to the Company any changes in those products, goods, operations or premises as described below, and the Company shall have the right to adjust the

premium and/or Deductible(s) for such changes, based on its sole assessment of the additional exposure(s) presented.

Changes to report:

1. any changes to manufacturing or servicing premises requiring structural alterations, or acquisition of additional manufacturing or servicing premises;

2. any changes in manufacturing or servicing operations which is likely to result in an annual increase in payrolls of twenty-five percent (25%) or more;

3. any change in operations which are not accurately described by the description as stated in Item 5. of the Declarations.

**MARKEL®**

☐ Deerfield Insurance Company
☐ Evanston Insurance Company
☐ Essex Insurance Company
☐ Markel American Insurance Company
☐ Markel Insurance Company
☐ Associated International Insurance
Company

# Master Policy

## APPLICATION FOR CLINICS (MEDICAL, DENTAL, PUBLIC HEALTH, MENTAL HEALTH, OTHER) PROFESSIONAL LIABILITY INSURANCE

NOTICE: The policy for which application is made provides coverage on a "CLAIMS MADE" basis. Please read the policy carefully. If space is insufficient to answer any question fully, attach a separate sheet.

| I. | GENERAL INFORMATION |
|---|---|

1. (a) Full name of Applicant: Wexford Health Sources Inc / Ballymore Medical Management Inc / The Bantry Group_____

   (b) Principal practice address: 501 Holiday Drive, Foster Plaza IV                    Allegheny_____
                                             (Street)                                  (County)

   Pittsburgh                      PA                      15220_____
         (City)                            (State)                         (Zip)

   (c) Location: Stand alone _____ Hospital _____ School _____ Correctional Facility _X_____ Other _____

   (d) (i) Phone:412-937-8590_____

       (ii) E-Mail Address:_____ (iii) Website Address: **www.wexfordhealth.com**

   (e) Date Established: 7/21/1992_____
       Attached a proforma business plan if the Applicant is newly established.

2. Applicant is a:
   [ X ] professional corporation                 [ ] joint venture
   [ ] limited liability company              [ ] professional association
   [ ] other _____    [ ] partnership

3. Name(s) of all partners or members of the clinic who provide professional services: On file with company_____

4. Does any owner, partner or director operate or administer, wholly or in part, any hospital, nursing home or other institution where medical services are rendered? .............................................................................. [ X ] Yes [ ] No
   If Yes, provide details, including name, location, size and number of beds. _____

5. Is the Applicant a "Covered Entity" under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule? .......................................................................................................................................... [ X ] Yes [ ] No
   If Yes,
   (a) Has the Applicant implemented procedures to comply with the HIPAA Privacy Rule? ............... [ X ] Yes [ ] No
   (b) Provide the name and title of the Applicant's Privacy Officer. Joe Ebbitt, Risk Mgr/HIPPA Officer_____
   Our Business Associate Agreement is available at https://www.markelcorp.com/en/US-Insurance/HIPAA. This is the only Business Associate Agreement we will recognize.

| II. | OPERATIONS |
|---|---|

1. Days/hours of operation: 24/7_____

2. (a) Provide the name and specialty of the Applicant's Medical Director: Thomas M Lehman MD_____
   (b) Does the Applicant's Medical Director have direct patient contact? ............................................ [ ] Yes [ X ] No
   (c) Is the Applicant's Medical Director full-time or part-time? FT_____

3. Applicant's professional specialty: Provision of health care to the correctional industry_____

4. Provide the percentage of patients/clients:

| | | | | | |
|---|---|---|---|---|---|
| Bariatrics | _____% | Holistic medicine | _____% | Sleep Disorders | _____% |
| Communicable Disease | _____% | Obstetrical | _____% | Stress Testing | _____% |
| Correctional Medicine | 100__% | Oncology | _____% | Students | _____% |
| Dental | _____% | Pain Management | _____% | Substance Abuse | _____% |
| Disability Evaluation | _____% | Pediatric | _____% | Surgical | _____% |
| Family Planning | _____% | Physical Rehabilitation | _____% | Urgent Care | _____% |
| Free Clinic | _____% | Psychiatric | _____% | | |
| Hemodialysis | _____% | Research or Experimental | _____% | | |

5. List all Locations where Applicant is registered and licensed to operate:

Location 1: See attached_____

Location 2: _____

Location 3: _____

Location 4: _____

6. Name(s) and location(s) of any hospital or medical facility that the Applicant refers in practice:  N/A_____

7. Has the Applicant's state license, registration or certification, or certification for federal reimbursement ever been limited, revoked, suspended, refused, cancelled or voluntarily surrendered?....................... [  ] Yes  [X] No
If Yes, provide details._____

8. List all accreditations and association memberships held by Applicant's facility and include a copy of the most recent report: ACA, NCC_____

9. Does the Applicant currently participate in or plan to participate in a state patient compensation fund, health care stabilization fund or other governmentally established malpractice liability funding mechanism? ...............................................................................................................[  ] Yes  [X] No

10. Is the Applicant "deemed" under the Federal Tort Claims Act ("FTCA")? ............................................. [  ] Yes  [X] No
If Yes, what percentage of services are provided under the FTCA? _____

11. Does the Applicant or any of its employees or independent contractors provide services for correctional facilities, such as a jail, detention center, prison, etc.? ...................................................... [X ] Yes  [  ] No

12. Applicant's Gross Revenues:

| | Last Twelve Months | Next Twelve Months |
|---|---|---|
| Fee for Service | REDACTED | |
| Medicare/Medicaid Funds | $_____ | $_____ |
| Research | $_____ | $_____ |
| Other (describe) | $_____ | $_____ |
| TOTAL GROSS REVENUES | REDACTED | |

13. Number of outpatient/client visits:

| | Last Twelve Months | Next Twelve Months |
|---|---|---|
| Clinics | REDACTED | |
| Laboratory | | |
| X-ray/Imaging | | |
| Pharmacy | _____ | _____ |
| TOTAL VISITS: | _____ | _____ |

NOTE: If Applicant provided services for correctional facilities, provide number of inmates: _____

14. Does the Applicant maintain any beds for overnight occupancy:

   (a) On the Applicant's premises? ......................................................................................... [  ] Yes  [X] No
   If Yes,
     (i) No. of beds: ____
     (ii) Attach a copy of license and an explanation including protocols for on site 24 hour staffing.

(b) Off the Applicant's premises? ..............................................................................................[ ] Yes [ ] No
   If Yes,
   (i) No. of beds: _____
   (ii) Attach a copy of license and an explanation including protocols for on site 24 hour staffing.

## III. STAFF

1. Indicate the number of professional employees, independent contractors and volunteers. If None, state None.

| | Employees | | Independent Contractors | | Volunteers | |
|---|---|---|---|---|---|---|
| | **Full-Time** | **Part-Time** | **Full-Time** | **Part-Time** | **Full-Time** | **Part-Time** |
| Physicians: No surgery (other than incision of boils, suturing of skin) or obstetrical procedures | 58 | 17 | | | | |
| Physicians: Minor surgery or obstetrical procedures not constituting major surgery | | | | | | |
| Anesthesiologists | | | | | | |
| Obstetrics-Gynecologists | | 1 | | | | |
| Oncologists | | | | | | |
| Ophthalmologists | | | | | | |
| Urologists | | | | | | |
| Dentists | 47 | 25 | | | | |
| Chiropractors | | | | | | |
| Nurse Anesthetists | | | | | | |
| Nurse Practitioners/ Physician Assistants | 49 | 19 | | | | |
| Optometrists | | | | | | |
| Pharmacists | 1 | | | | | |
| Physician Assistants | | | | | | |
| Podiatrists | | | | | | |
| Psychologists | 38 | 6 | | | | |
| RNs/LPNs/LVNs | 769 | 347 | | | | |
| Social Workers | 106 | 25 | | | | |
| Other(describe):Clerical/Psychiatrists | 435/17 | 135/19 | 28 | | | |

NOTE: If the Applicant requires any of the above to be Insureds, submit a separate application for each such individual.

2. Are all of the above persons licensed in accordance with applicable state and federal regulation? ..... [X] Yes [ ] No
   If No, attach explanation.

3. Do all professional staff maintain a Professional Liability Insurance Policy?.......................................... [X] Yes [ ] No
   If Yes, what are the minimum limits of liability that the Applicant requires?
   $1,000,000_____each claim / $3,000,000_____ aggregate

## IV. PROFESSIONAL SERVICES

1. Does the Applicant's employees or independent contractors:
   (a) Perform any minor surgery other than incision of boils and superficial abscesses or suturing skin
       and superficial fascia? ......................................................................................................[X] Yes [ ] No
       If Yes, list all minor/invasive procedures occasional biopsises/stitches_____

   (b) Perform any anti-aging procedures, including Botox or other injectables?..................................... [ ] Yes [X] No
       If Yes, complete a Supplement for Medical Spa/Anti-Aging Clinics (SM31001).

(c) Perform abortions and/or menstrual extractions? ........................................................................ [ ] Yes [X] No
    If the Applicant provides pregnancy termination complete a Supplement for Abortion Centers (SM31002)

(d) Perform any experimental procedures or research testing? ........................................................ [ ] Yes [X] No
    If Yes, are they FDA approved? ................................................................................................. [ ] Yes [ ] No
    If No, attach a description.

(e) Perform any chelation therapy services? ................................................................................... [ ] Yes [X] No
    If Yes, explain: _____

(f) Administer anesthesia other than topical or local infiltration? ..................................................... [ ] Yes [X] No
    If Yes, attach detailed explanation.

(g) Use drugs for weight reduction for patients? ............................................................................ [ ] Yes [X] No
    If Yes, attach list of drugs used and percentage of practice devoted to weight reduction;
    frequency and duration of prescriptions or weight reduction drugs and quantity dispensed.

(h) Administer any methadone treatment? ..................................................................................... [X] Yes [ ] No
    If Yes,
      (i) Provide the number of treatments during the:
          Last 12 months __<50____ Next 12 months <50_____
      (ii) Attach a description of treatment and controls used. WHS does NOT
prescribe/Dispense Methadone – controls by the State

(i) Provide teleradiology services? .............................................................................................. [ ] Yes [X] No
    If Yes, provide description of services and for whom services are provided._____

(j) Offer professional advice to the public via the internet, newspapers or broadcasts? ..................... [ ] Yes [X] No
    If Yes, provide details._____

(k) Advertise professional services in any manner other than a simple listing in a telephone directory? ....... [X] Yes [ ] No
    If Yes, attach a copy of all advertisements. Attached

2. Does the Applicant use a collection agency: ....................................................................................... [X] Yes [ ] No
    If Yes,
    (i) Name of agency:Rapid Recovery Solutions – (used only to recover sign on bonus of physicians)_____
    (ii) Does the agency have authority to file a collection suit on behalf of the Applicant? ..................... [ ] Yes [X] No

## V. CLAIMS AND HISTORY

1. Has the Applicant or any of its employees ever:
    (a) Been the subject of disciplinary or investigatory proceedings or reprimand by a licensing,
       administrative or governmental agency? ............................................................................. [X] Yes [ ] No
    (b) Been convicted for an act committed in violation of any law or ordinance including traffic
       offenses? ............................................................................................................................ [ ] Yes [ ] No
       If Yes, provide details. Unknown_____

    _____

    (c) Been evaluated or treated for alcoholism or drug addiction or mental or mental or emotional
       disorders? ........................................................................................................................... [X] Yes [ ] No
       If Yes, provide details. Various unknown_____

    _____

    (d) Had any professional license or license to prescribe or dispense narcotics been denied,
       limited, refused, suspended, revoked, renewal refused or accepted only on special terms or
       has the Applicant or any of its employees voluntarily surrendered any professional license? ......... [X] Yes [ ] No
       If Yes, provide details. A physican in 2008 was placed on probation by DEA_____

2. Has any claim or suit for malpractice ever been made against the Applicant or any person proposed
    for this insurance? ............................................................................................................................ [X] Yes [ ] No
    If Yes,
    (i) How many? _____
    (ii) Provide details. On file with company_____

3. Has any claim or suit for malpractice ever been made against the Applicant or any person proposed for this
    insurance that has not been reported to the Applicant's current or prior insurer?           [ ] Yes [X] No
    If Yes, explain._____

    _____

4. Is the Applicant or any person proposed for this insurance aware of any act, error, omission, fact,
    circumstance, or records request from any attorney which may result in a malpractice claim or suit? .. [ ] Yes [X] No
    If Yes,
    (i) How many? _____

(ii)   Provide details._____

5.   Has any insurer cancelled, rescinded, nonrenewed or declined any similar insurance for the Applicant, its predecessors, subsidiaries, affiliates, employees and/or for any other person or entity proposed for his insurance in the last five years? ............................................................................................................ Yes [  ]  No [ X ]
If Yes, attach a copy of such insurer's notice.

6.   List prior Professional Liability Insurance for each of the last five (5) years, including the current year:
If None, check here. [  ]

| Ins Company | Limits of Liability | Premium | Eff./Exp. Dates | Claims Made or Occurrence Form | Retroactive Date |
|---|---|---|---|---|---|
| Evanston | $3/10m | | 10/1/13-10/1/14 | Claims Made | 10/1/2008 |
| Evanston | $3/10m | | 10/1/12-10/1/13 | Claims Made | 10/1/2008 |
| Evanston | $3/10m | | 10/1/11-10/1/12 | Claims Made | 10/1/2008 |
| Evanston | $3/10m | | 10/1/10-10/1/11 | Claims Made | 10/1/2008 |
| Evanston | $3/10m | | 10/1/09-10/1/10 | Claims Made | 10/1/2008 |

7.   List prior General Liability Insurance for each of the last five (5) years, including the current year:

| Ins Company | Limits of Liability | Premium | Eff./Exp. Dates | Claims Made or Occurrence Form | Retroactive Date |
|---|---|---|---|---|---|
| Evanston | $3/10m | | 10/1/13-10/1/14 | Claims Made | 10/1/2008 |
| Evanston | $3/10m | | 10/1/12-10/1/13 | Claims Made | 10/1/2008 |
| Evanston | $3/10m | | 10/1/11-10/1/12 | Claims Made | 10/1/2008 |
| Evanston | $3/10m | | 10/1/10-10/1/11 | Claims Made | 10/1/2008 |
| Evanston | $3/10m | | 10/1/09-10/1/10 | Claims Made | 10/1/2008 |

## VI.   GENERAL LIABILITY (To be completed by the Applicant if applying for General Liability)

1.   Complete the following for each of the Applicant's facilities:

| Location Number | Name of Facility | Address | Description of Facility | Does the Applicant Maintain a Garage? (Yes/No) | Is There an Adjacent Exposure? (Yes/No) |
|---|---|---|---|---|---|
| 1 | 501 Holiday Drive Pittsburgh PA 15220 | | | No | No |
| 2 | 510 George Street Jackson MS | | | No | No |
| 3 | 661 Holiday Drive Pittsburgh PA 15220 | | | No | No |

2.   Complete the following for each of the Applicant's locations:

| | Location 1 | Location 2 | Location 3 | Location 4 |
|---|---|---|---|---|
| Square Footage* | 42,000 | 1000 | 857 | |
| Year Built | 1983 | | 1980 | |
| Year Remodeled | 1995 | | 1994 | |
| Number of Stories | 3 | | 3 | |
| Type of Construction (frame, brick, concrete) | facade | | facade | |
| Percentage of Building Occupied by Applicant | 66 | 5 | 0 | |
| Other occupants? (Yes/No) | Yes | Yes | Yes | |

*Include square footage of parking facilities if owned or rented by the Applicant.

3.   Are all of the Applicant's locations equipped with:
(a)   Complete Sprinkler System?............................................................................................................[×] Yes [  ] No
(b)   At least two clearly marked exits on each floor?............................................................................[×] Yes [  ] No

(c) Self-closing fire doors on each floor?..................................................................................................[X] Yes [ ] No
(d) Automatic fire alarm system connected to a local fire department? ...................................................[X] Yes [ ] No
(e) Smoke detectors? .............................................................................................................................[X] Yes [ ] No
(f) Emergency electrical system? ...........................................................................................................[X] Yes [ ] No
(g) Heat sensors? ...................................................................................................................................[X] Yes [ ] No
(h) Fire escape(s)? .................................................................................................................................[X] Yes [ ] No
(i) Posted emergency evacuation procedures?.......................................................................................[X] Yes [ ] No
(j) Properly maintained fire extinguishers?.............................................................................................[X] Yes [ ] No

If any of the above are answered No, provide details by attachment.

4. Does the Applicant have a written safety program in place? ...............................................................[ X ] Yes [ ] No
If Yes, attach a copy of the written safety program.

5. Does the Applicant have written procedures for incident reporting?....................................................[ X ] Yes [ ] No

6. Do any of the Applicant's locations have any:

(a) Exposure to flammables, explosive, chemicals? ............................................................................[ ] Yes [ ] No
(b) Catastrophe exposure?....................................................................................................................[ ] Yes [ ] No
(c) Exposure to radioactive materials?..................................................................................................[ ] Yes [ ] No

7. Do any of the Applicant's operations involve storing, treating, discharging, applying, disposing, or
transporting hazardous materials?.........................................................................................................[ ] Yes [ X ] No

8. Does the Applicant sell or lease any medical equipment or products to patients/clients or others in
connection with Applicant's operation? ..................................................................................................[ ] Yes [ X ] No
If Yes, Total Annual Sales                    $_____

Total Annual/Lease Rental Receipts $_____

9. Does the Applicant:

(a) Loan or rent machinery or equipment to others?...........................................................................[ ] Yes [ X ] No
(b) Own any elevators or escalators?..................................................................................................[ ] Yes [ X ] No
(c) Own or rent any parking facility?....................................................................................................[ ] Yes [ X ] No
(d) Provide any recreational facility? ...................................................................................................[ ] Yes [ X ] No
(e) Have a swimming pool on the premises? .......................................................................................[ ] Yes [ X ] No
(f) Sponsor any sporting or social events? .........................................................................................[ ] Yes [ X ] No

10. Has any claim for General Liability ever been made against any person(s) or entity(ies) proposed
for this insurance? .................................................................................................................................[ X ] Yes [ ] No
If Yes, answer the following:
Provide three year loss history for claims under $100,000 Loss and Expense and ten years for claims $100,000 and
greater. Attach further sheets if needed.

| Date of Occurrence | Date Claim Made | Description of Loss | Amount of Loss Reserved and Paid | Amount of Expenses Reserved and Paid | Open (O) or Closed (C) |
|---|---|---|---|---|---|
| Loss History Attached | | | | | |

11. Is (are) any person(s) or entity(ies) proposed for this insurance aware of any fact, circumstance or situation which
may result in a General Liability claim, such that would fall under the proposed insurance?................ [ X ] Yes [ ] No
If Yes, provide details for each incident. Frivolous behavior_____

## VII. ADDITIONAL INFORMATION

As part of this Application attach the following:
1. A CV of Medical Director including specialty and board certification.
2. Five (5) years of currently valued Professional Liability Insurance and General Liability Insurance claim runs from
current and prior insurers or complete a Supplemental Claim Information form (SM6236) for each claim.

3. A list of any activities or procedures performed that are not otherwise described in this Application.

4. Credentialing, Risk Management protocols.

5. Most recent annual financial statements, both a balance sheet and a revenue and expense statement. If the Applicant is newly established attached proforma financial statements.

6. Complete an Additional Insured Supplement for any additional insured that coverage is being requested for under General Liability Coverage.

## NOTICE TO THE APPLICANT - PLEASE READ CAREFULLY

The policy applied for is SOLELY AS STATED IN THE POLICY, if issued, which provides coverage on a "CLAIMS MADE" basis for ONLY THOSE "CLAIMS" THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD, unless the Extended Reporting Period option is exercised in accordance with the terms of the policy.

The underwriting manager, Company and/or affiliates thereof are authorized to make any inquiry in connection with this application. Signing this application does not bind the Company to provide or the Applicant to purchase the insurance.

This application, information submitted with this application and all previous applications and material changes thereto of which the underwriting manager, Company and/or affiliates thereof receives notice is on file with the underwriting manager, Company and/or affiliates thereof and is considered physically attached to and part of the of the policy if issued. The underwriting manager, Company and/or affiliates thereof will have relied upon this application and all such attachments in issuing the policy. If the information in this application or any attachment materially changes between the date this application is signed and the effective date of the policy, the Applicant will promptly notify the underwriting manager, Company and/or affiliates thereof, who may modify or withdraw any outstanding quotation or agreement to bind coverage.

## WARRANTY

I/We warrant to the Company, that I/We understand and accept the notice stated above and that the information contained herein is true and that it shall be the basis of the policy and deemed incorporated therein, should the Company evidence its acceptance of this application by issuance of a policy. I/We authorize the release of claim information from any prior insurer to the underwriting manager, Company and/or affiliates thereof.

Must be signed by the Applicant within 60 days of the proposed effective date.

| | |
|---|---|
| Name of Applicant | $\mathcal{E}VP \; \& \; CAO$ <br> Title |
| Signature of Applicant | $9.8.14$ <br> Date |

**Notice to Applicants:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects the person to criminal and civil penalties.

## ADDITIONAL EXPLANATIONS

# EXHIBIT "B"

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| LAMONT HALL, | ) | |
|  | ) | |
|  | ) | |
| Plaintiff, | ) | CIVIL ACTION UNDER §1983 |
|  | ) | |
| vs. | ) | Case No. 14 C 6308 |
|  | ) | |
| ARTHUR FUNK, M.D., | ) | Judge Matthew F. Kennelly |
| WEXFORD HEALTH SOURCES, INC., and | ) | |
| MICHAEL LEMKE, | ) | |
|  | ) | |
| Defendants. | ) | |

## PLAINTIFF LAMONT HALL'S FIRST AMENDED COMPLAINT

Plaintiff Lamont Hall ("Hall"), by and through his attorneys, files this First Amended

Complaint against defendants Arthur Funk, M.D. ("Funk"), Wexford Health Sources, Inc.

("Wexford"), and Michael Lemke ("Lemke") (collectively, "defendants") as follows:

### INTRODUCTION

1.     This is a civil action seeking damages against defendants for, *inter alia*,

committing acts, under color of state law, which deprived Mr. Hall of rights secured by the

United States Constitution and the laws of the United States.  Defendants Funk, Wexford, and

Lemke repeatedly acted with deliberate and conscious indifference to Mr. Hall's serious medical

condition, depriving Mr. Hall of his rights guaranteed by the Eighth and Fourteenth Amendments

to the Constitution of the United States.

2.     This action also asserts Illinois common law medical malpractice claims and

seeks damages against defendants Funk and Wexford for negligence in the provision of Mr.

Hall's medical care.  Defendants Funk and Wexford repeatedly failed to conform to the

applicable standard of medical care, causing Mr. Hall significant and unnecessary pain and suffering.

3.     This action also asserts claims and seeks damages against defendants Funk and Wexford under the Illinois common law intentional infliction of emotional distress for the extreme and outrageous conduct of refusing to provide Mr. Hall basic and much-needed medical care as additional punishment for a crime. Defendants Funk and Wexford recklessly and consciously disregarded the risk of inflicting emotional distress on Mr. Hall and did in fact inflict emotional distress on Mr. Hall.

## JURISDICTION AND VENUE

4.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Mr. Hall's rights as secured by the United States Constitution.

5.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

6.     This action also asserts Illinois common law medical malpractice and intentional infliction of emotional distress claims.

7.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.     Venue is proper under 28 U.S.C. § 1391(b). Defendants are subject to personal jurisdiction in this judicial district because the individual defendants resides here and the corporate defendant does business here. Moreover, all of the events giving rise to the claims asserted herein occurred within the Northern District of Illinois.

## PARTIES

9.     From on or about February 8, 2013, to on or about October 4, 2013, plaintiff Lamont Hall was incarcerated at Stateville Correctional Center ("Stateville"), a prison facility

operated by the Illinois Department of Corrections ("IDOC"). During that time, he required but did not receive timely treatment for a traumatic penis injury and related conditions.

10.     Defendant Funk is a physician licensed to practice medicine in Illinois. By counsel's estimation, he has been sued approximately twenty-five times for being deliberately indifferent to prisoners' serious medical needs.[1] At all relevant times, defendant Funk was employed by either defendant Wexford or the IDOC to supervise the provision of medical care at Stateville. In such role, defendant Funk made decisions about what medical care Mr. Hall would receive and treated Mr. Hall directly on at least one occasion. Defendant Funk is not a specialist in either urology or surgical repair of traumatic injuries. Defendant Funk acted under color of state law when performing these duties.

11.     Defendant Wexford is a corporation conducting business in the State of Illinois. Defendant Wexford contracted with the State of Illinois to provide medical services, including care for traumatic injuries, to inmates in the custody of IDOC. Defendant Wexford acted under color of state law when performing its contractual duties.

12.     During the relevant time period, defendant Lemke was employed by IDOC as the Stateville Warden. As Warden, defendant Lemke retained final discretion on the provision of emergency medical care through the prisoner grievance system and enforced IDOC policies and procedures. Defendant Lemke acted under color of state law when performing these duties.

---

[1] *See, e.g., Diaz v. Hart*, No. 08 C 5621, 2010 WL 849654, at *6 (N.D. Ill. Mar. 8, 2010) (physicians at Cook County Jail and Stateville, including Dr. Funk, "can all be considered to have had sufficient personal involvement with these denials of surgery to allow Diaz's claims to proceed against them in their individual capacities, particularly as their high-level positions warrant an inference that they established policies that others followed in withholding treatment."); *Gills v. Funk*, No. 13-CV-00791-GPM, 2013 WL 4670034, at *1 (S.D. Ill. Aug. 30, 2013) ("[p]laintiff fears that if his ailments go untreated—if he is not give[n] the recommended surgeries—he could die."). *See also King v. Mote*, No. 04-1328, 2007 WL 3348402, at *3 (C.D. Ill. Nov. 5, 2007) ("the plaintiff says Dr. Funk mocked him and accused him of being a malingerer.")

## FACTS

### *The Wound to Plaintiff's Penis*

13.     On or about November 18, 2012, Mr. Hall suffered a gunshot wound to his penis, which created a through-and-through injury, with a diameter of approximately 2 centimeters.

14.     Physicians at Presence Saint Francis Hospital in Evanston, Illinois performed emergency surgery on Mr. Hall immediately following the incident on or about November 18. 2012, and inserted an 18 inch French Foley catheter.

15.     While recovering at Presence Saint Francis Hospital, Mr. Hall was seen by a urologist who recommended and prescribed a treatment plan which included  a second surgery— a staged urethroplasty.   The urethroplasty was needed in order for the wound to heal properly and to restore full function of his penis.  A urethroplasty is a procedure to repair an anatomic defect and to restore normal function to the organ.  Initially, Mr. Hall was advised to follow-up within two weeks.

16.     The physicians at Presence Saint Francis Hospital further advised Mr. Hall that, once they removed the French Foley catheter, he would be able to urinate on his own, but only in a seated position. To fully restore function to his penis and urethra, Mr. Hall would need a staged urethroplasty.  However, until he had the staged urethroplasty, he would need to regularly insert a straight catheter into the opening at the tip of his penis.  Without regular insertion of the straight catheter, structuring could occur, which would make restoring full functioning of Mr. Hall's urethra more difficult and subject to serious complications.

17.     As the urologist and treating physicians at Presence Saint Francis Hospital explained to Mr. Hall,  the straight catheter was  a temporary procedure for use pending Mr. Hall's staged urethroplasty.  If Mr. Hall ceased to routinely insert the straight catheter, he would risk losing the ability to restore a fully functioning urethra.

4

18.     In addition, the urologist and other treating physicians at Presence Saint Francis Hospital gave Mr. Hall specific instructions for caring for his wound, which included cleaning his genital area daily with antibacterial soap and regularly changing his bandages.

19.     Mr. Hall's staged urethroplasty was scheduled to be performed in or around March 2013.

20.     On or about February 5, 2013, Mr. Hall was arrested for home invasion, which put him in violation of his parole and caused him to be incarcerated. On or about February 8, 2013, after being processed briefly at Cook County Jail, Mr. Hall was sent to Stateville to serve the remainder of a portion of the time left on his original sentence.

21.     On or about March 13, 2013, prison officials calculated that Mr. Hall would be released from Stateville no later than October 4, 2013.

22.     From Mr. Hall's incarceration at Stateville on or about February 8, 2013, to on or about October 4, 2013, defendants shared responsibility to provide and oversee the provision of Mr. Hall's medical care.

### *Scheduling Mr. Hall's Second Urethroplasty*

23.     On or about February 6, 2013, Mr. Hall was seen by a medical professional at the Cook County Jail's Medical Infirmary. Medical records from that date describe Mr. Hall's wound as a "gaping hole." Mr. Hall told unnamed medical staff at that time about the wound to his penis and his need for a staged urethroplasty.

24.     At that time, Mr. Hall also had a psychiatric consultation with a physician. Mr. Hall reported his history of depression and anxiety. Mr. Hall specifically stated that he had attempted suicide three times in the past.

25.    Cook County Jail sent these medical records to Stateville on or about the time Mr. Hall was transferred into IDOC custody on February 8, 2013.

26.    Immediately upon entering into IDOC's custody, Mr. Hall again informed prison medical personnel of the wound to his penis and his need for a staged urethroplasty, as the urologist at Presence Saint Francis Hospital had advised.

27.    On or about February 8, 2013, Mr. Hall had another psychiatric consultation. He reported feeling symptoms of depression. He also notified his treating physician of the open wound to his penis and his substantial pain.

28.    On or about February 13, 2013, Mr. Hall had a consultation with Stateville physician's assistant, Diane Schwarz. At that time, Mr. Hall informed Ms. Schwarz of the wound on his penis, his need to clean the wound daily, his need for straight catheter replacements, and his need for a staged urethroplasty. He advised Ms. Schwarz that the staged urethroplasty was critical to ensure proper healing, to restore long-term function of his penis, and to enable him to cease using the straight catheter that he had been required to use since his initial surgery. Ms. Schwarz scheduled him for a follow up appointment the next week.

29.    On or about February 20, 2013, Mr. Hall had a second appointment with Ms. Schwarz. At that time, Mr. Hall and Ms. Schwarz discussed Mr. Hall's penis injury in more detail. Ms. Schwarz indicated she would seek approval for an outside consultation with the Urology Department at the University of Illinois at Chicago Medical Center ("UIC Medical Center"). Ms. Schwarz also discussed Mr. Hall's injury with defendant Funk.

30.    One month later, on or about March 20, 2013, Ms. Schwarz secured the approval for a urology consultation at UIC Medical Center after reviewing Mr. Hall's case with a physician employed either by defendant Wexford or the IDOC, Dr. Haymes. The urology

consultation at UIC Medical Center was scheduled for June 2013—three months after Mr. Hall
arrived at Stateville and eight months after his initial injury. Throughout this time period, Mr.
Hall continued to experience constant, severe pain in his genital areas which affected his daily
activities.

31.    Also throughout this period, Mr. Hall continued to insert a straight catheter into
his urethra at least 2-3 times a week. He did so without the aid of prescribed numbing gel. Mr.
Hall experienced intense pain with every insertion.

32.    On or about June 12, 2013, over four months after entering Stateville, Mr. Hall
finally received his first urological consultation at UIC Medical Center. The urological specialist
who examined Mr. Hall noted that Mr. Hall "[n]eeds surgical repair" and also stated that he
would "schedule [the surgery] through Pat." The urological specialist made clear that Mr. Hall
needed "[d]aily showers to prevent infection" and that Mr. Hall should return for a second
consultation in "1 month" (emphasis in original).

33.    On that same day, when Mr. Hall returned to Stateville, he saw defendant Funk to
review the UIC specialist's orders and recommendations. Defendant Funk made clear that he
would not follow the urological specialists' orders and recommendations. He checked a box
marked "Deny" and noted "repair is elective, daily showers not necessary."

34.    Defendant Funk did more than deny the urological specialist's recommendations
and orders. He told Mr. Hall that he did not need the surgery because "it'd grow back,"
apparently referring to Mr. Hall's penis. Defendant Funk also denied the urologist's prescription
for daily showers, stating to Mr. Hall "that's why you have a sink."

35.    On or about July 16, 2013, defendant Funk officially denied Mr. Hall's
urethroplasty, which had been recommended by urologists at both Presence Saint Francis

Hospital and UIC Medical Center. At the same time, defendant Funk recorded that Mr. Hall would continue to "self-cath." Upon information and belief, defendant Funk did not inform Mr. Hall or the urologists at the UIC Medical Center that he had denied approval for his staged-urethroplasty.

36.     On or about July 23, 2013, Stateville conducted a evaluation of Mr. Hall's suicidal tendencies. In that evaluation, it was observed that Mr. Hall was expressing feelings of hopelessness or helplessness, that he was showing signs of depression, and that he had made previous suicide attempts.

37.     Approximately six months after entering the custody of Stateville, on or about August 7, 2013, Mr. Hall had a second consultation with a urological surgeon at UIC Medical Center. Based on the importance of the surgery, the urological surgeon scheduled Mr. Hall's surgery for September 12, 2013 and gave certain pre-operative orders, including that Mr. Hall receive a pre-operative shower with antiseptic soap the day before the surgery.

38.     On or about September 12, 2013, Mr. Hall was called down to inmate processing in order to be transported to UIC Medical Center to receive his long-awaited staged urethroplasty.

39.     However, after waiting for several hours in the inmate processing cell, Mr. Hall was informed that his surgery had been cancelled. Ms. Schwarz informed Mr. Hall that defendant Funk had cancelled the surgery. Ms. Schwarz also stated that that she did not know why defendant Funk had canceled the surgery. Based the information provided by Ms. Schwarz and the actual failure to receive the urethroplasty, Mr. Hall filed an emergency grievance.

40.     Throughout his entire duration at Stateville and during all relevant times, defendants Funk and Wexford showed deliberate indifference to Mr. Hall's serious medical

8

needs in refusing to permit Mr. Hall to receive his staged urethroplasty to repair the open wound to his penis and to restore full function of his penis, as urological specialists at Presence Saint Francis Hospital and UIC Medical Center had recommended. Defendant Lemke condoned such deliberate indifference and took no actions to correct it.

41.     As a result, throughout his incarceration at Stateville and during all relevant times, Mr. Hall endured extreme and unnecessary pain and related emotional suffering. Until he received his staged urethroplasty, he had to insert his own catheter on a regular basis, without proper replacements or numbing gel; faced ridicule and harassment from fellow inmates in showers and restrooms; constantly feared infection and permanent disability or disfigurement of his penis; and experienced heightened symptoms of depression and anxiety.

42.     At all times, defendants had knowledge of Mr. Hall's depression as well as his "gaping wound" in his penis. Yet, instead of following the recommendations of urologists, defendants failed to secure Mr. Hall his needed urethroplasty and instead insisted that he continue a treatment plan in which he endured extreme, intense, and unnecessary pain by inserting a straight catheter into his urethra 2 to 3 times a week.

### Failing to Provide Mr. Hall with Access to Soap and Daily Showers

43.     Immediately upon entering into IDOC's custody, Mr. Hall informed prison medical personnel of his need to properly clean the wound on his penis as well as to insert a straight catheter daily, as the physicians at Presence Saint Francis Hospital had advised.

44.     Throughout his incarceration at Stateville, Mr. Hall repeatedly requested additional soap and permission to shower more than once per week in order to clean his wound adequately. Mr. Hall made these requests both directly to medical personnel and prison officials, and through the prisoner grievance system. In essence, Mr. Hall requested that defendants

follow the basic recommendations of the specialists at Presence Saint Francis Hospital and UIC Medical Center.

45.     Defendants repeatedly denied these requests. Instead, they provided Mr. Hall with soap only on a monthly basis and permitted Mr. Hall to shower only on a weekly basis. They also reduced his medical supplies, providing Mr. Hall with only enough straight catheters to perform the painful, but necessary straight catheter procedure on an ad hoc basis.

46.     After Mr. Hall's June 12, 2013 surgery consultation, the UIC urologist ordered that Mr. Hall be allowed to take daily showers in order to properly care for the open wound to his penis.

47.     Despite knowing about the Mr. Hall's prescription for daily showers, defendants refused to allow Mr. Hall daily access to showers and continued to allow Mr. Hall to shower only once a week. In fact, when Mr. Hall returned from his June 12, 2013 surgery consultation, he had an appointment with defendant Funk. Defendant Funk acknowledged receipt of the urological surgeon's order, but told Mr. Hall that he would not be getting daily showers because "that's why you have a sink."

48.     Finally, on or about August 23, 2013, Mr. Hall was granted a special needs permit to shower three times per week—still not nearly what the specialist at UIC Medical Center had ordered. Yet grievances that Mr. Hall filed in September of 2013 make clear that, despite the special needs permit, Mr. Hall still was not permitted to shower more than once per week.

49.     Throughout Mr. Hall's incarceration at Stateville and during all relevant times, defendants showed deliberate indifference to Mr. Hall's serious medical need and refused to provide him soap and permission to shower daily in order to care for the open wound on his penis, as was ordered by physicians at Presence Saint Francis Hospital and UIC Medical Center.

50.     As a result, throughout Mr. Hall's incarceration at Stateville and during all relevant times, Mr. Hall endured extreme and unnecessary, physical and emotional, pain and suffering. Because he could not wash the area around his wound adequately, he constantly feared infection and permanent disability or disfigurement of his penis; faced ridicule and harassment from fellow inmates in showers and restrooms; and experienced heightened symptoms of depression and anxiety.

### *Failing to Respond to Mr. Hall's Grievances, Including His Emergency Grievance*

51.     Upon information and belief, Mr. Hall filed several grievances throughout his duration at Stateville, alerting medical and prison personnel to the insufficient medical care that he was receiving. These grievances[2] addressed Mr. Hall's inability to see medical personnel regarding his serious medical condition as well as being denied access to shower daily, as was prescribed by specialists at UIC Medical Center. Defendants did not adequately address these grievances.

52.     In particular, defendants did not adequately address at least three emergency medical grievances. Pursuant to Ill. Admin. Code 504.840, when an inmate requests that a grievance be handled on an emergency basis, "[t]he Chief Administrative Officer shall expedite processing of the grievance and respond to the offender, indicating what action shall be or has been taken." In other words, the warden of the prison—defendant Lemke, in this case—was responsible for reviewing Mr. Hall's emergency medical grievance on an expedited basis and informing Mr. Hall of the outcome of that emergency medical grievance.

---

[2] As of the filing of this amended complaint, IDOC has not provided counsel copies of any of the grievances Mr. Hall filed, despite counsel's request for such records in a subpoena originally dated January 14, 2015. Counsel renewed the request for these grievances on April 2, 2015.

53.     On or about May 29, 2013, Mr. Hall filed an emergency medical grievance requesting to see a physician and to be permitted to shower more than once weekly. In response, on or about June 6, 2013, Mr. Hall's counselor noted, "[y]our original grievance has been forwarded to the grievance office to await response from the HCU. At which time you will receive a copy of same." Mr. Hall never received a response from the Health Care Unit.

54.     On or about September 6, 2013, Mr. Hall filed an emergency medical grievance requesting that he be permitted to have his staged urethroplasty. Mr. Hall either did not know that the surgery had been scheduled for September 12, 2013, or at least rightly suspected that defendants Funk and Wexford were "trying to wait until [he was] released from their custody." Mr. Hall never received a response to that emergency medical grievance.

55.     Shortly after Mr. Hall's scheduled urethroplasty was cancelled without explanation on September 12, 2013, Mr. Hall again filed an emergency medical grievance requesting that he be permitted to have his staged urethroplasty and to shower more than once per week. Mr. Hall also never received a response to that emergency medical grievance.

56.     Defendant Lemke never informed Mr. Hall of the outcome of the emergency medical grievances that Mr. Hall filed on or about May 29, 2013, September 6, 2013, and September 12, 2013. To the contrary, instead of reviewing Mr. Hall's emergency medical grievances on an expedited basis and informing Mr. Hall of the outcomes, defendant Lemke completely ignored the emergency medical grievances from the time they were made until Mr. Hall was transferred into the custody of the Cook County Department of Corrections on or about October 4, 2013.

57.     Throughout his entire duration at Stateville and during all relevant times, defendants showed deliberate indifference to Mr. Hall's serious medical needs in that they failed to adequately respond to his grievances, including at least three emergency medical grievances.

58.     As a result, throughout Mr. Hall's incarceration at Stateville and during all relevant times, Mr. Hall endured extreme and unnecessary, physical and emotional, pain and suffering. The failure to respond to his grievances exacerbated the other deficiencies in his medical care—namely, that he had to insert his own catheter on a regular basis, without proper replacements and numbing gel; faced ridicule and harassment from fellow inmates in showers and restrooms; constantly feared infection and permanent disability or disfigurement of his penis; and experienced heightened symptoms of depression and anxiety.

*Causation*

59.     Due to defendants' failure to provide Mr. Hall proper care for the open wound on his penis, including but not limited to failing to provide Mr. Hall with the urologist recommended staged urethroplasty as well as daily showers, Mr. Hall suffered tremendous pain as well as the disability and disfigurement of his genitals. In particular, until he received his urethroplasty, Mr. Hall was forced to insert his own catheters, without proper supplies and necessary numbing gel; suffered ridicule from fellow inmates; ran the risk of serious infection; and suffered from the heightened symptoms of depression and anxiety. Despite now having received the surgery, Mr. Hall cannot achieve a physical erection on his own and continues to suffer from depression and anxiety.

60.     Thus, as a result of defendants' conduct, Mr. Hall suffered extreme emotional and physical pain; the related inability to focus on everyday functions, such as reading, writing, or

working; the temporary loss of normal functioning of his penis, including both urinary and

sexual functions; related emotional pain and suffering; and other serious health consequences.

61.     Physicians must have their patients' best interests in mind when making medical

decisions.  Mr. Hall had an open wound in his penis that required him to urinate in such a way

that was embarrassing and psychologically harmful.  This, combined with Mr. Hall's underlying

psychological diagnosis of depression and past suicide attempts, compelled defendants to follow

the recommendations of the independent urologists and schedule Mr. Hall's urethroplasty as

soon as medically possible.

## COUNT I – EIGHTH AMENDMENT VIOLATIONS
## DEFENDANT ARTHUR FUNK

62.     Mr. Hall restates and incorporates by reference the allegations of Paragraphs 1

through 61 herein.

63.     Mr. Hall brings Count I against defendant Funk in his individual and official

capacities.

64.     Mr. Hall suffered from a serious medical need while at Stateville in that he had an

open wound on his penis that caused him extreme pain, suffering, loss of function,  and other

adverse health effects.

65.     Upon information and belief, defendant Funk was responsible for supervising the

provision of all medical services, including care for traumatic injuries, at Stateville.  In this role,

defendant Funk directly determined the extent of the care Mr. Hall received for the open wound

on his penis, and in addition, treated Mr. Hall directly on at least one occasion.  Defendant Funk

acted under color of state law when he performed these duties.

66.     Defendant Funk knew, or reasonably should have known, that Mr. Hall's open

wound was a serious medical condition requiring treatment.  Mr. Hall informed medical

personnel immediately upon arriving at Stateville of the serious nature of his injury as well as his
pre-existing mental health conditions; Ms. Schwarz noted that she discussed Mr. Hall's injury
with defendant Funk on or about February 20, 2013; and Mr. Hall discussed the injury directly
with defendant Funk on or about June 12, 2013, when defendant Funk checked Mr. Hall back
into Statesville after his urological consultation at UIC Medical Center.

67.     However, despite defendant Funk's awareness, he was deliberately indifferent to
Mr. Hall's serious medical needs. In particular, defendant Funk:

a.      Refused to permit Mr. Hall to shower regularly with sufficient soap, as
        was prescribed by independent medical professionals;

b.      Failed to adequately respond to Mr. Hall's requests and grievances for
        medical care; and

c.      Delayed and ultimately cancelled Mr. Hall's long-awaited staged
        urethroplasty, which was critical to ensure that the wound healed properly
        and to restore full function to his penis, without reason or notice.

68.     As a result of defendant Funk's conduct, Mr. Hall endured prolonged pain and
suffering, and prolonged injury to his penis in violation of his Eighth Amendment rights. More
specifically, Mr. Hall suffered extreme emotional and physical distress; the related inability to
focus on everyday functions, such as reading, writing, or working; the temporary loss of normal
functioning of his penis, including both urinary and sexual functions; related emotional pain and
suffering; and other serious health consequences.

69.     In short, defendant Funk's conduct constituted deliberate indifference to and
reckless disregard of Mr. Hall's serious medical needs and caused Mr. Hall to suffer unnecessary
physical injuries and pain and suffering in violation of his Eighth Amendment rights.

## COUNT II – MALPRACTICE
## DEFENDANT ARTHUR FUNK

70.     Mr. Hall restates and incorporates by reference the allegations of Paragraphs 1 through 69 herein.

71.     Mr. Hall brings Count II against defendant Funk in his individual capacity.

72.     The above described conduct of defendant Funk failed to conform to the applicable standard of care in the medical community.  In particular, defendant Funk:

        a.     Refused to permit Mr. Hall to shower regularly with sufficient soap, as was prescribed by independent medical professionals;

        b.     Failed to adequately respond to Mr. Hall's requests and grievances for medical care; and

        c.     Delayed and ultimately cancelled Mr. Hall's long-awaited staged urethroplasty, which was critical to ensure that the wound healed properly and to restore full function to his penis, without reason or notice.

73.     The report of Dr. Benjamin James affirms that defendant Funk's conduct did not meet the appropriate standard of care in the medical community and is attached hereto as Exhibit 1.

74.     As an actual and proximate result of defendant Funk's failure to conform to the applicable standard of care in the medical community, Mr. Hall endured prolonged pain and suffering, and prolonged injury to his penis.  More specifically, Mr. Hall suffered extreme and unnecessary emotional and physical pain; the related inability to focus on everyday functions, such as reading, writing, or working; the temporary loss of normal functioning of his penis, including both urinary and sexual functions; additional and related emotional pain and suffering; and other serious health consequences.

## COUNT III – EIGHTH AMENDMENT VIOLATIONS
## WEXFORD HEALTH SOURCES, INC.

75.     Mr. Hall restates and incorporates by reference the allegations of Paragraphs 1 through 74 herein.

76.     Mr. Hall suffered from a serious medical need while at Stateville in that he had an open wound on his penis that caused him extreme pain, suffering, temporary loss of function, and other adverse health effects.

77.     At all relevant times, under its contract with the IDOC, defendant Wexford was responsible for maintaining official policies and customs to ensure the adequate provision of medical services, including care for traumatic injuries, at Stateville.  Defendant Wexford acted under color of law when it performed this duty.

78.     Instead, defendant Wexford maintained official policies and actual practices that were deliberately indifferent to inmates' serious medical needs.  In particular, Wexford:

a.      Routinely refused to follow the orders and recommendations of outside physicians;

b.      Routinely delayed or cancelled inmates' scheduled appointments with medical professionals, often without explanation;

c.      Routinely delayed responding to medical grievances; and,

d.      Routinely delayed or denied important medical procedures.

79.     Defendant Wexford's policies and practices were so prevalent as to have the force of law.

80.     As a result of defendant Wexford's policies and practices, Mr. Hall endured prolonged pain and suffering, and prolonged injury to his penis in violation of his Eighth Amendment rights.  More specifically, Mr. Hall suffered extreme emotional and physical pain;

the related inability to focus on everyday functions, such as reading, writing, or working; the temporary loss of normal functioning of his penis, including both urinary and sexual functions; related emotional pain and suffering; and other serious health consequences.

81. In short, defendant Wexford's policies and practices constituted deliberate indifference to and reckless disregard of Mr. Hall's serious medical needs and caused Mr. Hall to suffer physical injuries and pain and suffering in violation of Mr. Hall's Eighth Amendment rights.

## COUNT IV – MALPRACTICE
## WEXFORD HEALTH SOURCES, INC.

82. Mr. Hall restates and incorporates by reference the allegations of Paragraphs 1 through 81 herein.

83. Mr. Hall brings Count IV against defendant Wexford under a theory of respondeat superior.

84. Defendant Funk is an employee or agent of defendant Wexford. As such, defendant Wexford, a corporation, acted through defendant Funk.

85. The above described conduct of defendant Funk and other employees or agents of defendant Wexford failed to conform to the applicable standard of care in the medical community. In particular, employees or agents of defendant Wexford:

     a. Refused to permit Mr. Hall to shower regularly with sufficient soap, as was prescribed by independent medical professionals;

     b. Failed to adequately respond to Mr. Hall's requests and grievances for medical care; and

c.    Delayed and ultimately cancelled Mr. Hall's long-awaited staged

urethroplasty, which was critical to ensure that the wound healed properly

and to restore full function to his penis, without reason or notice.

86.    The provision of medical care was within the scope of such employees' or agents'

employment with defendant Wexford.

87.    The report of Dr. Benjamin James affirms that the conduct of Wexford's

employee, defendant Funk, did not meet the appropriate standard of care in the medical

community and is attached hereto as Exhibit 1.

88.    As an actual and proximate result of defendant Wexford's failure to conform to

the applicable standard of care in the medical community, Mr. Hall endured prolonged pain and

suffering, and prolonged injury to his penis.  More specifically, Mr. Hall suffered significant

emotional and physical pain and suffering; the related inability to focus on everyday functions,

such as reading, writing, or working; the temporary loss of normal functioning of his penis,

including both urinary and sexual functions; related emotional pain and suffering; and other

serious health consequences.

## COUNT V – ILLINOIS INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## DEFENDANTS ARTHUR FUNK AND WEXFORD HEALTH SOURCES, INC.

89.    Mr. Hall restates and incorporates by reference the allegations of Paragraphs 1

through 88 herein.

90.    The above described conduct of defendants Funk and Wexford was extreme and

outrageous.   In particular, defendants Funk and Wexford:

a.    Refused to permit Mr. Hall to shower daily, as a specialist at UIC Medical

Center had ordered;

b.  Delayed and ultimately cancelled Mr. Hall's long-awaited staged urethroplasty, which was critical to ensure that the wound healed properly and to restore full function to his penis, without reason or notice;

c.  Unnecessarily made Mr. Hall continue a treatment plan which involved him routinely having to insert a straight catheter into his urethra without numbing gel;

d.  Taunted Mr. Hall when refusing to permit Mr. Hall to shower daily and delaying his long-awaited second urethroplasty; and,

e.  Failed to adequately respond to Mr. Hall's requests and grievances for medical care.

91.  Defendants intended their conduct to cause severe emotional distress to Mr. Hall, or at least recklessly and consciously disregarded the high probability that their conduct would cause Mr. Hall severe emotional distress.

92.  As an actual and proximate result of the extreme and outrageous conduct of defendants Funk and Wexford, Mr. Hall endured prolonged emotional pain and suffering. More specifically, Mr. Hall experienced increased symptoms of depression and anxiety, was subjected to extreme ridicule, and suffered from other serious mental health issues.

## COUNT VI – EIGHTH AMENDMENT VIOLATIONS
## WARDEN MICHAEL LEMKE

93.  Mr. Hall restates and incorporates by reference the allegations of Paragraphs 1 through 92 herein.

94.  Mr. Hall brings Count VI against defendant Lemke in his individual capacity.

95.    Mr. Hall suffered from a serious medical need while at Stateville in that he had an

open wound on his penis that caused him extreme pain, suffering, loss of function,  and other

adverse health effects.

96.    At all relevant times, defendant Lemke, as the Warden or Chief Administrative

Officer at Stateville, was responsible for overall operation of the prison, including the provision

of medical care to inmates.  Defendant Lemke had duties to ensure that constitutionally adequate

care was provided to inmates and to remediate constitutionally inadequate care to the extent he

was aware of it.  Defendant Lemke was also specifically responsible for, and indeed retained

final discretion in, responding to emergency medical grievances.  Defendant Lemke acted under

color of law when he performed these duties.

97.    Defendant Lemke knew, or reasonably should have known, that Mr. Hall's open

wound was a serious medical condition requiring treatment.  Mr. Hall informed medical

personnel immediately upon arriving at Stateville of the serious nature of his injury.  Further, Mr.

Hall had made repeated requests for medical supplies and medical care through medical and

prison personnel that defendant Lemke supervised and through the prisoner grievance system.

Finally, Mr. Hall filed an emergency grievance relating to the wound on his penis on or about

September 12, 2013, to which it was defendant Lemke's responsibility to respond.

98.    Despite defendant Lemke's awareness, defendant Lemke was deliberately

indifferent to Mr. Hall's serious medical needs.  In particular, defendant Lemke failed to respond

to Mr. Hall's emergency medical grievances filed on or about May 29, 2013, September 6, 2013,

and September 12, 2013.

99.    As a result of defendant Lemke's conduct, Mr. Hall endured prolonged pain and

suffering, and prolonged injury to his penis in violation of his Eighth Amendment rights.  More

specifically, Mr. Hall suffered extreme emotional and physical pain; the related inability to focus on everyday functions, such as reading, writing, or working; the temporary loss of normal functioning of his penis, including both urinary and sexual functions; related emotional pain and suffering; and other serious health consequences.

100. In short, defendant Lemke's conduct and constituted deliberate indifference to and reckless disregard of Mr. Hall's serious medical needs and caused Mr. Hall to suffer physical injuries and pain and suffering in violation of his Eighth Amendment rights.

WHEREFORE, Plaintiff Lamont Hall demands judgment against defendants with interest for actual and consequential damages; punitive and exemplary damages; attorneys' fees, interest and costs, which are still accruing; and any other relief deemed by the trier of fact to be just, fair, and appropriate.

Dated: April 17, 2015

Respectfully submitted,

LAMONT HALL

By: /s/ Jack R. Bierig
    One of His Attorneys

Jack R. Bierig
jbierig@sidley.com
Veena K. Gursahani
vgursahani@sidley.com
John Ori Leahy
jleahy@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
(312) 853-7036 (fax)

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 17, 2015, he served the foregoing **First Amended Complaint,** on all counsel of record for defendant Arthur Funk via the Court's ECF filing system. As to defendant Wexford Health Sources, Inc. and defendant Lemke, the undersigned certifies that summonses will be presented to the clerk pursuant to Fed. R. Civ. P. 4(a) and (b) upon filing of the **First Amended Complaint**, and if issued, will be served upon defendants pursuant to Fed. R. Civ. P. 4(c) and (d).

By: /s/ John Ori Leahy

# EXHIBIT "C"



**VIA CERTIFIED MAIL-RETURN RECEIPT REQUESTED
AND EMAIL**

June 1, 2016

JOE EBBITT
WEXFORD HEALTH SROUCES, INC.
FOSTER PLAZA 4
501 HOLIDAY DRIVE
PITTSBURGH, PA 15220


ARTHUR FUNK, MD
1335 SOUTH PRAIRIE, #504
CHICAGO, IL 60605


| | | |
|---|---|---|
| Re: | Insured: | The Bantry Group Corporation DBA: Wexford Health Sources, Inc., and Ballymore Medical Management |
| | Claimant: | LAMONT HALL |
| | Policy No: | SM903254 |
| | Our File No: | SM273337 |

Dear Mr. Ebbitt & Dr. Funk:

As per our prior correspondence, Markel Services, Incorporated is the claims service manager for EVANSTON INSURANCE COMPANY (the "Company") relative to the referenced matter. We are addressing this matter under the above referenced Professional Liability Insurance policy which provides for cost in addition to limits of liability in the amount of $3,000,000 per claim and $10,000,000 in the aggregate subject to a $50,000.00 per claim loss and expense deductible. The policy period is October 1, 2014 to October 1, 2015 and the policy has a Retroactive Date of October 1, 2008.

As counsel has informed you, the claimant has indicated a willingness to settle this matter for a payment of $120,000.00.

As you are aware, the policy of Insurance requires your consent to settlement in order for the Company to negotiate with Plaintiff's counsel. At this time, you have not indicated any intent to consent to negotiating settlement in this matter at any amount up to and including $120,000.00, or any other such amount as may be recommended by the Company. Please promptly advise me in the event this is incorrect, or in the event your position has changed.

As indicated above, under the Policy, the Insured retains the right to either consent to settlement or refuse to consent. However, you should be aware in the event you refuse to consent to any professional liability settlement recommended by the Company, the Company's liability will not exceed the amount of the recommended settlement. Under the section of the Policy titled "Limit of Liability—Reduction for Refusal to Settle" the Policy indicates as follows:

**Markel - Claims**
**Arizona · California · Illinois · New Jersey · Virginia · Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markelcorp.com
California License: Markel West Insurance Services #OD95581
www.markelcorp.com



**MARKEL®**

File #: SM273337
June 4, 2019
Page 2

C. *Limit of Liability-Reduction for Refusal to Settle: The Company shall not settle any Claim without the consent of the Insured. If, however, the Insured is a partnership, professional association, professional corporation or limited liability company, the written consent of an Insured who was formerly but is no longer a member of the partnership, professional association or limited liability company or director, officer, stockholder or Employee of a professional corporation will not be required, provided the written consent of the corporate directors, officers, stockholders or Employees of a professional corporation, or their duly appointed representatives, has been obtained. If, however, the Insured shall refuse to consent to any settlement recommended by the Company and shall elect to contest the Claim or continue any legal proceedings in connection with such Claim, then the Company's liability for the Claim shall not exceed the amount for which the Claim could have been so settled including Claim Expenses incurred up to the date of such refusal. Such amounts are subject to the provisions of the above Limits of Liability A. and B.*

Should you maintain the position that you will not consent to settlement of this matter at any amount up to and including $120,000.00, or any other such amount as may be recommended by the Company, the Company will not be liable for more than the amount for which the Claim could have been so settled, including Claim Expenses incurred up to the date of your refusal to consent.

Please feel free to call the undersigned at (847) 572-6124 if you have any questions or comments regarding this matter.

Very truly yours,

*Amanda Vickers*

Amanda Vickers, CCHP
Claims Examiner

**Markel - Claims**
**Arizona · California · Illinois · New Jersey · Virginia · Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markelcorp.com
California License: Markel West Insurance Services #OD95581
www.markelcorp.com

# EXHIBIT "D"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

**Lamont Hall,**

Plaintiff(s),

v.

**Funk, et al.,**

Defendant(s).

Case No.  14 C 6308
Judge Matthew F. Kennelly

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $       ,

       which ☐ includes     pre–judgment interest.
               ☐ does not include pre–judgment interest.

    Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

    Plaintiff(s) shall recover costs from defendant(s).

---

☐     in favor of defendant(s)
and against plaintiff(s)

    Defendant(s) shall recover costs from plaintiff(s).

---

☒     other:  Judgment is entered in favor of defendant Arthur Funk and against plaintiff Lamont Hall on Count 1 of the amended complaint; in favor of defendants Arthur Funk and Wexford Health Sources, Inc. and against plaintiff on Count 5 of the amended complaint; and in favor of plaintiff Lamont Hall and against defendant Wexford Health Sources, Inc. on count 3 of the amended complaint, awarding plaintiff Lamont Hall compensatory damages of $125,000 and punitive damages of $300,000 against defendant Wexford Health Sources, Inc.  Counts 2 and 4 of the amended complaint are voluntarily dismissed with prejudice.

---

This action was *(check one)*:

☒ tried by a jury with Judge Matthew F. Kennelly presiding, and the jury has rendered a verdict.
☐ tried by Judge    without a jury and the above decision was reached.
☐ decided by Judge   on a motion

Date:  4/16/2018           Thomas G. Bruton, Clerk of Court

                          Pamela J. Geringer, Deputy Clerk

# EXHIBIT "E"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LAMONT HALL, | ) | |
| | ) | |
|      Plaintiff, | ) | |
| | ) | |
|      vs. | ) | **Case No. 14 C 6308** |
| | ) | |
| ARTHUR FUNK, M.D. and WEXFORD | ) | |
| HEALTH SOURCES, INC., | ) | |
| | ) | |
|      Defendants. | ) | |

### <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Plaintiff Lamont Hall sued Wexford Health Sources, Inc. and Dr. Arthur Funk,

alleging that they violated his constitutional rights and committed intentional infliction of

emotional distress by refusing to authorize surgery to repair a hole in his penis while he

was incarcerated at the Illinois Department of Corrections' Northern Reception and

Classification Center. After a trial, a jury found in favor of Dr. Funk on both the

constitutional and state-law claims but found Wexford liable under *Monell v. Department*

*of Social Services of the City of New York*, 436 U.S. 658 (1978), and awarded Hall

$425,000 in compensatory and punitive damages. Wexford has moved for judgment as

a matter of law or alternatively for a new trial. Hall has moved to recover attorney's fees

and costs.

### Background

In late 2012, Lamont Hall suffered a gunshot wound to his groin and underwent

surgery that left a hole in the underside of his penis. Before Hall's follow-up surgery to

repair the hole, he was arrested and convicted of a criminal offense arising from a

separate matter. He was ultimately incarcerated at the Northern Reception and

Classification Center (NRC), located at the Stateville Correctional Center. While at the

NRC, Hall was required to wash and self-catheterize his penis in front of other inmates,

which he says caused him significant embarrassment and emotional distress.

Hall sued Dr. Arthur Funk, a physician at the NRC, alleging that he was

deliberately indifferent to Hall's serious medical need in violation of the Eighth

Amendment and committed intentional infliction of emotional distress by refusing to

authorize surgery to repair his penis. Hall also sued Wexford Health Sources, Inc., the

company that contracts to provide medical services at the NRC, alleging, under *Monell*,

that Wexford's policy of denying so-called "elective" surgeries violated his constitutional

rights.

The case went to trial in April 2018. The jury returned a verdict in favor of Dr.

Funk on both counts but found for Hall on his *Monell* claim against Wexford, awarding

him $125,000 in compensatory damages and $300,000 in punitive damages. The

Court, initially concerned that the verdict was inconsistent, instructed the jurors to

continue deliberating, then excused the jury for the weekend. Before the jury was

reconvened, however, the Court held oral argument on the propriety of the verdict,

reversed its decision, and accepted the verdict.

Wexford has moved for judgment as a matter of law or alternatively for a new

trial. Hall has moved to recover attorney's fees and costs. The Court apologizes for its

inordinate delay in ruling on these motions.

## Discussion

Wexford argues that it is entitled to judgment as a matter of law under Federal Rule of Civil Procedure 50 for two reasons: first, there cannot be *Monell* liability without individual liability, and second, the evidence was insufficient to support a finding that Dr. Funk was deliberately indifferent. In the alternative, Wexford has moved for a new trial under Rule 59, arguing that the jury instructions were confusing and that the Court wrongly excluded certain evidence and thereby deprived Wexford of a fair trial.

Finally, Hall has moved for attorney's fees under 42 U.S.C. § 1988 and has submitted a bill of costs. The parties agree on the amount of the attorney's fees, but Wexford objects to the bill of costs on several grounds.

### A. Motion for judgment as a matter of law

A court may grant a motion for judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a); *May v. Chrysler Group, LLC*, 716 F.3d 963, 970-71 (7th Cir. 2013). The court must "review all of the evidence in the record," but in doing so it must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Robinson v. Perales*, 894 F.3d 818, 833 (7th Cir. 2018) (quoting *Reeves v. Sanderson Pluming Prods., Inc.*, 530 U.S. 133, 150-51 (2000)).

Wexford argues that it is entitled to judgment as a matter of law because the jury verdict was inconsistent and the evidence was insufficient to support the verdict.

3

## 1.  Consistency of the verdict

Wexford first argues that the jury verdict is inconsistent as a matter of law.  In evaluating this argument, the "court must reconcile apparently inconsistent verdicts, rather than overturn them."  *Delloughery v. City of Chicago*, 422 F.3d 611, 617 (7th Cir. 2005).  A verdict is inconsistent only if "no rational jury could have brought back the verdicts that were returned."  *Id.* (internal quotation marks omitted).

At the outset, the Court notes that Wexford cannot support its argument for judgment as a matter of law by invoking an allegedly inconsistent jury verdict.  "A new trial on all claims is the appropriate remedy (rather than judgment as a matter of law) in a case in which the jury has returned inconsistent verdicts."  *Id.*  But whether evaluated as part of the motion for a new trial or as a basis for judgment as a matter of law, Wexford's argument fails because the jury's verdict was not inconsistent.

Wexford argues that the jury could not have found it liable after finding in favor of Dr. Funk.  It cites the Supreme Court's decision in *City of Los Angeles v. Heller*, 475 U.S. 796 (1986), for the proposition that "neither *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."  *Id.* at 799.  Wexford maintains that *Heller* is an absolute bar to liability in this case because the jury's finding in favor of Dr. Funk conclusively shows that there is no constitutional harm for which Wexford could be liable.

The Seventh Circuit has clarified, however, that *Heller* does not sweep as broadly as Wexford contends.  In *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293 (7th Cir. 2010), the Seventh Circuit considered whether the county could be

held liable even though its individual officers were found not to have committed a constitutional violation. The court rejected the county's argument, calling it "an unreasonable extension of *Heller*." *Id.* at 305. The court held that an entity does *not* escape liability whenever the individual officers are found not liable, but only when those two findings together "would create an *inconsistent* verdict." *Id.* And whether the verdict is inconsistent depends, in turn, on "the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Id.*

*Thomas* establishes that the verdict in this case is consistent. In *Thomas*, as here, the plaintiff alleged that he was unconstitutionally denied medical care, which requires showing both that the plaintiff's medical condition was objectively medically serious and that the defendants acted with a sufficiently culpable state of mind. *Thomas*, 604 F.3d at 305; *see also Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). In this context, "the jury could have found that [the individual defendants] were not *deliberately indifferent* to [the plaintiff's] medical needs, but simply could not respond adequately because of the well-documented breakdowns in the [entity defendant's] policies . . . ." *Thomas*, 604 F.3d at 305. In other words, the two verdicts are not inconsistent because the jury might have concluded that Dr. Funk lacked the requisite mental state for liability but that Wexford's policies were nonetheless responsible for a violation of Hall's constitutional rights.

This conclusion finds further support in *Glisson v. Indiana Department of Corrections*, 849 F.3d 372 (7th Cir. 2017) (en banc). *Glisson* involved a suit under section 1983 alleging that the medical staff and the company providing health services in an Indiana prison were deliberately indifferent to the decedent's serious medical

needs. The district court dismissed the *Monell* claims against the defendant entity after

it granted summary judgment in favor of the individual defendant doctors and nurses.

The Seventh Circuit reversed, noting that the "case well illustrates why an organization

might be liable even if its individual agents are not. . . . [I]f institutional policies are

themselves deliberately indifferent to the quality of care provided, institutional liability is

possible." *Id.* at 378. *Glisson* therefore clearly establishes that entities may be liable

under *Monell*, particularly in the context of denial of medical care, even when the entity's

agents have not personally committed a constitutional violation.

Wexford's effort to distinguish *Glisson* is unavailing. First, Wexford's observation

that four judges dissented from the *en banc* opinion does not constitute a basis for this

Court to disregard recent, binding precedent. In any case, the dissent's dispute with the

majority concerned the sufficiency of the *evidence* of the defendant entity's indifference

and its causal relationship to the harm—not the underlying premise that the entity may

be liable even when individual officers are not. *See id.* at 383 (Sykes, J., dissenting).

Second, Wexford points out that *Glisson* involved multiple individual defendants

and an allegation that the entity failed to appropriately coordinate group care. This

distinction is similarly immaterial. *Glisson*'s fundamental similarity to this case is simply

that "none of the individual providers . . . personally did anything that would qualify as

'deliberate indifference' for Eighth Amendment purposes," *id.* at 375, which is what the

jury found here. *See also Miranda v. County of Lake*, 900 F.3d 335, 344 (7th Cir. 2018)

(citing *Glisson* for the proposition that "*Monell* liability is possible even if no individual

official is found deliberately indifferent"). The Seventh Circuit concluded that

notwithstanding a finding in favor of the individual defendants, a reasonable jury

nonetheless could have found the entity defendant liable under *Monell.* The same is true here.

The contrary authority Wexford cites does not undermine the rule in *Thomas* and *Glisson.* In *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658 (7th Cir. 2016), for example, the Seventh Circuit noted that "if the plaintiff's theory of *Monell* liability rests entirely on individual liability . . . negating individual liability will automatically preclude a finding of *Monell* liability." *Id.* at 664. But that observation is entirely consistent with *Thomas* and its application to this case: what matters is whether the *Monell* claim is fully dependent on the individual claim, or whether it can survive a finding in favor of the individual defendant. Indeed, the facts of *Whiting* furnish a useful contrast. There, the plaintiff's theory of *Monell* liability asserted that the individual defendant was acting as the policymaker on behalf of the entity when he committed the alleged harm. *Id.* at 664. Under that theory, there could be no *Monell* liability unless the individual defendant is also liable. But this case presents no such equivalence between the two theories of liability. Instead, Hall's claim of *Monell* liability rested on evidence that Wexford had a policy or practice of denying surgeries it deemed "elective" irrespective of the patient's medical needs. The existence of that policy, and the possibility that it caused Hall to be denied necessary medical care, are logically independent of the question of whether Dr. Funk possessed a culpable mental state.

The other Seventh Circuit cases that putatively contradict *Thomas* are distinguishable because they concern allegations of excessive force. *See Sallenger v. City of Springfield*, 630 F.3d 499 (7th Cir. 2010); *Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007); *Thompson v. Boggs*, 33 F.3d 847 (7th Cir. 1995). These cases differ

crucially from cases about the denial of medical care because excessive force claims do
not have a subjective element. *See McDonald by McDonald v. Haskins*, 966 F.2d 292,
292-93 (7th Cir. 1992) (describing the "purely objective test for excessive force claims").
As explained above, this subjective element—deliberate indifference—constitutes the
basis on which the jury reached divergent findings on the liability of Wexford and Dr.
Funk. (Concededly, the court in *Sallenger* also dismissed in passing the possibility of
*Monell* liability without individual liability in the denial-of-medical-care context.
*Sallenger*, 630 F.3d at 505. But that argument was not presented to the court, whereas
the contrary holdings of *Thomas* and *Glisson* analyze the issue squarely and in
significant detail. *Thomas* and *Glisson* therefore control this case, especially given their
factual similarity to the denial of medical care in this action.)

## 2. Consistency with the jury instructions

The jury's verdict also conforms to the instructions. The Court gave the jury the
following instructions with respect to counts 1 (the individual constitutional claim against
Dr. Funk) and 3 (the *Monell* claim against Wexford):

**First claim – failure to provide medical care (Dr. Funk)**

To succeed on his first claim, which is against Dr. Funk, Mr. Hall must
prove each of the following four propositions by a preponderance of the
evidence:
1. Mr. Hall had a serious medical need. A serious medical need is a
   condition that a doctor says requires treatment, or that is so obvious
   that even someone who is not a doctor would recognize it as requiring
   treatment.
2. Dr. Funk was aware that Mr. Hall had a serious medical need. You
   may infer this from the fact that the need was obvious.
3. Dr. Funk consciously failed to take reasonable measures to provide
   treatment for Mr. Hall's serious medical need. Delaying treatment may
   constitute a failure to take reasonable measures if the delay
   unnecessarily prolonged Mr. Hall's pain. In deciding whether Dr. Funk
   consciously failed to take reasonable measures, you may consider the

seriousness of Mr. Hall's medical need, how difficult it would have been
for Dr. Funk to provide treatment, and whether Dr. Funk had legitimate
reasons related to safety or security for failing to provide treatment.

4. As a result of Dr. Funk's actions or inaction, Mr. Hall was harmed. Mr.
Hall may establish this by showing that he suffered prolonged,
unnecessary pain.

[. . .]

### Third claim – failure to provide medical care (Wexford)

To prevail on his third claim, which is against Wexford, Mr. Hall must
prove each of the following three propositions by a preponderance of the
evidence:

1. Dr. Funk failed to provide medical care to Mr. Hall, as described in the
instructions regarding Mr. Hall's first claim.
2. At the time, Wexford had a policy of refusing to allow inmates at the
Northern Reception Center (NRC) to receive surgeries deemed to be
elective.
3. Wexford's policy caused Dr. Funk to fail to provide medical care to Mr.
Hall as described in the instructions regarding Mr. Hall's first claim.

Dkt. no. 207, at 11, 13. Wexford contends that the *Monell* instruction, which refers to

the failure "to provide medical care to Mr. Hall as described in the instructions regarding

Mr. Hall's first claim," incorporates the requirement that Dr. Funk acted with deliberate

indifference. As a result, Wexford argues, the jury instructions prohibited the jury from

both finding in favor of Dr. Funk and finding Wexford liable.

This argument mischaracterizes the *Monell* instruction. The reference to count 1

specifically refers to Dr. Funk's conduct—that is, his "failure to provide medical care"—

and not to his subjective mental state. By its express terms, the *Monell* instruction

required the jury only to find that Dr. Funk failed to provide medical care, and not that he

acted with deliberate indifference. It was therefore consistent with this instruction for the

jury to find Wexford liable while also finding in favor of Dr. Funk.

Finally, the Court acknowledges that there may be an argument that the *Monell*

instruction misstated the law by failing to require the jury to find that Wexford's policies

were themselves deliberately indifferent. But Wexford did not raise this objection at

trial—indeed it agreed to the *Monell* instruction and did not propose an alternative—and

it does not make this objection even now. To the contrary, Wexford argues that

*Thomas* does not apply and, by implication, that an instruction based on *Thomas* would

have been erroneous. Wexford therefore has waived any issue based on potential error

in the *Monell* instruction.

### 3. Sufficiency of the evidence

Wexford also argues that it is entitled to judgment as a matter of law because the

evidence presented at trial was insufficient to permit a reasonable jury to find that Dr.

Funk had been deliberately indifferent. The cases discussed in the previous section

show, however, that this is the wrong question. Dr. Funk's deliberate indifference is not

essential to Wexford's liability. For example, the evidence that Wexford contends

shows that Dr. Funk's treatment decision was not a substantial departure from accepted

medical standards is relevant only to Dr. Funk's alleged deliberate indifference, not to

Wexford's liability. *See McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (explaining

that the "substantial departure" standard is relevant to determine only whether a

defendant medical professional acting in a professional capacity was deliberately

indifferent). Wexford's sufficiency argument is therefore best understood simply as

another challenge to the consistency of the verdict. Because the Court concludes that

the jury's verdict is not inconsistent for the reasons set forth above, Wexford is not

entitled to judgment or a new trial on that basis.

### B. Motion for a new trial

In addition to its motion for judgment as a matter of law, Wexford has moved in

the alternative for a new trial. Federal Rule of Civil Procedure 59 permits the court to grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "A new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice of where the verdict, on the record, cries out to be overturned or shocks our conscience." *Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017).

### 1. Confusing jury instructions

Wexford first argues that it is entitled to a new trial because the jury instructions were confusing. A party who seeks a new trial based on an allegedly faulty jury instruction must show that the "instruction misstates the law in a way that misguides the jury to the extent that the complaining party suffered prejudice." *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 381 (7th Cir. 2018) (internal quotation marks omitted). The moving party must show both confusion *and* prejudice; "[e]ven if we believe that the jury was confused or misled, we would need to find that the defendants were prejudiced before ordering a new trial." *Jimenez v. City of Chicago*, 732 F.3d 710, 717 (7th Cir. 2013).

As a threshold matter, Wexford has waived its objections to the jury instructions by failing to raise them at trial despite being given the opportunity to do so. Fed. R. Civ. P. 51(c); *Schmitz v. Canadian Pacific Ry. Co.*, 454 F.3d 678, 683 (7th Cir. 2006) ("Rule 51 . . . forecloses a party from claiming instructional error unless he properly objects to the giving or withholding of a requested instruction.") As explained above, Wexford never objected to the alleged deficiencies in the *Monell* instructions that it argues warrant a new trial; indeed, Wexford agreed to the instruction and did not propose any

11

alternative. The Court therefore finds that Wexford has waived these objections.

But even if Wexford had properly objected to the jury instructions, it has not shown that it is entitled to a new trial. First, even now, Wexford does not argue that the *Monell* instruction was legally erroneous. Instead, it contends that the instruction was legally accurate but that the jury failed to follow it. *See* Wexford's Mot., dkt no. 220, at 11. Without showing that the instruction misstated the law, Wexford cannot prevail on its motion for a new trial. *See Guzman v. City of Chicago*, 689 F.3d 740, 745 (7th Cir. 2012) ("This inquiry requires us first to determine whether an instruction misstates or insufficiently states the law . . .").

Second, even if the Court were to charitably read Wexford's motion as implicitly alleging error in the *Monell* instruction, Wexford's legal theory is incorrect. Again, Wexford's contention—its only contention—is that the instruction failed to tie its liability to a finding of individual liability regarding Dr. Funk. As the Court previously discussed, the Seventh Circuit's decisions in *Thomas* and *Glisson* show that *Monell* liability does not depend on individual liability in this case. Indeed, *Thomas* and *Glisson* make clear that an instruction tethering Wexford's liability to Dr. Funk's individual liability would have been erroneous.[1]

Third, Wexford argues that the fact that the jury submitted questions to the Court asking to clarify the relationship between the two counts is evidence of confusion. Although the jury may have been confused initially, the Court's responses to the jury's questions were accurate and appropriate. The jury's first note stated that they were

---

[1] As the Court previously noted, if there was any error in the *Monell* instruction, it was the failure to instruct the jury on the standard for Wexford's deliberate indifference. But Wexford did not argue this before, and it does not argue it now.

"unable to come to agreement on #3 of the first claim," and that they did not "think [they could] decide the subsequent claims" until they had done so. Dkt. no. 214. In response, the Court re-read the final instruction and instructed the jury to continue deliberating. Trial Tr., dkt. no. 220-4, at 655-56. The jury's second note asked whether they could "come to agreement on" the *Monell* claim "[i]f we can't agree on the first claim." Dkt. no. 215. In response, the Court wrote a note stating that it could not give further instructions on that question and asking the jurors to rely on the instructions they had already been given. *Id.* Because the original instructions accurately reflected that Wexford could be liable independently of Dr. Funk's liability, the Court's responses referring the jury to the original instructions were appropriate. *See United States v. Mealy*, 851 F.2d 890, 902 (7th Cir. 1988) ("If the original jury charge clearly and correctly states the applicable law, the judge may properly answer the jury's question by instructing the jury to reread the instructions.").

After the jury returned its verdict, the Court initially believed the verdict was inconsistent, told the jury this, and instructed the jury to continue deliberating. Trial Tr., dkt. no. 220-4, at 673. Shortly thereafter, the jury submitted its final note, which stated, "Page 9 says, you must consider each claim separately, which is what we did, separate defendants, and we found against Wexford but not Funk. Why is this not okay?" *Id.* at 674. This note suggests that the jury correctly understood that counts 1 and 3 were independent of one another and that Wexford's liability did not depend on Dr. Funk's liability.

Finally, even if the jury's questions evince some degree of confusion on the part of some jurors, for the reasons previously discussed, Wexford has not shown that it was

13

prejudiced by the misstatement of the law it claims: under the law as it applied in this case, Wexford's liability did not depend on Dr. Funk's individual liability. Confusion without prejudice does not warrant a new trial. *Jimenez*, 732 F.3d at 717.

## 2.    Evidentiary arguments

Wexford also argues that a new trial is required because of the Court's decision to exclude certain evidence. When considering evidence that was allegedly wrongfully excluded, a "new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice." *Burton v. City of Zion*, 901 F.3d 772, 776 (7th Cir. 2018) (internal quotation marks omitted). The party seeking a new trial must "show that an average juror would have found the omitted evidence persuasive." *Id.* If the evidentiary rulings do not warrant a new trial when considered individually, they may nonetheless justify a new trial based on "cumulative prejudice," which "occurs when (1) . . . multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered the trial fundamentally unfair." *Thompson v. City of Chicago*, 722 F.3d 963, 979 (7th Cir. 2013) (internal quotation marks omitted) (alteration in original).

### a.    Felony conviction

Wexford argues that it should have been permitted to introduce evidence that Hall was in prison in connection with a firearm-related felony. This argument is unpersuasive given that the Court permitted Wexford to introduce evidence that Hall was a parole violator who was in prison for a felony at all relevant times. To the extent that Wexford objects to Hall's attorneys characterizing him as a "victim of happenstance," Wexford's Mot., dkt. no. 220, at 14, the evidence that he was in prison

14

because he committed a felony suffices to rebut that inference. The Court admitted the relevant part of the evidence, which was sufficient to prevent any prejudice to the Wexford.

Wexford further argues, however, that the *nature* of the conviction had special importance because it "provides a window into Hall's mind; specifically, the weight and importance that he placed upon the second-stage surgery to correct the defect, and the alleged emotional state he was in." Wexford's Reply Br., dkt. no. 227, at 8. But Wexford has failed to explain what is uniquely significant about the fact that Hall was in prison on a firearms conviction, and the suggestion that the nature of his felony has any bearing on his view of the importance of the surgery is speculative and unsupported. More plausible is that Wexford hoped to introduce this evidence to imply that Hall had a character for criminality. As this Court noted in an earlier ruling, this evidence is "irrelevant and grossly and unfairly prejudicial," Order of April 7, 2018, dkt. no. 199, at 6, and its exclusion does not warrant a new trial.

> ### b.  Self-inflicted wound

Wexford also argues that it is entitled to a new trial because the Court excluded evidence that Hall's gunshot wound was self-inflicted. Wexford asserts that this evidence would have shown that Hall did not primarily suffer embarrassment because of the hole in the base of his penis that required him to self-catheterize in front of other prison inmates every day, but because he shot himself.

This argument lacks any evidentiary basis. First, Wexford cites the following deposition testimony:

> Q:    Sure. Were they ridiculing you because you had shot yourself or were they ridiculing you because of the catheterization?

[objections omitted]

A:    What I am sure of, they was harassing me and stuff due to the fact that I had to self-catheterize and sit and use it as a woman. And, you know, they was making all type of disturbing remarks.

Hall Dep., dkt. no. 220-6, at 60:1-8. Wexford presents this testimony as evidence that Hall was embarrassed by having shot himself, but it plainly says the opposite. In its reply brief, Wexford reframes its argument to assert that because Hall failed to say that the inmates did not know that he had shot himself (information the question did not ask for), the other inmates must have known, and therefore they must have made fun of him for that reason. In fact, Hall expressly identified the cause of his harassment and embarrassment, which was that he had to self-catheterize. Any other inferences from this testimony are wildly speculative at best.

Second, Wexford cites the deposition testimony of Dr. Tiger Devore, an expert witness for the plaintiff, that a self-inflicted gunshot wound would produce a different emotional response than being shot by someone else. It argues that cross-examining Dr. Devore about the psychological effect of a self-inflicted gunshot wound would have undermined Dr. Devore's conclusions about the cause of his psychological harm. In fact, Wexford did cross-examine Dr. Devore about Hall's preexisting psychological issues and argued in its closing that these factors caused his psychological injuries. Wexford offers no explanation or evidence suggesting that excluding the self-inflicted nature of the wound had a substantial and injurious effect on the jury's determination.

As the Court noted in an earlier ruling, the evidence that the gunshot wound was self-inflicted "is entirely irrelevant regarding what medical treatment was or was not appropriate," and its admission would work "unfair prejudice" that "far outweighs any minuscule probative value it might have." Order of April 7, 2018, dkt. no. 199, at 6.

16

Considering this substantial risk of unfair prejudice, even if the evidence that the wound is self-inflicted were probative, Wexford has failed to explain why excluding that evidence was so injurious as to be "inconsistent with substantial justice." *Burton*, 901 F.3d at 776.

Finally, even if the Court were to find that excluding both pieces of evidence—the nature of Hall's felony conviction and the self-inflicted gunshot wound—was erroneous, their exclusion, considered together, does not constitute "cumulative prejudice" sufficient to "render[] the trial fundamentally unfair." *Thompson*, 772 F.3d at 979.

## C.     Attorney's fees and bill of costs

Having concluded that Wexford is not entitled to a new trial or judgment as a matter of law, the Court turns to Hall's motion for attorney's fees and bill of costs.

### 1.     Attorney's fees

In an action under 42 U.S.C. § 1983, the district court "may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b); *Capps v. Drake*, 894 F.3d 802, 804 (7th Cir. 2018). The starting point for determining a reasonable attorney's fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Thorncreek Apartments III., LLC v. Mick*, 886 F.3d 626, 638 (7th Cir. 2018). In cases brought by a prisoner, however, the attorney's fee is limited by statute in two respects. First, the total fee may not exceed 150% of the damages award. 42 U.S.C. § 1997e(d)(2). Second, the prisoner's attorney must recover 25% of the fee award from their client's judgment. *Id*.

Hall has moved to recover $531,250 in attorney's fees. Because Hall was awarded $425,000, this amount complies with 42 U.S.C. § 1997(d)(2) because it equals

150% of the damages award less 25%. Wexford does not dispute that a fee of $531,250 is permitted under the statute.

Wexford also agrees that the requested attorney's fee is reasonable given the significant number of hours Hall's attorneys invested in this case over the past three years. Hall has submitted timesheets showing that the attorneys, paralegals, and project assistants working on his case billed nearly 5,000 hours at a total value exceeding $3 million. The Court need not determine whether $3 million is a reasonable fee because it is almost six times the statutory maximum that Hall is permitted to recover. The Court finds that Hall's requested fee is reasonable and awards an attorney's fees in the amount of $531,250.

## 2. Bill of costs

Federal Rule of Civil Procedure 54 instructs that "costs—other than attorney's fees—should be allowed to the prevailing party" unless "a court order provides otherwise." Fed. R. Civ. P. 54(d)(1). By statute, recoverable costs include (1) fees of the clerk and marshal; (2) fees for transcripts necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for copies necessarily obtained for use in the case; (5) docket fees; and (6) compensation of court appointed experts and interpreters. 28 U.S.C. § 1920; *Republic Tobacco Co. v. N. Atlantic Trading Co.*, 481 F.3d 442, 447 (7th Cir. 2007). The losing party bears the burden of showing that taxed costs are not appropriate. *Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 864 (7th Cir. 2005).

Hall's bill of costs claimed $30,601.49 in expenses, of which Wexford disputes $14,216.64.

### a. Service of summons and subpoenas

First, Wexford objects to $1,245 in costs for the service of subpoenas. It argues

that because Hall used a special process server (instead of serving subpoenas by

certified mail) and has not demonstrated the necessity of doing so, he may not recover

any of those costs. Second, Wexford argues that Hall may only recover trial subpoena

costs for witness who testified at trial, and that the subpoena costs for several non-

testifying witnesses must be denied as unnecessary.

Hall is entitled to recover the full $1,245 in subpoena service costs. Costs arising

from the use of special process servers are recoverable so long as they do not exceed

the rate that the U.S. Marshals Service would have charged. *Hillman v. City of Chicago*,

No. 04-CV-6671, 2017 WL 3521098, at *9 (N.D. Ill. Aug. 16, 2017) (citing *Collins v.

Gorman*, 96 F.3d 1057, 1060 (7th Cir. 1996)). Hall's bill of costs satisfies this

requirement because it charges the lesser of the U.S. Marshals Service's rate and the

actual amount paid to the process servers. *See* Pl.'s Ex. A., Summ. of Costs, dkt. no.

229-1, at 1. And Hall is not limited to recovering service fees for witnesses who testified

at trial; he may recover the costs of serving subpoenas to any witnesses whose

testimony was "necessary at the time [it was] sought." *Ayala v. Rosales*, No. 13-CV-

04425, 2016 WL 2659553, at *3 (N.D. Ill. May 9, 2016). Hall argues that he listed all the

subpoenaed witnesses on his pretrial disclosures and intended to call them at trial.

Wexford's conclusory allegation that these witnesses were "unnecessary" does not

satisfy its burden to show that the service costs are inappropriate.

### b. Transcripts

Hall seeks $18,097.06 for the costs of obtaining deposition and trial transcripts.

19

Wexford objects only to certain costs associated with deposition transcripts. It argues that some categories of expenses—that is, the costs of video recordings, court reporter attendance fees, deposition exhibits, and delivery, shipping, and handling—are non-recoverable. It also argues that Hall's per-page rate improperly exceeds the limits imposed by the fee schedule of the United States Judicial Conference in violation of Northern District of Illinois Local Rule 54.1(b).

With several exceptions, Wexford's objections to the transcript costs are generally unfounded. First, comparing the invoices to Hall's schedule of costs reveals that Hall is not seeking to recover the costs of conducting or obtaining video recordings. *See* Pl.'s Ex. A, Summ. of Costs, dkt. no. 229-1, at 1-2; Pl.'s Ex. B, Dep. & Trial Tr. Invoices, dkt. no. 229-2.

Second, it is simply untrue as a matter of law that Hall may not recover the attendance fee or the cost of obtaining deposition exhibits. The Seventh Circuit has held that the district court has discretion to award costs "'incidental' to the taking of the depositions, . . . such as per diem and delivery charges by the court reporter." *Finchum v. Ford Motor Co.*, 57 F.3d 526, 534 (7th Cir. 1995). And "[c]ourts in this district have found costs associated with deposition exhibits taxable on the ground that exhibits are essential to understanding the content of a deposition, especially in a complex and heavily litigated case." *Springer v. Ethicon, Inc.*, No. 17 C 3930, 2018 WL 1453553, at *14 (N.D. Ill. Mar. 23, 2018) (internal quotation marks omitted). Though deposition exhibits are non-recoverable when the party was already in possession of those exhibits, *Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 456 (7th Cir. 1998), Wexford has not shown or even alleged that Hall was already had the exhibits in

question.

Third, Wexford is mistaken about the nature of Hall's requested transcript costs. A review of Hall's invoices and the schedule of costs reveals that, in general, Hall has properly adjusted those costs to align with the United States Judicial Conference schedule of costs by calculating an adjusted total using the maximum allowed per-page rate of $3.65 for original transcripts. *See* Pl.'s Ex. A, Summ. of Costs, dkt. no. 229-1, at 1-2; Pl.'s Ex. B, Dep. & Trial Tr. Invoices, dkt. no. 229-2; U.S. Courts, Federal Court Reporting Program, http://www.uscourts.gov/services-forms/federal-court-reporting-program#rates (last visited Mar. 11, 2019).

Hall's request includes a few errors, however. The schedule for the deposition transcripts of Hall, Allen Chernoff, Tiger Devore, and Jaclyn Milose improperly request a per-page rate of $3.65, even though this is the authorized rate for original transcripts and Hall's attorneys obtained copies. Adjusting the costs for those transcripts according to the $.90-per-page rate for copies yields a total combined cost of $648.00 for those four transcripts, rather than the requested $2,066.99. But Hall also under-charged for the deposition transcript of David Mathis because of an apparent typographical error. The requested cost of that transcript—$8.69—should instead be $868.70.

Hall also improperly requests court reporter attendance fees that exceed the maximum rates set by the Clerk, which are "$110 for one half day (4 hours or less), and $220 for a full day attendance fee." Northern District of Illinois, Transcript Rates, http://www.ilnd.uscourts.gov/Pages.aspx?page=transcriptrates (last visited Mar. 11, 2019). Adjusting the requested attendance fees to conform to these rates reduces the cost from $3,250 to $1,870.

Finally, Wexford is correct that a plaintiff generally may not recover the "costs associated with delivering, shipping, or handling transcripts," which "are typically non-recoverable ordinary business expenses." *Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, No. 13 C 321, 2016 WL 316865, at *3 (N.D. Ill. Jan. 26, 2016). Because Hall has not shown that the shipping and handling costs associated with the deposition transcripts are reasonable and necessary, rather than simply for his attorneys' convenience, he is not entitled to $329.50 in delivery costs.

After correcting Hall's per-page and court reporter attendance rates to conform to the applicable fee schedules and deducting the costs for shipping and handling, the Court concludes that Hall is entitled to $14,409.59 for the total cost of transcripts.

### c. Printing, duplication, and data

Hall claims $9,608.96 in expenses related to printing, duplication, and data. Wexford objects to that entire amount, arguing that Hall has not adequately demonstrated the necessity of each of the expenses.

A party seeking to recover printing and data costs need provide only "the best breakdown obtainable from retained records." *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 643 (7th Cir. 1991). The Seventh Circuit has held in an analogous context that an affidavit attesting to the necessity of the costs is sufficient. *Nat'l Org. for Women v. Scheidler*, 750 F.3d 696, 698 (7th Cir. 2014) (observing that "[n]o sensible legal system requires parties to waste $60 of lawyers' time to explain spending $6 on making a copy of something"). But a court cannot award any copying costs "unless it has some confidence that the costs are, in fact, recoverable, reasonable, and not incurred merely for the convenience of counsel." *Springer*, 2018

22

WL 1453553, at *17.

The breakdown Hall attached to his bill of costs is deficient because it does not specify the purpose of each expense, and Hall's attorneys have not submitted an affidavit attesting to their necessity. Without this information—or at least one or the other—the Court cannot verify the propriety of the printing costs to ensure that they are not duplicative or solely for the attorneys' convenience. Hall has attempted to shore up his request by submitting an additional summary of the printing and data invoices that ties each expenditure to a corresponding phase of the litigation. *See* Pl.'s Ex. 1, Add'l Summ. of Pl.'s Invoices for Printing & Copying Costs, dkt. no. 231-1. But this supplemental exhibit also lacks appropriate verification, and it does not offer any means of vetting the necessity of the costs.

Without providing evidence that the costs were necessary, Hall cannot recover full amount requested for printing, duplication, and data costs. Given the history of this case, the Court concludes that Hall's request for $9,608.96 in costs for printing, duplication, and data is excessive. The Court will award $3,202.99 in printing costs, or one-third of the requested amount.

### d. Witness expenses

Wexford's final objection to the bill of costs concerns the witness fees for Allen Chernoff, Ervin Kocjancic, Anna McBee, and Rose Perry. It argues that because those witnesses did not testify, Hall may not recover the corresponding witness fees. First, Wexford is mistaken with respect to Perry, who did in fact testify. Second, witness fees are recoverable as long as the "witness's attendance was reasonably expected to be necessary, and if that witness was ready to testify." *Huerta v. Village of Carol Stream*,

23

No. 09 C 1492, 2013 WL 427140, at *4 (N.D. Ill. Feb. 4, 2013). Hall argues that these witnesses were listed on his pretrial disclosures and that he intended to call them; Wexford has not shown otherwise. Hall is entitled to the requested $433.52 in witness fees.

### Conclusion

For the foregoing reasons, the Court denies defendant Wexford's motion for judgment as a matter of law or a new trial [dkt. no. 220]. The Court grants plaintiff's motion for attorney's fees of $531,250 and also awards plaintiff costs in the amount of $20,508.05 [dkt. nos. 228, 229].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 18, 2019

24

# EXHIBIT "F"

# MARSHALL DENNEHEY
## WARNER COLEMAN & GOGGIN

ATTORNEYS-AT-LAW    WWW.MARSHALLDENNEHEY.COM

A  P R O F E S S I O N A L   C O R P O R A T I O N
2000 Market Street, Suite 2300, Philadelphia, PA 19103
(215) 575-2600  Fax (215) 575-0856

Direct Dial:  (215) 575-2688
Email: eafitzgerald@mdwcg.com

| | |
|---|---|
| **PENNSYLVANIA** | **OHIO** |
| Allentown | Cincinnati |
| Doylestown | Cleveland |
| Erie | |
| Harrisburg | **FLORIDA** |
| King of Prussia | Ft. Lauderdale |
| Philadelphia | Jacksonville |
| Pittsburgh | Orlando |
| Scranton | Tampa |
| **NEW JERSEY** | **NEW YORK** |
| Mount Laurel | Long Island |
| Roseland | New York City |
| | Westchester |
| **DELAWARE** | |
| Wilmington | |

June 4, 2019

**VIA EMAIL [slamden@nge.com]**
Seth D. Lamden, Esq.
Neal Gerber & Eisenberg LLP
2 LaSalle Street
Suite 1700
Chicago, IL  60602-3801

Re:    **Insured:  The Bantry Group Corp., D/B/A Wexford Health Sources, Inc. and Ballymore**
       **Medical Management**
       **Claimant : Lamont Hall**
       **Policy No.: SM903254**
       **Claim No.: SM273337**

Dear Mr. Lamden:

I have been retained as coverage counsel for Evanston Insurance Company in the above-referenced matter.  I am directing Evanston's Reservation of Rights to you directly as counsel for Wexford Health Sources and on your representation that you are authorized to receive this letter on behalf of Wexford and Dr. Funk.

I am writing with regard to the judgment entered against Wexford Health Sources ("Wexford") entered in the USDC Northern District of Illinois on April 16, 2019, in the amount of $425,000, and the award of attorneys' fees in the amount of $551,758.05 entered March 18, 2019.  Evanston was recently placed on notice of Plaintiff's filing of a Citation to Discover Assets against Wexford with regard to the judgment, which is currently on appeal.

In the course of its continued defense of Wexford in the Lamont Hall matter, Evanston will reimburse Wexford for the reasonable and market competitive costs of an appeal bond to stay any judgment pending its appeal to the Fifth Circuit Court of Appeals.  Under the terms of the policy, Wexford is obligated to apply for and furnish the bond in the first instance.  Evanston's agreement to reimburse the reasonable costs of the bond, together with its continued defense of Wexford, is subject to a reservation of rights.   Evanston is reserving its rights to disclaim indemnity for the judgment entered against Wexford and also for reimbursement of defense fees and costs incurred on behalf of Wexford and Dr. Funk from June 1, 2016 to the present and continuing throughout the course of the appeal.

Evanston is reserving rights for a number of reasons.  First, the damages award includes $300,000 in punitive damages.  The Evanston policy provides coverage for punitive damages only where such damages are

Seth D. Lamden, Esq.
June 4, 2019
Page 2

assessed vicariously against Wexford. Insofar as the jury in the Hall action assessed damages against Wexford only, these damages are not vicarious and the punitive damage award is not covered by the terms of the Evanston policy and as a matter of law.

Second, Evanston's total exposure for both defense and indemnity is capped at $120,000 by virtue of its correspondence dated June 1, 2016, invoking the policy's "Limit of Liability- Reduction for Refusal to Settle" condition. The terms of the condition are set forth in full in Evanston's letter, a copy of which is provided herewith for your convenience.

If you currently have any information which you feel would cause Evanston to reconsider this Reservation of Rights, please forward any such information to the undersigned at your earliest convenience. Please note that Evanston's review of any additional information or documentation is not a waiver of the terms of this Reservation of Rights. Additionally, Evanston reserves the right to supplement this letter with any further terms and conditions in the Evanston policy as may apply to this matter.

Thank you for your attention to this matter. Should you have any questions, please do not hesitate to contact me.

Very truly yours,

*Eric A. Fitzgerald*

Eric A. Fitzgerald, Esq., CPCU, CLU

EAF

LEGAL/123021109.v1